# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JASON ALEJANDRO AGUIRRE,
Defendant and Appellant.

S175660

Orange County Superior Court
07ZF0003

August 28, 2025

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Kruger, Groban, and Jenkins concurred.

Justice Liu filed a dissenting opinion, in which Justice Evans concurred.

Justice Evans filed a dissenting opinion, in which Justice Liu concurred.

PEOPLE v. AGUIRRE

S175660


Opinion of the Court by Guerrero, C. J.


A jury found defendant and appellant Jason Alejandro Aguirre guilty of murder (Pen. Code, § 187, subd. (a), count 1),[1] two counts of attempted murder (§§ 664, subd. (a), 187, subd. (a), counts 2 and 3), and active participation in a criminal street gang (§ 186.22, subd. (a), count 4).  The jury also found that defendant:  (1) personally discharged a firearm, causing great bodily injury or death, in connection with the murder and one (count 2) of the attempted murder charges (§ 12022.53, subd. (d));  (2) personally discharged a firearm in connection with both of the attempted murder charges (§ 12022.53, subd. (c));[2] and (3) committed the charged murder and both attempted murders for the benefit of a criminal street gang, Dragon Family and Dragon Family Junior (§ 186.22, subd. (b)(1)).  The jury also found true a special circumstance allegation that the murder was in furtherance of the activities of a criminal street gang.  (§ 190.2, subd. (a)(22).)  The jury found not true a sentence enhancement allegation attached to the second attempted murder count in which the People alleged that defendant had personally discharged a firearm, causing great

---

[1]    All subsequent undesignated code references refer to the Penal Code.

[2]    As to count 2, this finding was later stricken by the trial court on the ground that section 12022.53, subdivision (c) is a lesser included enhancement of section 12022.53, subdivision (d).

1

bodily injury. (§ 12022.53, subd. (d).) In a bifurcated bench trial, the trial court determined that defendant had been convicted of a felony violation of former section 12025, subdivisions (a)(1) and (b)(3), and on that basis found defendant guilty of possessing a firearm as a convicted felon. (Former § 12021, subd. (a)(1); count 5.)[3] At the penalty phase of trial, the jury returned a verdict of death. The trial court denied defendant's automatic motion to modify the verdict. (§ 190.4, subd. (e).) This appeal is automatic. (§ 1239, subd. (b); Cal. Const., art. VI, § 11, subd. (a).)

We reverse the judgment of death because of retroactive changes in the law made by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699) (Assembly Bill 333). This legislation increased the showing that must be made to prove a " 'pattern of criminal gang activity' " (§ 186.22, subd. (e)(1)), an element of the crime of active participation in a criminal street gang as well as the gang enhancements and the gang-murder special-circumstance allegation that were found true in this case. The Attorney General acknowledges that this case, which was tried in 2009, was not decided under this heightened standard for proving a pattern of criminal gang activity, and he concedes that this error prejudiced defendant. Our review of the

---

[3] The reporter's transcript of the bench trial does not reflect that the court made any finding regarding the gang enhancement allegation (§ 186.22, subd. (b)(1)) that was attached to this count. Almost a year after the trial, a "nunc pro tunc" entry was made to the minute order for the trial, providing that the court had found this enhancement true. Any inconsistency in this respect is of no consequence because, as explained *post*, we conclude that all of the gang enhancements that were found true must be reversed due to instructional error.

record leads us to accept this concession as well-taken, as we cannot conclude with the necessary confidence that any rational fact finder, properly instructed, would have convicted defendant of active participation in a criminal street gang or found the gang enhancements or the gang-murder special-circumstance allegation to be true. The conviction for active participation in a criminal street gang and all of the gang enhancement and gang-murder special-circumstance findings therefore must be reversed. Because the gang-murder special circumstance was the only special circumstance allegation in this case, the judgment of death must also be reversed.

We otherwise affirm the judgment. In seeking reversal of his convictions, defendant asserts error under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) during jury selection. He also argues that prejudicial error occurred at trial due to the allegedly insufficient corroboration of accomplice testimony; the trial court's failure to instruct the jury sua sponte regarding third party culpability and its refusal to grant a continuance so the defense might further investigate a DNA testing error; the admission of statements linked to him that, defendant contends, constituted protected creative expressions (see Evid. Code, §§ 352, 352.2); the trial court's refusal to exclude a witness from trial proceedings; and alleged prosecutorial misconduct at closing argument. We conclude that all of these arguments, to the extent they have been preserved, are meritless.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

One evening in August 2003, a member of the Dragon Family/Dragon Family Junior gang[4] mistook a group of five family members arriving at an Orange County restaurant for members of a rival gang. He called a fellow gang member and told him to come to the restaurant to instigate a fight. Several Dragon Family/Dragon Family Junior gang members eventually went to the restaurant. They spotted the perceived rivals, and after waiting for the family to finish and drive off, followed them from the restaurant in multiple cars. The family soon noticed they were being pursued. They turned their vehicle into a residential cul-de-sac, parked in a driveway, and turned off the lights. The family's vehicle was spotted by their pursuers, one of whom drove his car into the cul-de-sac. An occupant of that vehicle then exited, walked up to the victims' car, and fired several shots into the passenger compartment. These shots killed 13-year-old Minh Tran, leading to the murder charge in this case, and wounded his brother and a cousin, leading to the two attempted murder charges. The shooter and the other gang members then left the scene. Some of the Dragon Family/Dragon Family Junior members involved in the incident were quickly apprehended. Defendant was arrested in Arizona seven months later. By its verdict, the jury determined that he was the shooter.

---

[4]     The prosecutor's gang expert likened Dragon Family Junior and Dragon Family's relationship as analogous to that of a junior varsity and a varsity sports team, with Dragon Family Junior being a junior faction of the Dragon Family gang. The precise relationship between the two groups has not been raised as an issue in this appeal, and this opinion generally describes the relevant gang as Dragon Family/Dragon Family Junior.

**A. Guilt Phase**

1. *Prosecution case*

a. *Accomplice testimony*

Aaron Villegas and Quang Do, two members of the Dragon Family/Dragon Family Junior gang, testified pursuant to agreements that limited their sentencing exposure. Their testimony regarding the fatal shooting, incorporating contextual details supplied by other witnesses, is summarized below.

On the evening of August 12, 2003, Donny Nguyen, a member of the Dragon Family/Dragon Family Junior gang, was at a restaurant called Alerto's with some companions when he saw the victims arrive. He thought the group belonged to a rival gang, and that some of them were disrespecting him by staring at him in an aggressive manner known as "mad dogging." Nguyen borrowed his girlfriend's phone and called Dung (Tom) Le, a fellow gang member. Nguyen told Le that rival gang members were at Alerto's, and to "come down and jump these guys." Nguyen then left the restaurant and went to his girlfriend's residence.

Le called Do, another gang member, to pass along that the "enemy" was at Alerto's. Do was at defendant's residence on Trask Avenue when he received the call. Defendant was known to be part of the Dragon Family clique and, being in his late 20s, he was significantly older than members of Dragon Family Junior. He nevertheless associated with the Dragon Family Junior group. Although defendant was Caucasian and other members of Dragon Family/Dragon Family Junior were Vietnamese, he was accepted as part of the gang. Defendant was also known as "Slim"; Villegas did not know defendant's real name until after the shooting. Le told Do he would come over to

defendant's residence, and a larger group of gang members could then go to Alerto's and "take care of business." When Do told defendant about the call, defendant was excited and said, "All right."[5]

In all, six members of the Dragon Family/Dragon Family Junior gang convened at defendant's residence and went to Alerto's. Villegas, Le, Danny Duong, and Harrison Pham left defendant's home in Pham's white Lexus. Do followed in his green Acura Integra, with defendant as his passenger. Before he and Do left, defendant retrieved a gun with a holster from his closet and put it in his waistband. Defendant had shown Do the gun, a revolver, a few weeks before the shooting. At that time, defendant told Do to let him know if others ran into trouble and needed a gun.

By the time they arrived at Alerto's, Nguyen had already left. Villegas's group circled around the restaurant's drive-through area. They saw some people inside they believed fit the description Nguyen had provided. In fact, the group that Nguyen had seen, and his fellow gang members spotted, consisted of five family members — Minh Tran, his brother, his uncle, and two cousins, none of whom were affiliated with a gang.

Harrison Pham parked the Lexus in the parking lot on the side of the restaurant and its occupants waited for the group inside the restaurant to leave. Villegas testified that he and the

---

[5]     Do testified that he had smoked methamphetamine on the evening of the shooting. He was also on probation, with conditions including not to associate with gang members or wear gang-related clothing, such as a hat with a "D" on it or anything with a picture of a dragon.

others planned on getting into a fight. While they waited, Le was on the phone with other gang members. Do and defendant soon arrived in Do's vehicle. Do parked across the street and also waited. While waiting, Do received a call from Eric Pham, another Dragon Family/Dragon Family Junior member. Do explained what was happening and told him to come over.[6]

Tran and his family left the restaurant and got into a black Acura Integra. The Lexus containing Villegas, Harrison Pham, Le, and Duong followed them out of the parking lot. Do's vehicle trailed, with Le on the phone with defendant and giving him directions.

The driver of the black Acura eventually pulled his vehicle into a residential cul-de-sac and parked in a driveway. Members of Villegas's group saw where the black Acura had parked. Harrison Pham then drove a bit farther and met up with Do and defendant. Le exited the Lexus and entered Do's vehicle. According to Villegas, as Le changed vehicles, he said, "Let's go blast 'em."

Do, guided by Le, then drove into the cul-de-sac where the black Acura had parked, while the Lexus parked at the end of the street. By then, the black Acura's lights were off. Do parked his car behind the black Acura. Seeing no movement or lights inside the parked car, Do told defendant and Le that the occupants had probably gone inside a house. Defendant said,

---

[6] Do testified on redirect examination that "when we parked across the street from Alerto's, [Eric Pham] was there already." It is unclear from Do's testimony whether Eric Pham was at Alerto's when Do and defendant arrived, and was summoned back, or whether Do referred to seeing Eric Pham at Alerto's after he called him. As will be explained, Do testified that he did not see Eric Pham at the scene of the shooting.

"[h]old on" and "[l]et me go check." Defendant got out of Do's vehicle, walked up to the black Acura, and looked inside one of its passenger-side windows. Defendant then smashed one of the vehicle's windows with the butt of his gun and started firing shots inside the vehicle. Defendant fired six shots in rapid succession.

Villegas and Do both testified that defendant was wearing black clothing as he approached and shot into the victims' vehicle. Both witnesses also described defendant as wearing a black hat, with Do identifying the hat as a baseball cap. Do also testified that defendant was wearing a black bandana over his face. The Dragon Family/Dragon Family Junior gang associated itself with the color black, and every member of the gang had a black bandana with a dragon on it.

Defendant returned to Do's car and said, "Let's go." The Lexus and the green Acura drove off.

Villegas and Do gave somewhat different accounts of what happened next. Both testified that the gang members who had followed the victims from Alerto's had a rendezvous nearby, where Le returned to Harrison Pham's vehicle. According to Villegas, defendant remained in Do's Acura.[7] Villegas further testified that the Lexus and green Integra split up after this transfer, but both eventually returned to defendant's residence. As the Lexus arrived, Villegas noticed that Do's car was parked in front of defendant's residence, and he saw Do and defendant

---

[7] Villegas testified on cross-examination that Eric Pham's car was also somewhere in the area of the rendezvous spot. Villegas had seen Eric Pham's car earlier at defendant's house, but he was not sure if he saw the car at Alerto's, and he did not see it in the cul-de-sac where the shooting occurred.

running inside. Harrison Pham parked his Lexus across the street. About a minute later, police arrived and apprehended Villegas, Duong, Le, and Harrison Pham.

According to Do's testimony, Eric Pham arrived in his car (a blue Acura Legend) as the others were leaving the scene of the shooting and reported over the phone that the group was being followed by a witness. Do pulled over and saw the witness drive past. After driving to another location, Do, Harrison Pham, and Eric Pham all pulled over. Le returned to Harrison Pham's Lexus, and defendant switched to Eric Pham's car. The groups agreed to split up and reconvene at defendant's residence.

When Do arrived at defendant's home, defendant was not around. Do left his car there and a few hours later met with Eric Pham, defendant, and another member of the Dragon Family/Dragon Family Junior gang known as "Trigger" at a different location. This group discussed what had happened. Defendant told the others that he had walked up to the black Acura, saw that its occupants were hiding, broke one of its windows, and started shooting. Defendant acted out how he committed the shooting. He said he was aiming at the person in front at first, and then at the person in the back. Trigger advised defendant to get rid of the firearm; defendant agreed he would. Upon also being advised to hide out, defendant agreed with that as well.

Villegas was interrogated at the police station after being apprehended. After initially telling police that the shooter was

Vietnamese, he said he thought the shooter was "Slim."[8] Shown a photographic lineup later that evening or the next morning, Villegas identified defendant as the shooter.

    b. *Victim Testimony*

Tran's brother and his wounded cousin testified at trial. They described a sequence of events between their arrival at Alerto's and the shooting similar to that testified to by Villegas and Do. Both testified that a young man was staring at their group as they arrived at the restaurant. Later, while eating, they noticed some young Asian men in a white Lexus staring at them through a restaurant window. When the family members finished their meal, they left the restaurant in a black Integra driven by Minh Tran's uncle, with Minh Tran sitting in the front passenger seat and the three other passengers in back.

Their group noticed they were being followed by the white Lexus. Tran's brother and cousin told the uncle to try to lose their pursuers. Tran's uncle drove his black Acura into a residential cul-de-sac, parked in a driveway, and turned off the vehicle's lights. The group ducked and remained still. The Lexus drove past the cul-de-sac. It then returned and parked near the cul-de-sac's entrance. Within a few minutes a dark car arrived, entered the cul-de-sac, and parked behind the black Acura. One of the dark vehicle's doors opened, and a tall, slim male dressed in black appeared by the passenger side of the vehicle. Tran's brother, who could see the shooter up to his shoulder and part of his head, described this individual as bald,

---

[8]    Villegas testified that he gave a statement to the police because he felt "pressured" by them, but he also acknowledged it was his decision and was partly motivated by the fact that he "kind of felt bad" that someone had died.

but he did not see the shooter's face and could not discern his race.[9] Tran's cousin saw only part of his chin. Without speaking, the man fired several shots into the passenger compartment, then left. After the shooting, the victims drove to Tran's cousin's house, where an ambulance was summoned.

In interviews with police shortly after the shooting, both Tran's brother and his wounded cousin identified the shooter as an Asian male, with the cousin saying that the shooter was probably Vietnamese. Both also told police at that time that the shooter was approximately 18 years old. Tran's cousin further described the shooter as between five feet six inches and five feet seven inches in height, and approximately 120 pounds.

Asked on cross-examination about the difference between his initial identification of the shooter and his description of the shooter at trial, Tran's brother testified that he had been having dreams since defendant's case began. On redirect examination, Tran's brother testified that since 2003, he consistently remembered the shooter being slim and tall, and that the dreams he mentioned on cross-examination had begun only about two months earlier. Tran's cousin testified that he had simply assumed the shooter was Asian and young because all the other individuals who had pursued them were Asian.

c. *Other eyewitness testimony*

Another eyewitness testified that he was visiting his sister at her home on the cul-de-sac where the shooting occurred when he heard gunshots. Looking out toward the street, he saw someone proceeding toward a dark green vehicle that was

---

[9] Do testified that defendant had bleached hair at the time of the shooting.

blocking a black Acura in a driveway. The witness could not clearly identify the person's face, but he saw that the individual was short and slim, appeared to be Asian, and was wearing dark clothing. The witness jumped into a friend's vehicle and followed the green car as it quickly drove away. He called 9-1-1 as he drove and spoke to a dispatcher. He then saw the green vehicle stop and an exchange of passengers occur between it and a white Lexus. When the two vehicles split up, the witness reported the Lexus's direction to 9-1-1 and continued to follow the green car. The witness read its license plate number and reported it to the 9-1-1 dispatcher. At one point, as the green vehicle made a U-turn, the witness observed that the driver appeared to be Asian. The green Acura stopped on Trask Avenue, near Clinton Street. The driver exited and helped the passenger enter a residence. The passenger appeared to be injured or in a stupor. The witness departed as he saw police approach but returned to Trask Avenue later that evening and identified Harrison Pham's Lexus and Do's green Acura as the vehicles he had seen earlier that night. He could not identify any of the individuals the police had detained.

d. *Subsequent investigation*

Minh Tran was shot five times. He suffered wounds to his lungs, liver, spinal cord, and heart, with the injuries to his heart being fatal. Tran's brother was shot in the stomach. His cousin was shot in the buttocks. A forensic scientist testified that all the bullets recovered from the shooting were either .357 or .38 special caliber and that a revolver was among the weapons that could have been used to fire the bullets.

Police recovered five cell phones from the passenger compartment of Harrison Pham's Lexus. A black bandana was

found in the backseat area of the Lexus. A black nylon holster suitable for a large caliber handgun was found on the passenger-side floorboard of Do's vehicle, parked nearby on Trask Avenue. Investigators also found a black bandana in a compartment in the green Acura's driver's-side door, and a white bandana under the driver's seat.

DNA tests were run on several items obtained from the Lexus and the green Acura. Not enough DNA was found on some of these items to allow for DNA testing. No DNA consistent with defendant's profile was found on any of the items tested. Eric Pham's DNA profile matched DNA found on the black bandana seized from the green Acura. The forensic specialist testified that although defendant's DNA was not found on that bandana, she could not determine whether he may have worn it. This witness also testified that while DNA testing of clothing usually yielded the person who wore it last, that was a "general statement." Regarding the bandana, she could not say definitively that Eric Pham "is the individual who wore that item last, or even that he wore it"; he may have simply handled it or deposited his DNA on it in another way.

Both the Lexus and the green Acura were processed for fingerprints. Lift cards from the exterior right front door, the exterior right rear door and window, and the exterior left rear door of the Lexus yielded matches with Villegas's, Le's, and Duong's fingerprints. Four fingerprints obtained from the green Acura matched Do's fingerprints. None of the fingerprints obtained from the Lexus or the green Acura matched defendant's fingerprints. The parties stipulated that police found no gunshot residue on the hands of Harrison Pham, Le, Duong, or Villegas.

The parties also stipulated that defendant's stepfather was the subscriber on the account connected to one of the cell phones found in the Lexus. The phone number for that account ended in 8003. The contact list on Harrison Pham's phone identified that number as belonging to "Jason S.," and on Le's phone, the number was associated with "Slim." The phone with the 8003 number received a call from Eric Pham's cell phone at 10:09 p.m., placed a call to Eric Pham's phone six minutes later, called Le's phone at 10:16 p.m., and received a call from Le's phone at 10:25 p.m. The phone with that number also "pinged" off at least one, and possibly two, cell phone towers in the vicinity of Alerto's and the cul-de-sac where the shooting occurred around the time of the shooting.

Vinnie Nguyen, another Dragon Family/Dragon Family Junior gang member, was detained after the shooting while driving near defendant's residence. Subsequent investigation determined that between 10:30 p.m. and around 11:00 p.m. on August 12, 2003, his phone had been used to call, or attempt to call, Donny Nguyen's girlfriend's phone, Danny Duong's phone, Harrison Pham's phone, the phone associated with defendant, and Do's phone. Examination of Le's phone revealed calls with Donny Nguyen's girlfriend's phone at 10:03 p.m. and 10:07 p.m. that evening, and that the number associated with "Slim" had been dialed several times between 10:10 p.m. and 10:25 p.m. that night.

Defendant was apprehended in Tempe, Arizona, in March 2004. A police officer performed a welfare check at an apartment where defendant was residing. After contacting defendant, the officer ran his name for outstanding warrants and found one for homicide. The officer wrote this down and provided the information to a colleague. Defendant then jumped

off a couch and fled the apartment. The officer pursued him. Defendant continued to run despite being ordered to stop. He was apprehended after a short chase.

Two witnesses who resided at the Arizona apartment with defendant testified that months before he was apprehended, defendant, whom they knew as "Bill," came to live with them and their young son. Defendant needed a place to stay and did housework and took care of their son while they were at work. He had access to computers at the residence.

Two computers and some writings were seized from the Arizona apartment pursuant to a search warrant. Forensic analysis of a mirror image of one of the computer hard drives revealed that in February 2004 the computer had been infected by a virus that captured the keystrokes entered on its keyboard. Due to this virus, law enforcement recovered numerous instant messages that had been sent from the computer by the user everybodykilla22, who also gave their name as "Slim." Defendant had a tattoo reading "ebk" on his upper left arm and shoulder, which Do testified stood for "everybody killer."

The messages sent by everybodykilla22 included: "[n]****z cant see me for the fact that i stay with my black beenie disguise so dont be suprised when theese guys dressed in black are coming to take youe life"; "i wanna go bangin bye myself for fun with two clips and one gun"; "i remember me a hot dog go bang with the crv when I had the 380";[10] "ebk all day till the day i die"; "got snitchez n shit u know," followed by "fukin n****z dont knwo how to keep they mouth shut"; "5 n**g alocked

---

[10] Other Dragon Family/Dragon Family Junior members referred to Quang Do by the nickname "Hot Dog." No evidence at trial connected Do to a CRV vehicle.

up they think thas it [enter] haha [enter] so many still out n bangin"; and a sequence in which everybodykilla22 first wrote "wtf u want me to tell u" to one user, then wrote messages to another user providing, "i blast three n****z" and "oops wrong im," followed by messages to the original recipient, "i blast three n****z [enter] Naw."[11]  The virus did not capture the other sides of the conversations in which these messages were written. Keystrokes preserved by the virus also indicated that a user had used the computer to search the Orange County Sheriff's Department website for outstanding warrants for "Jason Aguirre."

The writings seized from the Arizona apartment included several pages of handwritten poetry or lyrics (hereinafter referred to as lyrics).  A handwriting analyst with the Orange County Sheriff's Department compared the lyrics with handwriting samples obtained through a mail cover that was applied to defendant in jail, and determined that writer of the

---

[11]  These excerpts have been drawn from People's Exhibit 119, a compilation of the instant messages that was admitted prior to closing arguments.  In discussing these and other writings offered as evidence at trial, we generally repeat how statements appear either in the pertinent exhibit or in the reporter's transcript, consistent with the context in which they are being discussed.  With some statements, minor variations exist between the original writings, and their description by counsel as reflected in the reporter's transcript.

Although we have generally maintained the statements' original language, including any incorrect spelling or punctuation errors, we have made an exception for a slur that appears in these statements, for which only the first and last letters are given, with asterisks in between.  (See *People v. Ware* (2022) 14 Cal.5th 151, 158.)

samples was also responsible for the lyrics.[12]   These lyrics included:  "black fitted Detroit tiger baseball cap but the D stands for Dragon best believe that n***a check the tat on my Back fool I stay strapped 357's equal 187's with 357's AK's and all Dat"; "N****z cant see me for the fact that I stay with my black beannie disgize so don't be suprized wen these guys dressed in black are coming to take your life"; "every other muthafucka thinks im trippin tell a n***a Im to old to bang kickback and let them lil n****z do there thang I tell um fuck that shit bangin's the blood that's pumpin through my veins"; and "cruzing around untill you run out of gas high as hell drinkin and driving when I Blast then back to the pad to get something to eat and another 40 of old E after I cut up this body of the enime that we just murdered on these OC streetz muthafucka."

Lyrics found on other handwritten pages admitted as evidence included, "its dfj every day all day till the day i die," "357, AK, 9 milli, Glock 45, I bang for the hood slang for the hood," "OC is ours we da OG's with fly cars," "catch an enime slipping you know Ima empty that clip, cause wether im jackin or I bang you know it don't mean a thang, I do it for two reasons that's the hood and some change," "man these n****z don't wanna fly straight now i gotta blast, increase the crime rate," "crossin' me a fatal mistake," "you never live by it, make n****z move outta state snatch the weight, pull 38's, and break the safe," and "cuz when it comes to a n***a like me i won't stop till i see your fuckin blood drippin down the sewadge drain."

---

[12]   This mail cover consisted of an instruction to copy papers written and received by defendant while he was in custody.

The couple with whom defendant resided in Arizona testified that they did not use the screen name everybodykilla22, write instant messages associated with that screen name, use their computer to search the Orange County Sheriff's Department website for warrants under the name of Jason Aguirre, or write the lyrics found at the apartment.

A search of what police believed to be defendant's residence on Trask Avenue on the evening of August 12 or early morning hours of August 13, 2003, revealed paperwork and magazines addressed to defendant, as well as Dragon Family Junior gang writings.

In September 2003, law enforcement seized the computer of a Dragon Family/Dragon Family Junior member who was not involved in the pursuit or shooting. A subsequent search of the computer yielded a file with Minh Tran's photo and name, and the words "R.I.P."

Detective Tim Walker of the Westminster Police Department testified regarding criminal street gangs generally and the Dragon Family/Dragon Family Junior gang specifically. Walker testified that the Dragon Family/Dragon Family Junior gang was associated with signs and symbols including dragons and the letter "D." He testified that at the time of the charged crimes, the gang was involved in a violent rivalry with the Young Locs gang. Walker identified several individuals, including defendant, Do, Villegas, Donny Nguyen, Le, Harrison Pham, and Eric Pham as members of the Dragon Family/Dragon Family Junior gang at the time of the shooting. Walker described convictions that had been incurred by members of the gang.

Walker also testified regarding defendant's gang tattoos and letters written by defendant while in custody. In one of these letters, dated November 6, 2006, defendant wrote, "I'ma tell you 'bout me. I am in a Viet gang, DRAGON FAMILY. I put EBK 'cause we black rag. Not bloods, not crips, but EBK. EveryBodyKillaz." Walker's opinion that, as of August 12, 2003, defendant was a member of the Dragon Family/Dragon Family Junior gang was informed by the lyrics retrieved from the Arizona apartment and the instant messages recovered from one of the computers found in that apartment. Walker further testified that a hypothetical pursuit and shooting that tracked the facts of this case would benefit a criminal street gang by being an "absolute textbook example of a gang hunting down a perceived enemy," and that such a crime "enhances the individual, and the gang's reputation as a whole, which in turn will give them more power within the gang community."

2. *Defense case*

Detective Walker testified to the placement of a mail cover on defendant while he was in jail pending trial. Walker also testified that defendant was roughly six feet tall.

A private investigator testified regarding measurements he made of the victims' make and model of vehicle and the cul-de-sac where the shooting occurred, and of his observations of the street lighting at that scene.

Donny Nguyen, who received a sentence of 18 years four months due to his involvement in the attack, testified to what transpired at Alerto's before, during, and immediately after his call to Le. On cross-examination, Nguyen testified that two months before the shooting he "got into a confrontation with rivals" at Alerto's, an incident that led to some of the convictions

by Dragon Family/Dragon Family Junior gang members that Detective Walker had testified about during the prosecution's case-in-chief.

### 3. *Rebuttal*

Tran's brother was recalled as a witness and briefly testified that on the night of the incident he was wearing a blue flannel shirt; Walker had previously testified that blue clothing may have been associated with the Dragon Family/Dragon Family Junior gang's rivals. The brother also testified that in the parking lot at Alerto's, he only took a "quick glance" at Nguyen.

## B. Penalty Phase

### 1. *Prosecution case in aggravation*

The prosecution offered victim impact testimony from Minh Tran's father, his older brother, and his mother. These family members testified regarding their memories of Tran and the impact that his death had upon them. Tran's father had been a "very energetic, very healthy person," but after his son's death, he became ill and had to sell his business. Tran's brother remembered that Tran was "always laughing" and "[e]verything we did, we did together." His mother testified that when she arrived in this country from Vietnam, she had hoped that her children were going to have a bright future. Her son wanted to become a dentist. His death remained "impossible" to deal with.

The prosecution also presented evidence regarding a violent incident that occurred in Hawaii in 1998. A traffic-related dispute escalated and a party to the altercation stabbed or slashed two men with a knife. One of the victims, who was stabbed in the torso, identified defendant as the assailant; the other testified that defendant looked like the assailant.

An Irvine Police Department officer testified that in August 2001 he interviewed defendant after responding to a call of a fight in progress. Defendant told the officer that he was affiliated with the Dragon Family gang. Upon searching defendant's vehicle, the officer located a baseball bat and what he described as a "wooden handle," or billy, and two knives. Asked about the bat and handle, defendant's response indicated that they were "for protection."

A witness testified that on April 28, 2001, he was with four friends in a vehicle in Garden Grove when another vehicle blocked an intersection in front of them. The driver of the other vehicle was staring the group down and throwing gang signs. In an effort to diffuse the situation, the witness and his companions explained they were from "nowhere," and the driver of the witness's vehicle said, "we don't bang or anything like that." The driver of the witness's vehicle tried to drive off, but the other car pursued them. After a chase of about five or six minutes, the witness's vehicle pulled into a dead-end street, where the driver lost control and crashed. The other car pulled up. A passenger in the pursuing vehicle exited it, kicked the driver's side and passenger side doors of the crashed vehicle, and then left with the driver. Shown a photo array on the evening of the incident, the witness identified defendant as the driver of the vehicle that pursued his group.

A sheriff's deputy testified that defendant was involved in a fight with another inmate while detained in jail pending trial in this case. According to the testifying deputy, when asked what happened, defendant said that he had "a problem" with the other inmate and "wanted to go out and settle it" by starting a fight. As described to the deputy, the "problem" began with the other inmate being noisy, but then escalated into what the

deputy described as "more of a disrespect sort of an issue." The other inmate received minor injuries in the fight.

The prosecution also introduced evidence that in April 2001 defendant had been convicted of possessing a concealed firearm in a vehicle while an active participant in a criminal street gang. (Former § 12025, subds. (a)(1), (b)(3).)

### 2. *Defense case in mitigation*

Defendant's friends and family members testified regarding his life prior to the shooting. Defendant's parents separated and divorced when defendant was very young. Defendant's parents gave differing accounts of their relationship, with defendant's mother describing his father as abusive and his father denying any physical abuse. Defendant's mother remarried to a man who maintained a positive relationship with defendant. That marriage also ended, but when defendant was 12 years old, he moved to Hawaii to be closer to his former stepfather. Due to issues with his stepfather's new wife, defendant soon moved in with his cousin (his stepfather's nephew), who was several years older than him. Defendant's stepfather initially gave the cousin a monthly stipend for defendant's support but eventually stopped providing these funds.

While in Hawaii, defendant became friendly with a Vietnamese family whose son attended the same school as he did, and defendant eventually resided in that family's house for a number of years, off and on. The classmate perceived that his was defendant's only family.

The renter of the apartment in Arizona where defendant was apprehended testified that he allowed defendant to live with him on the condition that he change his life. According to

this witness, defendant did a good job taking care of the apartment and looking after the renter's young son during the four or five months he lived there.

A criminologist testified regarding gang membership and why defendant might have joined a gang, and an Asian gang in particular. Another defense expert testified that various factors in defendant's background put him at greater risk of bad outcomes, including criminality or violence.

## II.   DISCUSSION

### A. *Batson/Wheeler* Challenge

Defendant argues that the trial court erroneously denied his pretrial motion asserting that a prospective juror was improperly excused by the prosecution due to his race. We reject defendant's argument, concluding that the trial court's ruling is entitled to deference and is supported by substantial evidence.

#### 1. *Facts*

Defendant challenges the prosecution's use of a peremptory challenge against Prospective Juror No. 179, who was excused after he completed a juror questionnaire and was questioned by the court, defense counsel, and the prosecutor.

The juror questionnaire included a section posing questions about gangs. One question asked, "Some people believe that it should be a crime to be a member of a street gang. How do you feel about that?" Prospective Juror No. 179, a 45-year-old man who worked as a process engineer for Boeing, responded, "Would have to agree. I've always been told not to join gangs. I grew up seeing my friends and family hurt by gang activity." Prospective Juror No. 179 answered "Yes" to a question asking if jury candidates had "heard of Dragon Family/Dragon Family Junior or Young Locs gang," explaining

that he "heard it is an Asian gang" from his friends. Asked about his feelings regarding a defendant who is a member of a criminal street gang, he wrote, "I feel sorry for the defendant. He probably has had a rough life and was look [*sic*] to the gang to provide the support in his life." Prospective Juror No. 179 also indicated he could set aside his personal feelings and base his decision as a juror only on the law and what was presented in court. Asked if he or any of his close friends or relatives had ever associated with a criminal street gang, he answered "Yes," explaining, "I grew up in Harbor City California. Gangs were an everyday visual. Mexican/Blacks (Bloods/Crips)/Whites. Drug activity and shootings occured [*sic*] all the time. A lot of my friends were in the gang." Elsewhere in the jury questionnaire, Prospective Juror No. 179 responded "Yes" to the question, "Have you or a close friend or relative ever been a victim of a crime of violence?" explaining, "Gang shooting."

At the outset of voir dire, the trial court stated that it had gone through each jury questionnaire and identified topics that it wanted to discuss with prospective jurors. When it came time to speak with Prospective Juror No. 179, the court inquired, "You said you grew up with some friends who were in gangs or were — ," at which point the prospective juror said, "Oh, absolutely, yes." The trial court asked Prospective Juror No. 179, "[A]s far as your knowledge of the Dragon Family, or Dragon Family Juniors or Young Locs, do you know anything in particular, or just heard the name?" The prospective juror replied, "Just heard the name." The court also inquired into the circumstances of the gang shooting referenced in the questionnaire. Prospective Juror No. 179 replied, "Well, there were several. Just growing up, several, I mean my best friend actually was shot by a drive-by."

Defense counsel then posed a few questions to the prospective juror. Asked what qualities he had that would make him a good juror, such as a good attention to detail, Prospective Juror No. 179 agreed that he had an attention to detail, stating, "I mean engineering, that's part of what I do."

When it was the prosecutor's turn to ask questions, she confirmed with Prospective Juror No. 179 that he was an engineer and offered that his work was "very precise"; he agreed that it was. The prosecutor asked the prospective juror a series of questions in which she stated that evaluating witness testimony was "not like a math problem" and "not always an exact science," and that there was "not a formula" for placing weight on aggravating evidence at the penalty phase. Prospective Juror No. 179 indicated that he understood as much. The prosecutor also asked the prospective juror, "You said in your life experience you have known people who are gang members?" to which he replied, "Absolutely." Prospective Juror No. 179 gave identical responses when the prosecutor asked if he was "[f]riends with some of them," whether he had seen gang violence, and "that's part of who you are, right?" After posing several questions relating to the consideration of evidence regarding gang membership, the prosecutor asked the prospective juror, "You said you heard of this particular gang before?" Prospective Juror No. 179 replied, "Yes." Asked about the context, he replied, "Just with talk with people at work." Probing further, the prosecutor asked, "Was it in conjunction to any particular crime, or just in general?" The prospective juror replied, "I can't recall the conversation, but V.F.N." The prosecutor followed up, "But as you sit here today, is it fair to say that you remember just the name of the gang, and it is a gang?" The prospective juror answered, "Yes." When the

prosecutor confirmed that he knew "no other specifics," the prospective juror responded, "Correct."

Shortly thereafter, the court entertained challenges by the parties. The prosecution exercised a peremptory challenge against Prospective Juror No. 179. The defense asked for an opportunity to be heard. Outside the jury's presence, the defense identified Prospective Juror No. 179 as the only African American jury candidate "in the box" and objected to his excusal, citing to *Wheeler*.[13]

The trial court asked the prosecutor for a response. The prosecutor replied that "Juror 179 is an engineer, very precise type area of work. He is friends with gang members, has been friends with gang members in the past, had heard of D.F.J., but didn't know if it was in connection to any crime. Although he answers certain questions okay, he had some level of hesitation in giving the answer. So that's my reason for excusing him." The trial court said, "They appear to be race neutral." Defense counsel responded, "I disagree he gave any hesitation, he answered the questions very forthrightly." The trial court then said, "Well, he had heard of Dragon Family, he had — ," with defense counsel interjecting that it was "[i]n an old conversation without any details, that he couldn't really remember." As trial court started to reply, "Well — ," the prosecutor said, "That's my point." Defense counsel then stated he had "made the objection." The court ruled, "The question is whether or not there are any race neutral grounds, and there appear to be race neutral grounds, so I will deny it."

---

[13] "Although at trial defendant cited only *Wheeler* in support of his objection, this sufficed to preserve his *Batson* claim for appeal." (*People v. Vines* (2011) 51 Cal.4th 830, 847, fn. 7.)

## 2. *Legal principles*

Parties are accorded significant latitude in their exercise of peremptory challenges.  But the use of these challenges to exclude prospective jurors on account of their race violates both the state and the federal Constitutions.  (See *Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276–277.)  A contention that a peremptory challenge was impermissibly based on race implicates a three-step process.  " 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' [Citation.]  '[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' [Citation.]  To support a *Batson*/*Wheeler* motion, a party must prove 'it was more likely than not' that a challenge was motivated by discrimination."  (*People v. Nadey* (2024) 16 Cal.5th 102, 124 (*Nadey*).)

Here, the court asked the prosecutor to respond to the defense's *Batson*/*Wheeler* motion, and the prosecutor replied by providing an explanation for the challenged excusal.  While the court did not expressly state that the defense had made a prima facie case, with the prosecutor's reasons before us, we "simply proceed as though this is a step three case, analyzing whether the trial court properly accepted the race-neutral reasons given

by the prosecutor." (*People v. Mai* (2013) 57 Cal.4th 986, 1050 (*Mai*).)

A third-stage inquiry presents a question of fact concerning the presence of purposeful racial discrimination. (*People v. Baker* (2021) 10 Cal.5th 1044, 1076 (*Baker*).) "The answer to this factual question will ordinarily depend 'on the subjective genuineness of the race-neutral reasons given for the peremptory challenge.' [Citation.] A justification based on a mischaracterization of the record could reveal a discriminatory motive [citation], but might reflect a mere error of recollection [citations]. Likewise, a justification that is 'implausible or fantastic . . . may (and probably will) be found to be pretext[ual],' yet even a 'silly or superstitious' reason may be sincerely held. [Citations.] Of course, the factual basis for, and analytical strength of, a justification may shed significant light on the genuineness of that justification — and, thus, on the ultimate question of discrimination. [Citation.] But the force of the justification is significant only to the extent that it informs analysis of the ultimate question of discriminatory motivation." (*Id.* at pp. 1076–1077; see also *People v. O'Malley* (2016) 62 Cal.4th 944, 982 (*O'Malley*) [" ' " '[H]unches[,]' and even 'arbitrary' exclusion is permissible, so long as the reasons are not based on impermissible group bias" ' "].) The trial court's assessment of the credibility of a prosecutor's stated reasons for an excusal may take into consideration, " ' "among other factors, the prosecutor's demeanor; . . . how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy." ' " (*People v. Jones* (2011) 51 Cal.4th 346, 360 (*Jones*).)

Our " ' "[r]eview of a trial court's denial of a *Wheeler*/*Batson* motion is deferential, examining only whether

28

substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " ' " (*Mai*, *supra*, 57 Cal.4th at pp. 1048–1049.) "In reviewing the correctness of a trial court's ruling on a *Batson/Wheeler* motion, we consider 'all the circumstances of th[e] case.' [Citation.] The circumstances of the case include what the jurors said and wrote in connection with voir dire and the reasonable inferences that can be drawn from those statements." (*People v. Williams* (2013) 56 Cal.4th 630, 653–654.)

When ruling on a *Batson* challenge in which multiple reasons are given for the exercise of a peremptory challenge, "the court should determine whether the challenge was based on group bias by considering the reasons as a whole, without focusing on a single stated reason to the exclusion of others." (*People v. Smith* (2018) 4 Cal.5th 1134, 1158 (*Smith*).) "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919 (*Reynoso*); see also *Baker*, *supra*, 10 Cal.5th at p. 1077 ["A court may make a sincere and reasoned effort to evaluate a peremptory challenge even if it does not provide a lengthy and detailed explanation for its ruling"];

*People v. Manibusan* (2013) 58 Cal.4th 40, 76 (*Manibusan*) [extending deference to the trial court and affirming the denial of a *Batson*/*Wheeler* motion where, after hearing the prosecutor's reasons for excusing a prospective juror and defense counsel's response, the trial court ruled, " 'It's a proper use of a peremptory challenge' "]; *People v. Lewis* (2008) 43 Cal.4th 415, 471 ["the trial court was not required to question the prosecutor or explain its findings on the record because . . . the prosecutor's reasons were neither inherently implausible nor unsupported by the record"].)  Further inquiry by the trial court may be necessary for a reviewing court to accord deference "[w]hen 'the proffered reasons lack[] inherent plausibility or [are] contradicted by the record.' " (*Baker*, at p. 1078.)  In this respect, a trial court's failure to probe an "obvious gap" when a prosecutor's stated reasons are completely unsupported by the record (*People v. Silva* (2001) 25 Cal.4th 345, 385) "may eliminate the basis for deference" (*Baker*, at p. 1078; see also *People v. Hardy* (2018) 5 Cal.5th 56, 80 (*Hardy*) [contrasting the situation in *Silva* with one involving only a "slight discrepancy"]).[14]

---

[14]    Code of Civil Procedure section 231.7, enacted in 2020, provides that when a peremptory challenge is premised on certain grounds, it "is presumed to be invalid unless the party exercising the peremptory challenge can show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." (*Id.*, subd. (e).)  The statute also identifies other reasons for

In reviewing a trial court's ruling at the third stage of the *Batson* analysis, a "comparative juror analysis must be considered" by an appellate court "if relied upon by the defendant and the record is adequate to permit the urged comparisons." (*People v. Lenix* (2008) 44 Cal.4th 602, 622 (*Lenix*).) This "analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*Ibid.*) Such analysis, as applied to a claim alleging improper excusals based on race, "compares the voir dire responses of the challenged prospective jurors with those of similar jurors who were not members of the challenged jurors' racial group, whom the prosecutor did not challenge." (*O'Malley, supra*, 62 Cal.4th at p. 975.)

When comparing an excused jury candidate with others, "we are mindful that comparative juror analysis on a cold appellate record has inherent limitations." (*Lenix, supra,* 44 Cal.4th at p. 622.) Among these limitations, a transcript will not necessarily capture a prospective juror's "attitude, attention, interest, body language, facial expression and eye contact" (*ibid.*), vocal inflections, or other facts or circumstances that

_____

exercising a peremptory challenge, including the prospective juror's inattentiveness or demeanor (*id.*, subd. (g)(1)(A), (B)), as "presumptively invalid unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party. Even with that confirmation, the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried" (*id.*, subd. (g)(2)). This statute applies only in trials in which jury selection began on or after January 1, 2022 (*id.*, subd. (i)), and it is therefore inapplicable here.

may be relevant to the exercise of a peremptory challenge. (See *id*. at pp. 622–623.) Also, " '[w]hen comparative juror arguments are made for the first time on appeal, . . . the prosecutor was not asked to explain, and therefore generally did not explain, the reasons for not challenging other jurors. In that situation, the reviewing court must keep in mind that exploring the question at trial might have shown that the jurors were not really comparable.' " (*Hardy*, *supra*, 5 Cal.5th at p. 77.) "When a defendant asks for comparative juror analysis for the first time on appeal, we have held that 'such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent.' " (*O'Malley*, *supra*, 62 Cal.4th at p. 976.)

### 3. *Analysis*

Defendant argues, first, that we should not extend our usual deference to the trial court's ruling below. He asserts that such deference is unwarranted because the court did not make a " ' " 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered' " ' " by the prosecutor (*Mai*, *supra*, 57 Cal.4th at pp. 1048–1049) and instead simply accepted at face value the reasons the prosecutor gave for excusing the prospective juror. Defendant perceives the trial court's phrasing of its ruling, in particular, as reflective of an inadequate inquiry.

We extend our usual deference here. "Under our precedent, '[w]hen the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we . . . assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear on their

credibility.' " (*Baker*, *supra*, 10 Cal.5th at pp. 1077–1078; see also *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390 ["Absent evidence to the contrary, we presume that the trial court knew and applied the governing law"].)

The trial court's articulation of its decision does not compel a different approach. Given its natural meaning and viewed in context, the trial court's ruling that "[t]he question is whether or not there are any race neutral grounds, and there appear to be race neutral grounds," as preceded by the court's observation, "They appear to be race neutral," in response to the prosecutor's statement of reasons, reasonably reflected a finding that the prosecutor was credible and that her peremptory challenge was not motivated by discriminatory intent. (See *Mai*, *supra*, 57 Cal.4th at p. 1053 [rejecting an argument that the trial court's *Batson/Wheeler* ruling, articulated as " 'no discriminatory intent is inherent in the explanations, and the reasons appear to be race neutral,' " evinced a misunderstanding of its obligation to assess the sincerity of the prosecutor's stated reasons (italics omitted)]; *id.* at p. 1054; *Manibusan*, *supra*, 58 Cal.4th at p. 76.)[15] As used by the trial court, the word "appear" is indicative of a subjective determination that the reasons provided by the prosecutor were

_____

[15] Even though the record in this case does not support defendant's position that the trial court applied the wrong standard in ruling on his *Batson/Wheeler* motion, whether the court is applying the correct standard in making a ruling may be unclear in other trial court proceedings. Contemporaneously asking the trial court to clarify its ruling will allow the court to explain its reasoning, thereby enhancing the record and facilitating any appellate review that may be necessary. (See *Baker*, *supra*, 10 Cal.5th at p. 1079 [" 'Advocates and courts both have a role to play in building a record' "].)

legitimately being invoked.  Our conclusion that the trial court did not abdicate its responsibility to evaluate the prosecutor's credibility is further supported by its recollection to counsel that the prospective juror had heard of the Dragon Family gang. This reflection indicates that the court was actively mapping the reasons given by the prosecutor against what it recalled as the prospective juror's responses to questions, instead of accepting the prosecutor's reasons without any critical evaluation.[16]

---

[16] Citing to our decision in *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1172, one of the dissents asserts that the reasons given by the prosecutor were " 'not self-evident' " and that deference is therefore not warranted to the trial court's ruling on this record.  (Dis. opn. of Liu, J., *post*, at p. 6.)

*People v. Gutierrez* does not support the dissent's position. In that case, the reasons for excusing a prospective juror that we described as "not self-evident" (*People v. Gutierrez*, *supra*, 2 Cal.5th at p. 1172) were that she was unaware of gang activity in her town of Wasco and that the prosecutor " 'was unsatisfied by some of her other answers as to how she would respond when she hears that [a prosecution witness] is from a criminal street gang' " from that town.  (*Id*. at p. 1160.)  The trial court "made a global finding that the prosecutor's strikes were neutral and nonpretextual."  (*Id*. at p. 1157.)  We concluded that although the "Wasco reason" was facially neutral (*id*. at p. 1168), the reasoning behind it — that the prosecutor "was uncertain how a prospective juror's unawareness of Wasco gang activity might bear on her response to" the prosecution witness (*id*. at p. 1169) — was "tenuous" because "[i]t is not evident why a panelist's *unawareness* of gang activity in Wasco would indicate a bias against a member of a gang based in Wasco" (*ibid*.).  We further observed, "Although it is possible that a juror unaware of gang activity in Wasco would be discomfited by, and skeptical of, a witness who claimed to be [a] member of a gang based in her neighborhood, such a conclusion does not strike us as an

Turning to whether substantial evidence supported the trial court's denial of the *Batson* motion, we conclude that it did. According our standard deference to the trial court's ruling, we reject defendant's arguments that the prosecutor's reasons lack sufficient support in the record and that comparative juror analysis reveals them as pretexts for discrimination.

The first reason given by the prosecutor for dismissing Prospective Juror No. 179 was that he was an engineer, a "very precise type area of work." We have regarded a prospective juror's profession as a race-neutral reason for the exercise of a peremptory challenge. (*People v. Chism* (2014) 58 Cal.4th 1266, 1316 (*Chism*); *People v. Young* (2005) 34 Cal.4th 1149, 1174 (*Young*).) During voir dire, Prospective Juror No. 179 volunteered a connection between his work as an engineer and having an attention to detail. The prosecutor later asked him several questions consistent with concerns regarding how this mindset would affect the prospective juror's evaluation of witness testimony at the guilt phase and of aggravating and mitigating evidence at any penalty phase. As suggested by this questioning, a peremptory challenge citing the prospective juror's profession as an engineer and his agreement that it was

---

obvious or natural inference drawn from this panelist's responses." (*Ibid.*)

*People v. Gutierrez* thus used "not self-evident" (2 Cal.5th at p. 1172) to describe one reason that relied on a "tenuous" deduction (*id.* at p. 1169) and another that was so vaguely articulated as to make it difficult to understand what the prosecutor's concern was. Here, the prosecutor's reasons, viewed as a whole, allow for more "obvious or natural inference[s]" (*ibid.*) about why the prospective juror was being excused, such that additional probing or explication by the trial court was unnecessary.

a "very precise" line of work "had ' " 'some basis in accepted trial strategy' " ' [citation] insofar as it stemmed from a concern about the general attitudes and philosophies persons in that profession might harbor." (*Mai, supra*, 57 Cal.4th at p. 1053.)[17]

The prosecutor also stated that Prospective Juror No. 179 "is friends with gang members, has been friends with gang members in the past." We have regarded a similar concern as a race-neutral reason for a peremptory challenge in a case involving gang-related crimes. (See *People v. Williams* (1997) 16 Cal.4th 153, 191 (*Williams*).) This reason, too, finds support in the record. The prospective juror wrote in his questionnaire that "a lot" of his childhood friends were in a gang. He provided similar responses during voir dire. To recap, the prospective juror answered affirmatively when the trial court confirmed, "You said you grew up with some friends who were in gangs or were — ." The prosecutor later asked him, "You said in your life

---

[17] In applying de novo review, one of the dissents expresses skepticism of this reason for excusing the prospective juror and asks whether the prosecutor wanted a juror who was *not* detail oriented. (Dis. opn. of Liu, J., *post*, at p. 7.) The dissent's incredulity notwithstanding, the prosecutor could reasonably have been concerned about a prospective juror who connected his profession as an engineer to being detail oriented and agreed that his profession was "very precise." The prosecutor might have been concerned that if selected to serve on the jury, such a juror would focus too much on specific evidentiary details and resist appeals to view the evidence at trial as a whole. (See, e.g., *People v. Miles* (2020) 9 Cal.5th 513, 559 (*Miles*) [a prosecutor may excuse a prospective juror for race-neutral reasons that anticipate the evidence expected to be offered at trial]; *Chism, supra*, 58 Cal.4th at p. 1317 ["a prosecutor 'can challenge a potential juror whose occupation, in the prosecutor's subjective estimation, would not render him or her the best type of juror to sit on the case for which the jury is being selected' "].)

experience you have known people who are gang members?" The prospective juror replied, "Absolutely." He gave the same response to the ensuing question, "Friends with some of them?"[18] The prosecutor could have gleaned from these answers a possibility that the prospective juror had preconceived views regarding gangs or gang members that drew from these relationships and might affect his evaluation of the evidence at trial, including testimony by a gang expert regarding the Dragon Family/Dragon Family Junior gang's activities and interests.[19]

---

[18] Defendant also argues that the prosecutor's questioning of Prospective Juror No. 179 provides evidence that her peremptory challenge was racially motivated. Focusing on the prosecutor's question, "that's part of who you are, right?" and the questions regarding the circumstances of the prospective juror's early years that preceded it, defendant argues that "[t]he prosecutor's use of No. 179's residence as a child became a surrogate for impermissible racial bias. The prosecutor assumed that black jurors who were born in a poor black gang area would be hostile to the prosecution and sympathetic to the defendant." This argument reads too much into the prosecutor's questioning regarding the ongoing effect, if any, of the prospective juror's friendships with gang members and his familiarity with gang violence. The prosecutor's questioning was appropriate in light of the prospective juror's questionnaire responses, including his response that he would "feel sorry" for defendant, whom he viewed as "probably" having "had a rough life and was look [*sic*] to the gang to provide the support in his life." Furthermore, Prospective Juror No. 179 explained in his questionnaire response that there were White, Hispanic, and Black gangs where he grew up.

[19] In giving her reasons for the excusal, the prosecutor did not mention Prospective Juror No. 179's questionnaire response, "I feel sorry for the defendant. He probably has had a

Prospective Juror No. 179 also provided answers to some questions during jury selection that indicated a negative view toward gangs. These included his questionnaire response that he "[w]ould have to agree" it should be a crime to belong to a gang, with the explanation, "I've always been told not to join gangs. I grew up seeing my friends and family hurt by gang activity." Yet the prospective juror's views regarding gangs and his past experiences with gang activity are not inherently inconsistent with, and would not obviously overcome, concerns about how the prospective juror's evaluation of the evidence at trial would be affected by the relationships that he described. The prosecutor could, among other things, have perceived the prospective juror as possibly disliking gangs, but feeling differently about individual gang members. (See *Williams, supra,* 16 Cal.4th at p. 191 ["Despite the fact [the prospective

---

rough life and was look [*sic*] to the gang to provide the support in his life." The prosecutor's failure to cite this response in giving her reasons for the excusal means it cannot be relied upon as an independent ground for the peremptory challenge. (See *People v. Gutierrez, supra,* 2 Cal.5th at p. 1167 ["When they assess the viability of neutral reasons advanced to justify a peremptory challenge by a prosecutor, both a trial court and [a] reviewing court must examine only those reasons actually expressed"].) Yet even if we cannot regard this as an additional reason for the excusal, the trial court could have considered this response, along with the rest of the record, when evaluating the sincerity of the reasons the prosecutor did provide — including the prospective juror's friendships with gang members. (See *Mai, supra,* 57 Cal.4th at p. 1054 [enumerating various factors properly considered by the trial court as "bearing on the prosecutor's credibility"]; *Lenix, supra,* 44 Cal.4th at p. 625 ["it is the trial court's duty to 'assess the plausibility' of the prosecutor's proffered reasons for striking a potential juror 'in light of all evidence with a bearing on it' " (italics omitted)].)

juror] also stated on voir dire that he did not become involved with gangs at high school and defendant's being a Blood 'wouldn't mean a thing' to him, the prosecutor may have concluded the likelihood [the prospective juror] would evince sympathy for defendant owing to his high school familiarity with Bloods gang members was sufficient to warrant use of a peremptory challenge"].)[20]

The third reason given by the prosecutor for excusing Prospective Juror No. 179 was that he had some prior knowledge of "D.F.J.," with the prosecutor acknowledging that the prospective juror "didn't know if it was in connection to any

---

[20] One of the dissents states that the prosecutor "mischaracterized" Prospective Juror No. 179 as having both childhood and current friendships with gang members, when in fact he had only childhood friendships with these individuals. (Dis. opn. of Liu, J., *post*, at p. 8.) Prospective Juror No. 179's voir dire responses did not make it entirely clear whether he remained friends with some people who belonged, or had belonged, to gangs. He gave affirmative answers to the prosecutor's questions that "You said in your life experience you have known people who are gang members?" and "Friends with some of them?" and he did not clarify that these were only past friendships. Under the circumstances, any misstatement by the prosecutor (if there was one) in stating, "He is friends with gang members, has been friends with gang members in the past," was not an error indicative of pretext. Also, it may have been apparent to all parties present at the time of defendant's *Batson/Wheeler* challenge that the prosecutor's statement that "He is friends with gang members, has been friends with gang members in the past," involved a clarification that the relationships involved childhood friendships. The dissent's assumption that the prosecutor mischaracterized the prospective juror's responses fails to recognize the limitations inherent in appellate review of a cold record, and it underscores why we accord due deference to the trial court's ruling.

crime." Regarding this reason, the record establishes that the prospective juror had heard of a gang associated with this case, or at least, a gang *he* associated with the case. In his questionnaire and in response to questioning by the trial court, Prospective Juror No. 179 indicated he had heard of either Dragon Family, Dragon Family Junior, or the Young Locs. Upon subsequent questioning by the prosecutor about whether he had heard of "this particular gang," Prospective Juror No. 179 indicated that he had, then referred to "V.F.N."

Defendant asserts in his briefing that "V.F.N." refers to an altogether different gang, "V.F.L." (short for "Vietnamese for Life"), and that the prosecutor's justification that the prospective juror had heard of "D.F.J." is undercut by the fact that she never clarified what the prospective juror meant when he referred to "V.F.N." But "[a] party is not required to examine a prospective juror about every aspect that might cause concern before it may exercise a peremptory challenge." (*Jones, supra,* 51 Cal.4th at p. 363.) And here, the circumstances were such that the prosecutor might not have understood that any clarification was needed. The prospective juror mentioned "V.F.N." just after he responded affirmatively to whether he had heard of "this particular gang." The prosecutor may not have understood "V.F.N." as referring to a gang other than Dragon Family/Dragon Family Junior. Indeed, if the prosecutor wrongly inferred or assumed that the prospective juror had heard of Dragon Family/Dragon Family Junior, the record suggests that both the trial court and defense counsel had the same misimpression. In discussing the defense objection, the trial court recalled that the prospective juror had heard of "Dragon Family." Defense counsel highlighted the limited

extent of the prospective juror's knowledge, but he did not dispute which gang the prospective juror had heard about.

Under the circumstances, any mistake or ambiguity involved in the articulation of this reason does not indicate that it or the prosecution's other stated reasons were pretextual. "There is 'no *Batson* violation when the prosecutor excused a prospective juror for a factually erroneous but race-neutral reason.'" (*Hardy, supra,* 5 Cal.5th at pp. 79–80; see also *Manibusan, supra,* 58 Cal.4th at p. 78 [discussing the differences between mistakes and bias in jury selection].) In giving her reasons, the prosecutor could have focused on the prospective juror's initial responses indicating knowledge of Dragon Family/Dragon Family Junior or the Young Locs and his acknowledgment of having heard about "this particular gang," overlooking the passing reference to "V.F.N." Even if the record did not clearly establish that the prospective juror had heard about Dragon Family/Dragon Family Junior, as opposed to some other gang he associated with the case, any mistaken assumption by the prosecutor was similar to other minor errors in prosecutors' recitations of their reasons that we have found inconsequential, particularly when other legitimate reasons supported a strike. (See, e.g., *Hardy*, at pp. 79, 81 [prosecutor's mistaken recollection that a prospective juror had said police are "'"not always truthful and tend to exaggerate,"'" when the prospective juror had actually said that about prosecutors, was a "minor" discrepancy that did not provide a basis to overturn the trial court's ruling]; *O'Malley, supra,* 62 Cal.4th at p. 980 [prosecutor's mistaken reference to a prospective juror as having recalled and spoken of prejudice "does not establish that the prosecutor's stated reasons were pretexts for discrimination"].)

Nor is this reason so improbable as to suggest that race played a part in the prosecutor's decision. The prosecutor could have been concerned that, given the prospective juror's childhood experiences with gangs and gang members as described in his questionnaire and voir dire responses, any prior knowledge he might have of Dragon Family/Dragon Family Junior, even of a limited nature (as the prosecutor herself conceded in offering this reason), could further detract from his ability to view the evidence presented at trial from a fresh perspective.

The fourth reason provided by the prosecutor was that there was "some level of hesitation in giving the answer." This was also a facially race-neutral reason for exercising a peremptory challenge. (See *Reynoso, supra,* 31 Cal.4th at p. 917.) The dialogue that followed suggests that this "answer" likely involved Prospective Juror No. 179's statement that he could not recall the conversation in which he heard of "this particular gang," but recalled "V.F.N."

Defendant emphasizes that any hesitation by Prospective Juror No. 179 in responding to the prosecutor was disputed by defense counsel, was not expressly confirmed by the trial court, and is not captured by the reporter's transcript through the use of a dash or other indication of a pause when the answer was given. These contentions do not have the force that defendant ascribes to them. Defense counsel disputed that there was any hesitation generally, but he acknowledged that Prospective Juror No. 179 "couldn't really remember" the details of the conversation at issue, with the prosecutor then saying, "That's my point." This exchange suggests that the prosecutor may not have been concerned about a pause in giving the answer, but about some other kind of hesitation, such as a slowly articulated

response or one delivered in a faltering manner. Moreover, the prosecutor referenced only "some level of hesitation." For these reasons, it is not particularly meaningful that the reporter's transcript does not reflect a pause in the giving of this answer, whereas it does indicate pauses in some responses provided by other prospective jurors. This difference does not demonstrate the absence of "some level of hesitation" with Prospective Juror No. 179 because the other prospective jurors' responses may have involved longer or more noticeable pauses, or because the hesitation associated with Prospective Juror No. 179's response may have involved something other than a pause. At most, even if this ground for excusing the prospective juror is "not explicitly confirmed by the record," we "cannot say the record contradicts" it, and defendant's arguments do not provide grounds for withholding deference from the trial court's ruling. (*Mai*, *supra*, 57 Cal.4th at p. 1052; compare Code Civ. Proc., § 231.7, subd. (g)(2) [current rule requiring confirmation by the trial judge and explanation by the party exercising a peremptory challenge when the challenge is premised on a prospective juror's demeanor or inattentiveness].)[21]

---

[21] One of the dissents asserts that the trial court "shifted [the] focus" of the discussion after defense counsel disagreed about Prospective Juror No. 179's hesitation. (Dis. opn. of Liu, J., *post*, at p. 4.) The purported shift, however, appears to have involved the trial court's recollection of the answer the prosecutor had described as involving "some level of hesitation." After defense counsel said, "I disagree he gave any hesitation, he answered the questions very forthrightly," the trial court began to respond, "Well, he had heard of Dragon Family, he had — ," only to be interrupted by defense counsel's statement, "[i]n an old conversation without any details, that he couldn't

In sum, this is a situation in which, even if we were to assume that one or two of the prosecutor's reasons for a strike might raise concerns if viewed in isolation, "the persuasive power of all of them, taken together" warrants the "usual deference to the trial court's assessment of the prosecutor's sincerity." (*People v. Jones* (2013) 57 Cal.4th 899, 918; see also *Nadey, supra,* 16 Cal.5th at p. 137 ["Because the court appeared to judge the prosecutor's credibility in light of 'the reasons as a whole,' and did not 'focus[] on a single stated reason to the exclusion of others' [citation], and because the court was uniquely positioned to evaluate the prosecutor's demeanor in determining his credibility [citation], its ruling is entitled to deference"]; *Smith, supra,* 4 Cal.5th at pp. 1153, 1156, 1157 [viewing the record as a whole, substantial evidence supported the trial court's denial of *Batson* challenges involving two prospective jurors even though, as to one of these jurors, some of the reasons given by the prosecutor "either lack record support or do not withstand comparison to the prosecutor's treatment of other jurors" and, as to the other, one of the prosecutor's reasons "rings false" and another was "not borne out by the record"]; *Manibusan, supra,* 58 Cal.4th at p. 78 ["Given the ambiguity regarding the [foundation for one of the

---

really remember." The trial court resumed, "Well — ," with the prosecutor then interjecting, apparently in response to defense counsel, "That's my point." Defense counsel then stated, "I have made the objection." This discussion is more indicative of engagement by the trial court with the hesitation reason advanced by the prosecutor than any attempt by it to shift the conversation. And ultimately, the court reasonably could have determined that the prosecutor's additional explanation of her concern and defense counsel's submission of the issue made further discussion of the reason unnecessary.

prosecutor's stated reasons] and the prosecution's articulation of other, unquestionably legitimate grounds for the challenge, we find no error in the trial court's ruling"].)[22]  Applying the deferential standard of review that is appropriate here in light of the trial court's superior ability to assess the prosecutor's credibility and the totality of the circumstances associated with the peremptory challenge, we conclude that the record provides adequate support for the trial court's finding that the prosecutor's peremptory challenge was not motivated by race-based discrimination but instead was premised on the race-neutral reasons she provided.[23]

Our conclusion that substantial evidence supports the trial court's ruling is not disturbed by defendant's comparison of Prospective Juror No. 179 with others who ultimately served on

---

[22]  The trial court at one point stated that "[t]he question is whether or not there are *any* race neutral grounds" (italics added).  But it then followed up by stating, "there appear to be race neutral grounds," and it previously stated, in response to the prosecutor's statement of reasons, "*They* appear to be race neutral" (italics added).  The court's comments, taken together, indicate it considered the prosecutor's reasons collectively in assessing her credibility.

[23]  The dissents, applying de novo review, would find a violation of *Batson* and *Wheeler*.  Viewing the reasons given by the prosecutor individually, the dissenting justices find all of them wanting.  (Dis. opn. of Liu, J., *post*, at p. 12; dis. opn. of Evans, J., post, at p. 15.)  As has been explained, de novo review is inappropriate here, and the governing standard of review does not allow us to substitute our own subjective views of who would have been a good juror, or not, in this trial.  Although the reasons given by the prosecutor vary to some extent in their obviousness and the extent to which they find support in the record, viewed as a whole they provide adequate grounds for upholding the trial court's ruling.

the jury. Defendant argues that seated jurors of other races provided responses during jury selection that indicated they could have been excused for reasons similar to those invoked by the prosecution in excusing Prospective Juror No. 179. Defendant notes that two individuals who ultimately served on his jury (Prospective Jurors No. 196 and 274) were engineers and a third (Prospective Juror No. 182) was an engineering student. Defendant also stresses that one of the engineers seated as a juror (Prospective Juror No. 274) said in his jury questionnaire that he had heard about the Dragon Family/Dragon Family Junior or Young Locs gang from a story in the local newspaper, another juror (Prospective Juror No. 255) indicated she had some familiarity with the case through media reports, and a third (Prospective Juror No. 200) thought the case sounded "vaguely familiar," but "couldn't recall anything specific." Finally, defendant notes that another juror (Prospective Juror No. 160) said that her son had been friends with a gang member, and defendant reads the record as indicating she gave this response in a hesitant or halting manner. The prosecutor's failure to exercise peremptory challenges against these jurors, defendant argues, exposes the prosecution's excusal of Prospective Juror No. 179 as having been based on race.

We disagree. Prospective Juror No. 160's possible hesitation and her remote familiarity with a gang member through her son, other jurors' knowledge of the case through media reports, and the fact that some other jurors were engineers or an engineer in training do not establish that they were similarly situated to Prospective Juror No. 179. With some of these jurors, there are only tenuous grounds for any comparison. For example, Prospective Juror No. 160 "couldn't

even identify" the son's friend, and said that, in any event, "[w]e got him away from that."

More fundamentally, the suite of answers provided by Prospective Juror No. 179 during jury selection materially distinguished him from the jurors defendant now identifies as comparable. (See *O'Malley*, *supra*, 62 Cal.4th at p. 977 [noting that the critical question in conducting comparative juror analysis for the first time on appeal is whether "there were any *material* differences among the jurors — that is, differences, other than race, that we can reasonably infer motivated the prosecutor's pattern of challenges"].) Although "a comparison between the challenged juror and a similar nonchallenged juror in regard to *any one of* the prosecutor's stated reasons is relevant, but not necessarily dispositive, on the issue of purposeful discrimination" (*Miles*, *supra*, 9 Cal.5th at p. 543), the forcefulness of defendant's argument is lessened by the fact that "[n]one of the jurors brought to our attention by defendant expressed a substantially similar combination of responses to the responses provided by" Prospective Juror No. 179. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 107; see also *People v. Watson* (2008) 43 Cal.4th 652, 676.) Among the differences that materially distinguished Prospective Juror No. 179 from other candidates for jury service, none of the prospective jurors identified by defendant said that "a lot of" their friends were gang members while growing up and, after connecting their profession as an engineer to an attention to detail, agreed that their work was "very precise."

Furthermore, "[a] party concerned about one factor need not challenge every prospective juror to whom that concern applies in order to legitimately challenge any of them. 'Two panelists might give a similar answer on a given point. Yet the

risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable.'" (*Jones*, *supra*, 51 Cal.4th at p. 365.) This observation is relevant to our evaluation of Prospective Juror No. 274, whom defendant characterizes as similarly situated to Prospective Juror No. 179 in multiple respects. As has been noted, Prospective Juror No. 274 was an engineer. He indicated in his jury questionnaire that he had learned about the case from an article in that day's Orange County Register. He explained, "Article about jury selection. Summarized case. The deceased were not gang members. Tried to escape in car. Got cornered. Got shot. Possible death penalty." When asked in the questionnaire if he had already formed an opinion regarding defendant's guilt, he answered "Yes," stating that in his opinion defendant was "[m]ost likely guilty" and that he "would need strong proof of innocence." The prosecutor could have concluded that these answers justified retaining Prospective Juror No. 274 on the jury notwithstanding any concerns she may have had regarding his profession as an engineer and his prior knowledge about the case.

Defendant also argues that the prosecution's *failure* to examine other jurors who were engineers or an engineer in training about their profession, or Prospective Juror No. 160 about her son's past friendship with a gang member, casts doubt on her motives in excusing Prospective Juror No. 179. (See *Flowers v. Mississippi* (2019) 588 U.S. 284, 308 (*Flowers*) ["disparate questioning can be probative of discriminatory intent"].) This argument is unpersuasive here. First of all, it is not entirely accurate. The prosecutor's questioning of Prospective Juror No. 274 probed whether this candidate, in making a penalty determination, would simply sum up the

number of aggravating factors found to exist and compare them to the number of mitigating factors, with the prosecutor stressing that there was no "math formula" to the penalty calculation. Although the prosecutor did not explicitly tie these questions to the prospective juror's profession as an engineer, it echoed her earlier questioning of Prospective Juror No. 179. The prosecutor also asked a few questions similar to those posed to Prospective Juror No. 179 to Prospective Juror No. 174, who identified himself in his juror questionnaire as Caucasian and whose work experience included time as a clinical laboratory scientist. During voir dire, the prosecutor confirmed with this prospective juror that he had some scientific training and then asked whether he understood that the role of the juror was "a little bit different than exact sciences." The prosecutor would later exercise one of her peremptory challenges on Prospective Juror No. 174.

Moreover, there are ready explanations why the prosecutor might not have delved into these subjects with the other prospective jurors identified by defendant. Among the relevant prospective jurors, only Prospective Juror No. 179 was asked by the defense whether he had qualities such as an attention to detail that might make him a good juror and responded by drawing a connection between an attention to detail and his profession as an engineer. So only for Prospective Juror No. 179 would the prosecutor have been prompted to respond in kind. (See *Flowers*, *supra*, 588 U.S. at p. 310 [acknowledging that "disparate questioning . . . of . . . prospective jurors [of different races] may reflect ordinary race-neutral considerations"].) And the prosecutor may have been satisfied with the trial court's voir dire of Prospective Juror

No. 160, through which it was established that she could not even identify the son's friend who belonged to a gang.

Comparative juror analysis therefore does not provide substantial support for defendant's argument that the prosecutor's exercise of a peremptory challenge against Prospective Juror No. 179 was motivated by race. For this and the other reasons provided above, we reject defendant's *Batson*/*Wheeler* claim.[24]

---

[24] One of the dissents has identified training materials that were obtained by the American Civil Liberties Union of Northern California in response to a Public Records Act request in 2019, and were apparently used to instruct unknown prosecutors in various California counties regarding jury selection. (Dis. opn. of Evans, J., *post*, at pp. 4–12.) The dissent proffers its own interpretation of certain excerpts drawn from these training materials and asserts that principles described in those selected excerpts might be used to provide cover for impermissible racial discrimination by informing unscrupulous prosecutors how they might hide their discriminatory motives. These training materials are not in the record, are not the subject of judicial notice, were not raised by the parties, and are not properly before us. We have no reason to speculate how and to whom the excerpts may have been presented or how they might have been interpreted by their audiences, among other things. Rather than point to other excerpts from the training materials that note the importance of complying with *Batson* and *Wheeler*, we simply emphasize that " ' " '[w]e presume that a prosecutor uses peremptory challenges in a constitutional manner.' " ' " (*Mai*, *supra*, 57 Cal.4th at p. 1048.) We do not presume the opposite. The trial court found that the prosecutor's peremptory challenge here was not motivated by racial bias, and the record supports the trial court's conclusion. Under well-settled law, the trial court's order should be affirmed. The extraneous training materials cited by the dissent do not undermine that conclusion.

## B. Corroboration of Accomplice Testimony

Defendant argues that Villegas's and Do's testimony was insufficiently corroborated by other evidence introduced at trial. We disagree.

As summarized earlier, Villegas and Do testified regarding the circumstances surrounding the shooting, with both witnesses identifying defendant as the shooter. The jury was instructed with a modified version of CALCRIM No. 335 that identified Villegas, Do, and Donny Nguyen as accomplices and explained that the jury could not convict defendant of a charged crime or find the gang-murder special circumstance true based on their statements or testimony alone; instead, their statements and testimony had to be supported by independent evidence that tended to connect defendant to the commission of the crimes. Defendant asserts that other evidence introduced at trial fell short of providing the necessary corroboration.[25]

Section 1111 provides, "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." The statute defines an "accomplice" as someone "who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the

---

[25]     As to this and certain other claims, defendant argues that an alleged violation of state law also violated his federal constitutional rights. " '[N]o separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of [the] constitutional theory . . . .' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364.)

testimony of the accomplice is given." (*Ibid.*) "Section 1111 serves to ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives." (*People v. Davis* (2005) 36 Cal.4th 510, 547.)

The corroboration that section 1111 requires " ' "may be established entirely by circumstantial evidence" ' " and " ' " 'may be slight and entitled to little consideration when standing alone.' " ' " (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1204.) "It is only required that the evidence ' " 'tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the [accomplice] is telling the truth.' " ' " (*People v. Miranda* (1987) 44 Cal.3d 57, 100 (*Miranda*); see also *People v. Perry* (1972) 7 Cal.3d 756, 769 [independent " 'evidence need not corroborate the accomplice as to every fact to which [the accomplice] testifies' "].) The necessary corroboration may involve a defendant's own statements. (*People v. Williams* (1997) 16 Cal.4th 635, 681.)

The accomplice testimony at defendant's trial was adequately corroborated by independent evidence. This additional evidence included: (1) the location of Harrison Pham's Lexus and Do's green Acura close to defendant's residence after the shooting, with an eyewitness having followed the Acura there from the crime scene; (2) testimony from Tran's brother and cousin that the shooter was slim, tall, and dressed in black; (3) forensic evidence that the bullets fired into the black Acura were either .357 or .38 caliber, ammunition that could be fired from a revolver such as the one Do saw defendant possess; (4) the seizure of a cell phone connected to defendant

from the Lexus;[26] (5) evidence indicating that this phone "pinged" off a cell phone tower or towers close to Alerto's and the scene of the shooting around the timeframe when the shooting occurred, and that its user made calls to and received calls from phone numbers associated with other Dragon Family/Dragon Family Junior members on the evening of the shooting; (6) instant messages by the user everybodykilla22 stating, among other things, "i blast three n****z"; (7) forensic evidence suggesting that defendant, while in Arizona, searched the internet for outstanding warrants in his name; and (8) lyrics in defendant's handwriting, found in defendant's Arizona residence, in which the writer identified himself as a "DFJ" gang member and which described murdering the "enime" in "OC" and "coming to take your life" while wearing black. This evidence " ' " 'tend[ed] to connect the defendant with the commission of the crime[s] in such a way as [could] reasonably satisfy the jury that the [accomplices were] telling the truth.' " ' " (*Miranda, supra,* 44 Cal.3d at p. 100.)

## C. Claims Relating to Third Party Culpability

### 1. *Failure to instruct on third party culpability*

Defendant argues that the trial court committed reversible error by failing to instruct the jury sua sponte regarding how it should consider evidence of third party

---

[26]     Defendant, noting that the phone was found in Harrison Pham's Lexus, argues that another gang member could have been using the device on the night of the shooting. While that is possible, Villegas and Do, as well as the eyewitness who pursued the Lexus from the scene of the shooting, all testified to a swap of passengers between or across vehicles after the shooting had occurred. The jury could have concluded that defendant possessed his phone that evening up until that time.

culpability in determining whether the prosecution had met its burden of proof. Defendant argues that such an instruction was necessary for the jury to adequately consider evidence that someone other than defendant shot the victims. We find no error.

### a. *Facts*

The instructions that were given to the jury at the close of the guilt phase included CALCRIM No. 220, portions of which provided, "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt," and "[u]nless the evidence proves a defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."[27] The defense did not request an instruction that specifically addressed the relationship between the burden of proof and evidence of third party culpability.

Defendant now argues that the court should have instructed the jury along the following lines: "You have heard evidence that a person other than the defendant may have committed the offenses with which the defendant is charged. The defendant is not required to prove the other person's guilt.

---

[27] The jury also was instructed with CALCRIM No. 373, which, as given at trial, provided, "The evidence shows that other persons may have been involved in the commission of the crimes charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a co-defendant in this particular trial. You must not speculate about whether those other persons have been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crimes charged. [¶] This instruction does not apply to the testimony of Aaron Villegas, Quang Do, and Donny Nguyen."

It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. Therefore, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt. Evidence that another person committed the charged offense may by itself leave you with a reasonable doubt as to the determination. However, its weight and significance, if any, are matters for your determination. If after considering all of the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty."

b. *Analysis*

The legal principles pertinent to defendant's claim of instructional error " 'are clear.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824 (*Gutierrez*).) " 'A trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court." ' " (*Ibid*.) A trial court also " 'has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions "as to defenses ' "that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " ' " (*Ibid*.) Yet when " 'instructions relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi,' " such instructions " 'are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.' " (*Ibid*.) More generally, "[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise

55

correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638.)

We have previously rejected arguments of instructional error similar to the one raised by defendant. We have explained that a specific instruction that describes how evidence of third party culpability may give rise to reasonable doubt is unnecessary because standard instructions regarding the presumption of innocence and the People's burden of proving guilt beyond a reasonable doubt provide adequate guidance to the jury. (E.g., *Gutierrez, supra*, 45 Cal.4th at p. 825 ["Because the jury was properly instructed as to these issues, and because the jury could have acquitted defendant had it believed that a third party was responsible for [the victim's] death, no third party culpability instruction was necessary"]; *People v. Abilez* (2007) 41 Cal.4th 472, 517 (*Abilez*) ["no special instruction on third party culpability was necessary to apprise the jury of the pertinent legal principles"]; see *People v. Saille* (1991) 54 Cal.3d 1103, 1120 [explaining that the court need not sua sponte instruct the jury regarding the evaluation of evidence offered "in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt"].)

We reach the same conclusion here. Defendant's jury was instructed on the presumption of innocence and the People's burden of proving defendant's guilt beyond a reasonable doubt. The jury would have acquitted defendant had it concluded that the prosecution had not met this burden, as would be true if the jury harbored reasonable doubt whether defendant was the shooter. No additional instructions were required. And while this point is not critical to the analysis, we also observe that at closing argument the defense pressed the theory that the victims had been shot by someone other than defendant. This

argument drove home that the jury could consider evidence of third party culpability in its deliberations, as the instructions indicated they could.

Defendant acknowledges this court's holdings in *Gutierrez* and *Abilez*, but he regards this case as distinguishable due to the purported "lack of overwhelming evidence of guilt, and the presence of overwhelming evidence of third party culpability." This asserted balance of evidence, defendant contends, means that "[t]he fact the jury was instructed on the standard instructions of reasonable doubt, burden of proof and presumption of innocence was not sufficient to render the error harmless in light of the other instructions given." We disagree with defendant's characterization of the evidence of third party culpability in this case as "overwhelming." But, in any event, the purported weight of the evidence does not change the analysis. Just as in *Gutierrez* and *Abilez*, the jury here received instructions sufficient to guide its assessment of evidence of third party culpability, whatever its weight, and the trial court had no sua sponte responsibility to provide additional direction.

Defendant argues in the alternative that his trial counsel was ineffective for failing to request an instruction regarding evidence of third party culpability as it relates to the burden of proof. He claims that "there could be no possible tactical reason for not requesting [the] instruction."

This argument implicates the well-established principles applicable to claims of ineffective assistance of counsel raised on direct appeal. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that

counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) Regarding deficient performance, " 'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." ' [Citation.] When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was ' " 'no conceivable tactical purpose' " for counsel's act or omission.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674–675 (*Centeno*).)

Defendant has not shown he received ineffective assistance in violation of constitutional guarantees. Defendant's trial counsel reasonably could have concluded that the instructions given to the jury provided it with adequate direction regarding how to consider evidence of third party culpability. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1224 (*Rangel*) [" '[T]he reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof' "].) Counsel also could have reasonably regarded an additional instruction, such as the one now proposed by defendant, as repetitive of the instructions that were provided, and potentially confusing to the jury. The adequacy of the instructions that were given also defeats any claim of prejudice. (See *Gutierrez*,

*supra*, 45 Cal.4th at p. 825; *Abilez*, *supra*, 41 Cal.4th at pp. 517–518.)  Defendant has therefore not established either prong of an ineffective assistance of counsel claim.

### 2. *Failure to grant continuance*

Defendant contends that the trial court erred when it denied a continuance to allow for a further inquiry into why DNA found on the black bandana seized from Do's Acura was initially attributed to an individual unrelated to the case before it was identified as belonging to Eric Pham.  We find no abuse of discretion and no violation of defendant's constitutional right to due process.

### a. *Facts*

Months before trial, the prosecution provided the defense with discovery indicating that DNA found on the black bandana retrieved by police from Do's Acura matched the DNA of an individual named Henry Pham, who otherwise had no connection with the case.  On April 17, 2009, the prosecution advised the defense that a later comparison of the DNA on the bandana with the DNA of Henry Pham found no match.  The prosecutor had no explanation for the different results.  The trial court asked the prosecutor to step outside and spoke with defense counsel in chambers.  Counsel told the court they believed Eric Pham's DNA would be found on the bandana. Back in open court, the trial court stated that "it would be ineffective assistance of counsel for counsel not to pursue this particular issue."  At the court's urging, the parties agreed that DNA samples would be obtained, if possible, from Harrison Pham, Danny Duong, Aaron Villegas, and Eric Pham, and tested to see if they matched the DNA profile on the bandana.

On Wednesday, April 22, 2009, the prosecutor informed the court and the defense that the DNA profile drawn from the bandana matched Eric Pham's DNA. The prosecutor stated that the original attribution of the DNA to Henry Pham owed to a mix-up in the collection of the DNA used in the earlier DNA comparison.

Defense counsel argued that this error warranted additional investigation. Agreeing, the trial court inquired if Eric Pham, then housed at the county jail, could be brought to the courtroom. Pham and his attorney appeared that afternoon. Pham testified that he had provided a DNA sample about a year earlier, while housed at the county jail. He and Henry Pham were both housed in the same cellblock at the jail, a few cells apart. At the hearing, Eric Pham testified that he gave the sample one night after the last name "Pham" was called over a jail loudspeaker and his cell door opened. When he provided that sample, he gave his name as "Eric." No one asked him to repeat his name or show his identification band when he provided the sample.

In a subsequent chambers conference without the prosecutor present, defense counsel told the trial court that they believed the circumstances surrounding the earlier DNA collection were still unclear and that Eric Pham was more closely involved in the shooting than he claimed to be. Counsel explained that they wanted to explore the possibility that Eric Pham had engineered the DNA mix-up to disguise his involvement in the charged crimes. The defense sought discovery, including jail records, regarding the acquisition of the earlier DNA sample, and they requested "some delay, maybe just a few days" so that a defense expert could look at the DNA results the prosecution had referenced earlier that day. The

trial court stated that it intended to begin jury selection on April 27, and it gave the defense, in the court's words, "the rest of this week to do whatever goose chasing you want to do." Returning to the courtroom, the court urged the prosecutor to provide the defense with records relating to the collection of the earlier DNA sample at the jail.

Jury selection began on April 27, 2009, as the trial court had anticipated. One week later, on May 4, defense counsel informed the court he had "something just for the record." Counsel said that the defense had received discovery relating to the earlier collection and testing of DNA from the prosecution and requested a continuance of "about four weeks" to seek additional discovery and for his expert to review whatever records would be disclosed. Counsel explained, "I'm still trying to show a link rather than just coincidence, that somehow Eric Pham orchestrated this in order to protect himself from exactly what occurred." The prosecutor said that she had provided the defense with everything the Department of Justice had given her relating to the collection and testing of the earlier DNA sample. Defense counsel responded, "The prosecution says they can't find it. I think I need an opportunity to see if I can find it." The court ruled, "I'm not going to grant the continuance at this point. We're going to proceed."

b. *Analysis*

A criminal trial may be continued only upon a showing of good cause. (§ 1050, subd. (e).) The trial court has broad discretion in determining whether good cause exists. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) In deciding whether to grant a continuance, "The court must consider ' " 'not only the benefit which the moving party anticipates but also the

likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.' " ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 450 (*Doolin*).)  The court's "discretion 'may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.'   [Citation.]   'To effectuate the constitutional rights to counsel and to due process of law, an accused must . . . have a reasonable opportunity to prepare a defense and respond to the charges.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 670 (*Roldan*).)   Yet, "to demonstrate the usefulness of a continuance" sought to acquire additional evidence, "a party must show both the materiality of the evidence necessitating the continuance and that such evidence could be obtained within a reasonable time." (*People v. Beeler* (1995) 9 Cal.4th 953, 1003 (*Beeler*).)

A trial court's denial of a continuance is reviewed for an abuse of discretion (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 508), with the unsuccessful movant having the burden of establishing error (*Beeler, supra,* 9 Cal.4th at p. 1003).   On review, when it is asserted that the denial of a continuance violated a defendant's constitutional due process rights, "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.   The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (*Ungar v. Sarafite* (1964) 376 U.S. 575, 589.)

The trial court acted within its discretion when it denied defendant's request for a four-week continuance.  In moving for a continuance, the defense did not establish good cause for such

a lengthy delay. (See *People v. Snow* (2003) 30 Cal.4th 43, 75 ["Counsel's bare assertion that they would need 30, 45, or 60 days to complete their examination of the paint samples did not constitute good cause for such a lengthy continuance, especially as the prosecution had not even begun to present its own case"].)[28] The trial court had already inquired into the mistaken DNA identification through the earlier evidentiary hearing. It reasonably could have concluded that the extra time requested by the defense was unlikely to yield additional records that would meaningfully bolster its theory of an orchestrated mix-up; that any defense expert already had adequate time to review the records that had been produced; and that, especially with jury selection having commenced, the speculative prospect of helpful additional records was outweighed by the burdens that likely would result from the substantial delay requested by the defense.[29] Accounting for these considerations, the trial court's denial of the continuance did not deny defendant a reasonable opportunity to develop a defense and was not an abuse of its discretion. (See *Doolin*, *supra*, 45 Cal.4th at p. 451 [upholding the denial of a continuance where the defendant "made no showing that he could produce specific, relevant mitigating evidence within a reasonable time"]; *Roldan*, *supra*, 35 Cal.4th at p. 670; *People v. Roybal* (1998) 19 Cal.4th 481, 505 [no abuse of discretion in denying a continuance when the defense offered only "vague expressions of hope" that additional time would lead to the identification of a helpful expert].) Consistent with this

---

[28] The prosecution rested, and the defense began to put on its case, on May 18, 2009, two weeks after the continuance request.

[29] As indicated, the parties stipulated to the presence of Eric Pham's DNA on the bandana found in the green Acura.

conclusion, we find no violation of defendant's due process rights.

### D. Admission of Instant Messages and Handwritten Lyrics

Defendant argues that the trial court erred when it allowed the prosecution to introduce the instant messages and handwritten lyrics seized from the Arizona apartment where he was found by law enforcement. In his original merits briefing, defendant challenged only the admissibility of the handwritten lyrics, arguing that they should have been excluded pursuant to Evidence Code section 352 and that their admission violated his rights to due process and a fair trial. In a supplemental brief, defendant later argued that both these lyrics and the instant messages constitute creative expressions covered by Evidence Code section 352.2, a recently enacted statute (Stats. 2022, ch. 973, § 2) that requires a trial court to take specific considerations into account when determining the admissibility of creative material. Defendant also contends that Evidence Code section 352.2 applies retroactively to his case, which was tried before that statute entered into effect, and that under the statute's terms, neither the instant messages nor the lyrics should have been admitted.

We conclude, first, that Evidence Code section 352.2 does not apply retroactively to this case. Statutes are presumed to operate only prospectively, and this statute, which articulates a rule of evidence, does not implicate the contrary presumption of retroactive application that adheres to certain kinds of ameliorative legislation that have a sufficiently close relationship to the reduction of punishment. This conclusion means we need not address the admissibility of the instant messages, since defendant has not argued they are inadmissible

under Evidence Code section 352. Addressing the lyrics' admissibility under Evidence Code section 352 and relevant constitutional principles, we find no abuse of discretion by the trial court and no violation of defendant's constitutional rights.

1. *Facts*

Defendant brought a motion in limine prior to trial to exclude the handwritten lyrics obtained from the Arizona apartment where he was found in March 2004. The defense argued that the handwritten lyrics had not been adequately connected to defendant, were irrelevant insofar as they were seized months after the killing, and were unduly prejudicial under Evidence Code section 352.

The prosecution's opposition to the motion in limine characterized the lyrics as "highly relevant and probative" on the issues of defendant's motive and intent, and the identity of the shooter. At a pretrial hearing, the court denied defendant's motion to exclude the lyrics, regarding them as relevant to the issues of motive and intent in connection with the charge of active participation in a criminal street gang.

During her opening statement, the prosecutor quoted a portion of a statement, appearing in both the lyrics and in the instant messages obtained from the Arizona computer, as follows: " '[n]****z cant see me for the fact that I stay with my black beanie disguise. So don't be surprised when these guys dressed in black are coming to take your life.' "[30] The prosecutor

---

[30] Addressing the racial slur appearing in the instant messages and lyrics, the prosecutor said during her opening statement that defendant "doesn't use it as a racial slur on African-Americans," but as "gangster stuff." She told the jury,

also referred to the lyrics by saying that in his writings, defendant more generally "talks about [how] the streets of O.C. are his and his gang's."

The jury heard testimony regarding the seizure of the lyrics at defendant's Arizona apartment. During the subsequent examination of Detective Walker, the prosecutor asked about lines she quoted as, "black fitted Detroit Tigers baseball cap, but the D stands for Dragon. That's believed that n\*\*\*a checked the tat on my back. Fool I stay strapped. .357 was 187 with 357's, A.K.'s and all that."[31] Detective Walker described these lines as "talking about or writing about the gang lifestyle, and the life the gangsters lead." Asked about lyrics quoted as, "bailing in all black in the black Cadillac with the black tint in the back and the black strap on my lap," and "black gangsta baseball cap with the hood on the front and my name on the back," Walker testified that in his opinion, these lyrics were "consistent with the gang lifestyle." Regarding the lines, as read by the prosecutor, "N\*\*\*\*z can't see me for the fact that I stay with my black beanie disguise, so don't be surprised when the guys dressed in black are coming to take your life," Walker testified that black clothing was consistent with Dragon Family's colors and identifiers.

---

"He can use it as a term of affection, and you'll see that through some of the things he's written, or he uses it to talk about other people, enemies sometimes, other folks, cops."

[31] This discussion repeats the prosecutor's phrasing of her questions, as captured in the reporter's transcript of trial proceedings. As we have explained (see fn. 11, *ante*), in addressing this claim, except as otherwise noted we quote and address the lyrics as they were written and appear in People's Exhibit 110.

When the prosecutor attempted to read more lyrics into the record, the court interrupted and asked to see counsel at sidebar. The court said that "[t]he documents kind of speak for themselves," and that reading them into the record was a waste of time. When the prosecutor read a few more lines into the record after the sidebar, the defense objected under Evidence Code section 352. The court sustained the objection and ordered the question stricken. Upon further questioning, the gang expert testified that he had relied upon the handwritten lyrics, as well as the instant messages, in forming his opinion that defendant was a member of the Dragon Family/Dragon Family Junior gang at the time of the fatal shooting.

The handwritten lyrics were not formally admitted as an exhibit until after the last guilt phase witness testified. Just prior to closing arguments, the parties met with the court to discuss the admission of trial exhibits. At that time the defense objected to the admission of the handwritten lyrics on the ground that they merely constituted "a lot of talk about guns and straps, and the sort of poetic stuff about, you know, being around, creeping around at nighttime, and driving in Cadillacs and shooting guns, and just all this kind of stuff that does not at all speak in any manner whatsoever to the homicide in question before the jury." Assisting counsel for the defense urged the court to read the lyrics and perhaps "decide it is all coming in," or "decide none of it is coming in, or the court might decide maybe we need to take some of it out and redact it, whatever." The court indicated it was prepared to review the lyrics. After another topic was briefly discussed, the prosecutor returned to the lyrics' admissibility and argued that they should be admitted insofar as Detective Walker had relied upon them in forming his opinion that defendant was a member of Dragon

Family/Dragon Family Junior at the time of the charged crimes. When the prosecutor referenced the first few pages, the court said that "[i]f you stop at those two [pages], that is acceptable, the rest of it seems a bit much." Following further explanation by the prosecutor, the court added that "the last four pages seem to me to be nothing more than rap lyrics that didn't add anything to the first three pages." The prosecutor offered to redact repetitive portions of the lyrics, while indicating that she did not regard the first two pages, or specific passages appearing on the third and fourth pages, as repetitive. The court said, "Okay, why don't you submit to the court the ones you think should be in."

When the discussion resumed shortly thereafter, the prosecutor advised the court that lead defense counsel was withdrawing the defense objection to the lyrics and wanted the document "as is." Lead counsel explained, "Here is my objection now that we have kind of discussed it. . . . [¶] If you try to redact it except for the other portions that the prosecution thinks is somewhat probative, then you delete all the portions of an intent to make rap lyrics, and then we are back in a worse position." The court replied, "Like I said, I think the first two, maybe three pages are relevant on the issue of participation in a gang. I don't see anything in there that connects [defendant] with the shooting. So anything other than to demonstrate that he is a member of this gang really doesn't matter, which is why I thought the balance of your exhibit is not particularly relevant." The prosecutor offered that she had "propose[d] a redacted copy where [she] took out pages all together [*sic*], but at the end of the day they say they want the whole thing." Assisting counsel for the defense, who disagreed with lead counsel's approach, clarified, "Not they, I want to be clear on that." The court

replied, "Lead counsel." The discussion then turned to other exhibits, with seven pages of lyrics being admitted, without redaction, as People's Exhibit 110.

The prosecutor quoted the handwritten lyrics numerous times during her closing arguments at the guilt and penalty phases of trial. These references included several lyrics beyond those that had previously been read aloud by the prosecutor in eliciting Detective Walker's testimony. In his closing argument at the guilt phase, defense counsel characterized the rap lyrics as nonfactual creative expressions that did not constitute reliable evidence of defendant's guilt.

The instructions given to the jury at the close of the guilt phase of trial provided, in relevant part, "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related enhancements and special circumstance allegations charged, or, the defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness, and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character, or that he has a disposition to commit crimes." No limiting instruction specific to the jury's consideration of the lyrics was requested or given.

### 2. *Evidence Code sections 352 and 352.2*

Pursuant to Evidence Code section 352, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission

will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The "undue prejudice" that Evidence Code section 352 is concerned with " 'is that which " ' "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 29, italics omitted.) A " 'court enjoys broad discretion' " in determining the admissibility of evidence under Evidence Code section 352 (*People v. Michaels* (2002) 28 Cal.4th 486, 532), and we review a ruling under the statute for an abuse of this discretion (*People v. Pineda* (2022) 13 Cal.5th 186, 222 (*Pineda*)). "A ruling subject to this standard of review 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Ibid.*)

Evidence Code section 352.2, which became effective on January 1, 2023, calls for a particularized inquiry when the admissibility of a creative expression is challenged under Evidence Code section 352. Subdivision (a) of Evidence Code section 352.2 provides, "In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under [Evidence Code] Section 352, shall consider, in addition to the factors listed in [Evidence Code] Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue

prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evidence Code] Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings."  Subdivision (b) of Evidence Code section 352.2 requires the court, in evaluating the admissibility of a creative expression, to consider certain evidence "[i]f proffered and relevant to the issues in the case," in addition to "any additional relevant evidence."  The statute defines a " 'creative expression' " as "the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media."  (*Id.*, § 352.2, subd. (c).)

### 3. *Analysis: Retroactivity of Evidence Code section 352.2*

As a threshold issue, the parties dispute whether Evidence Code section 352.2 applies here and should guide our review of the admissibility of the lyrics in this appeal.  Defendant argues that a presumption of retroactive application attaches to Evidence Code section 352.2 because of its assertedly ameliorative character (see *In re Estrada* (1965) 63 Cal.2d 740, 745 (*Estrada*)), so that its provisions apply in all cases, including this one, in which the judgment was not yet final when the law entered into effect.  The Attorney General disagrees.  He argues that the standard rule of prospective-only application of new statutes adheres here (§ 3), while the *Estrada* presumption does not; and because the trial here occurred many years before

Evidence Code section 352.2's effective date, the statute is inapplicable.  The Attorney General is correct.

The question of whether Evidence Code section 352.2 applies retroactively has divided the Courts of Appeal. (Compare *People v. Venable* (2023) 88 Cal.App.5th 445, 456, review granted May 17, 2023, S279081 [Evid. Code, § 352.2 applies retroactively to cases with judgments that are not yet final] with *People v. Ramos* (2023) 90 Cal.App.5th 578, 596, review granted July 12, 2023, S280073 (*Ramos*) [Evid. Code, § 352.2 does not apply retroactively] and *People v. Slaton* (2023) 95 Cal.App.5th 363, 372, review granted Nov. 15, 2023, S282047 (*Slaton*) [same].)

In addressing this question, we are aided by our recent decision in *People v. Burgos* (2024) 16 Cal.5th 1 (*Burgos*).  There, we determined that new trial bifurcation procedures enacted through the same Assembly Bill 333 that also changed the definition of a pattern of criminal gang activity within section 186.22 do not operate retroactively.[32]  These bifurcation provisions, which the Legislature codified in section 1109, allow a defendant to defer the trial of a gang enhancement (§ 186.22, subds. (b), (d)) until after the defendant's guilt for the underlying offense has been determined (§ 1109, subd. (a)), and to have a count alleging active participation in a criminal street gang (§ 186.22, subd. (a)) "tried separately from all other counts that do not otherwise require gang evidence as an element of the crime" (§ 1109, subd. (b)).

---

[32]    As discussed *ante* and *post*, the provisions of Assembly Bill 333 that changed the definition of a pattern of criminal gang activity *do* operate retroactively.

The defendants in *Burgos* argued on appeal that this reform applied retroactively to their cases, in which the verdicts had been rendered before Assembly Bill 333 became effective. (*Burgos, supra,* 16 Cal.5th at p. 9.)  We began our analysis of this argument with the general presumption that statutes apply only prospectively.  (*Id.* at pp. 11–12, citing, e.g., *People v. Buycks* (2018) 5 Cal.5th 857, 880; *People v. Brown* (2012) 54 Cal.4th 314, 324 & *People v. Floyd* (2003) 31 Cal.4th 179, 184; see also § 3 ["No part of [the Penal Code] is retroactive, unless expressly so declared"]; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287 (*Tapia*) ["It is well settled that a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise"].)  In ascertaining whether the Legislature sought to depart from the standard rule of prospective-only application, we first consulted the relevant statutory text.  (*Burgos,* at pp. 19–20.)  We explained that the enactment neither expressly provided for retroactive application of the bifurcation procedures nor otherwise "clearly and unavoidably" indicated that the Legislature intended for these procedures to operate retroactively.  (*Id.* at p. 19.)  Noting that Assembly Bill 333 included legislative findings that expressed "significant concerns about gang enhancements in general" (*Burgos,* at p. 19), we determined that these "strongly worded legislative findings relating to racial bias and unfairness in the criminal justice system" did "not necessarily convey that the Legislature intended for section 1109 — which concerns the order of presentation of evidence at trial, not the substantive scope of the gang enhancements — to apply retroactively to cases that have already been tried" (*id.* at p. 20, fn. 5).

Our decision in *Burgos* also considered the *Estrada* presumption and determined that it did not apply. In *Estrada*, we explained, "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, *supra*, 63 Cal.2d at p. 745.)

*Burgos* reviewed our prior decisions applying *Estrada*[33] and concluded from this survey that "[w]e have adhered to

_____

[33] In this review, *Burgos* explained that we had "applied *Estrada*'s inference of retroactivity to legislation that created an affirmative defense, contracted a criminal offense, or otherwise lessened punishment in some meaningful manner" (*Burgos*, *supra*, 16 Cal.5th at p. 13, citing *People v. Prudholme* (2023) 14 Cal.5th 961, 968–969; *People v. Wright* (2006) 40 Cal.4th 81, 95; *People v. Nasalga* (1996) 12 Cal.4th 784, 798; *Tapia*, *supra*, 53 Cal.3d at pp. 300–301 & *People v. Rossi* (1976) 18 Cal.3d 295, 302); "to statutes that give trial courts discretion to impose lesser punishment" (*Burgos*, at p. 13, citing *People v. Stamps* (2020) 9 Cal.5th 685, 699 & *People v. Francis* (1969) 71 Cal.2d 66, 76); and "to statutes that, while not limited to reducing punishment for a particular crime, created a concrete avenue for

section 3's default rule of prospective operation in a variety of contexts and have applied *Estrada*'s limited inference of retroactivity only to statutes that 'are analogous to the *Estrada* situation' and by their nature implicate '*Estrada*'s logic' [citation]; that is, statutes that either reduce the punishment for a criminal offense or create discretion to reduce such punishment, or narrow the scope of criminal liability, because such enactments give rise to an 'inevitable inference that the Legislature [or electorate] must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally should apply.' " (*Burgos*, *supra*, 16 Cal.5th at p. 16.) We determined that the *Estrada* presumption did not apply to the bifurcation procedures at issue because, "[b]y its terms, section 1109 does not directly or potentially reduce the punishment for an offense. Nor does it change the elements of a substantive offense, defense, or penalty enhancement. Likewise, it does not create an alternative avenue for certain individuals to receive lesser or no punishment. Instead, section 1109 reflects a prophylactic procedural rule that modifies the sequence of trial proceedings." (*Burgos*, at p. 21.) Although section 1109 represented "an effort to minimize the potentially prejudicial impact of gang evidence" (*Burgos*, at p. 21), its bifurcation procedures did "not alter the criminality of defendant's conduct or the severity of punishment." (*Ibid*.) Therefore, we determined, "the logic of *Estrada* does not apply." (*Ibid*.; see also *id*. at p. 25, fn. 8 ["A voluntary procedure which

---

certain individuals charged with a criminal offense to be treated more leniently or avoid punishment altogether" (*Burgos*, at p. 13, citing *People v. Frahs* (2020) 9 Cal.5th 618, 624, 629 & *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303).

may (or may not) alter when gang evidence is admitted at trial is not the type of ameliorative reduction in punishment that gives rise to *Estrada*'s inference of retroactivity"].)

Guided by our analysis in *Burgos*, we conclude that Evidence Code section 352.2 does not apply retroactively in this appeal.

The presumption that new statutes operate only prospectively applies to provisions of the Evidence Code. (See Evid. Code, § 12, subds. (a), (b); *People v. Fitch* (1997) 55 Cal.App.4th 172, 185.) Examining the language of Evidence Code section 352.2 and its uncodified legislative findings (Stats. 2022, ch. 973, § 1), we see nothing that "clearly and unavoidably" (*Burgos*, *supra*, 16 Cal.5th at p. 19) reveals an intent to depart from the general rule of prospective-only application. The text of Evidence Code section 352.2 is silent on this question. Meanwhile, the Legislature described its intent in enacting the statute as "to provide a framework by which courts can ensure that the use of an accused person's creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice." (Stats. 2022, ch. 973, § 1, subd. (b).) These findings neither state nor clearly imply an intent that the statute apply retroactively. "With no 'express declaration of retroactivity or a clear and compelling implication that the Legislature intended' to apply the statute retroactively," we must apply the presumption that Evidence Code section 352.2

"operates prospectively unless the statute 'lessen[s] . . . punishment' within the meaning of *Estrada*." (*Burgos*, at p. 20.)

*Estrada*'s rationale does not apply here. Evidence Code section 352.2 "does not directly or potentially reduce the punishment for an offense. Nor does it change the elements of a substantive offense, defense, or penalty enhancement. Likewise, it does not create an alternative avenue for certain individuals to receive lesser or no punishment." (*Burgos*, *supra*, 16 Cal.5th at p. 21; see also *Ramos*, *supra*, 90 Cal.App.5th at p. 595, review granted ["Even though Evidence Code section 352.2 may, in many instances, end up being beneficial to a criminal defendant in that it may result in the exclusion of evidence favorable to the People, it is not a statute that creates the possibility of *lesser punishment* or any other type of more lenient treatment" or one "that *reduces criminal liability*"].) Evidence Code section 352.2 instead implements an essentially "neutral" rule of evidence. (*Slaton*, *supra*, 95 Cal.App.5th at p. 373, review granted.) As explained in *Slaton*, although Evidence Code section 352.2 may "tend to affect the prosecution's ability to present evidence more than a defendant's ability," it applies to all creative expressions regardless of their proponent as evidence. (*Slaton*, at p. 373.) Evidence Code section 352.2 thus may operate to exclude creative expressions when offered by a *defendant* to support a theory of third party culpability, or for some other purpose. (*Slaton*, at p. 373; cf. *People v. Melendez* (2016) 2 Cal.5th 1, 24 (*Melendez*) [considering, under Evid. Code, § 352, the admissibility of lyrics offered by the defendant in a murder trial to prove that another person was the killer].)

The *Slaton* court concluded that "evidentiary rules of this sort do not warrant *Estrada* treatment" (*Slaton*, *supra*,

95 Cal.App.5th at p. 373, review granted), a conclusion with which we agree. The Legislature could intend for prospective-only application of a rule of evidence such as that found in Evidence Code section 352.2 for reasons unrelated to "a desire for vengeance." (*Estrada, supra,* 63 Cal.2d at p. 745.) These reasons include an appreciation that applying a new evidentiary rule "retroactively to already-concluded proceedings will inevitably come with systemic costs (which may affect the resources available to ensure the timely and effective administration of justice in other cases)." (*Burgos, supra,* 16 Cal.5th at p. 22.) With Evidence Code section 352.2 having at best an attenuated and inconsistent connection to reduced punishment, and there being good reason why the Legislature might not have intended for its approach toward the admissibility of creative expressions to apply retroactively, the *Estrada* inference of retroactive application does not attach to the statute.[34]

One of the dissents argues that Evidence Code section 352.2 should be given retroactive effect. (Dis. opn. of Liu, J., *post,* at pp. 1–2, 12–17.) The dissent describes Evidence Code section 352.2 as having "the intent and effect of decriminalizing creative expression." (Dis. opn. of Liu, J., *post,* at p. 14.) This assertion mischaracterizes the statute. Evidence Code section 352.2 does not decriminalize anything. It does not even render all creative expressions inadmissible. It provides additional direction for evaluating the admissibility of creative expressions. Within its framework, courts shall consider several factors that they *already* might have folded into an evaluation

---

[34]    We disapprove *People v. Venable, supra,* 88 Cal.App.5th 445, to the extent it is inconsistent with this opinion.

of whether this type of material was admissible under Evidence Code sections 352 and 1101.  (See, e.g., *People v. Coneal* (2019) 41 Cal.App.5th 951, 969 (*Coneal*).)  Evidence Code section 352.2 is therefore multiple steps removed from decriminalization and very different from the kinds of laws that we have regarded as susceptible to the *Estrada* inference.

The dissent also argues that various materials (including a legislator's webpage) indicate Evidence Code section 352.2 is not entirely neutral in its application and was enacted to benefit criminal defendants.  (Dis. opn. of Liu, J., *post,* at pp. 14–15, citing, e.g., Evid. Code, § 352.2, subd. (a); Stats. 2022, ch. 973, § 1, subd. (b).)  This argument misses the point.  Contrary to the dissent's position, the critical question, for purposes of applying the *Estrada* inference, is not whether one can extract from the statutory text, legislative findings, or the other sources some intent to change or clarify the law in a manner that may be beneficial to criminal defendants, viewed as a whole.  Were that the test, *Burgos* may well have been decided differently.  (See *Burgos, supra,* 16 Cal.5th at p. 24 ["New bifurcation procedures that may, in some instances, be beneficial to a criminal defendant in that they conceivably could result in the exclusion of gang-related evidence during the trial of charged offenses are not the equivalent of a change in the legislated punishment that must be applied to all nonfinal cases on appeal"]; see also *ibid.* [noting that "[t]he uncodified legislative findings concerned with bifurcation establish an intent to promote fairness and reduce the potential for prejudice in trial proceedings where a gang enhancement is alleged," yet "they do not reflect an intent to lessen punishment within the meaning of *Estrada* and its progeny"]; *id.* at p. 27.)  Instead, "our precedent instructs that" in determining the applicability of the *Estrada* inference, we

focus first and foremost on whether there is a close enough relationship between the substantive provisions of a statute and the reduction of punishment. (*Id.* at p. 25.) As we have explained, it is clear that the substantive provisions of Evidence Code section 352.2 do not bear a close enough connection to reduced punishment to justify an inference that reverses the standard presumption that statutes operate only prospectively. Nothing that the dissent relies upon fills that gap. Because the framework for ascertaining the admissibility of evidence specified by Evidence Code section 352.2 does "not alter the criminality of [a] defendant's conduct or the severity of punishment, the logic of *Estrada* does not apply." (*Burgos*, at p. 21.) We must instead apply the general presumption that statutes apply only prospectively.

For these reasons, we conclude that Evidence Code section 352.2 does not guide us in this appeal. The discussion below therefore reviews defendant's claim of error through the lens of Evidence Code section 352 and defendant's constitutional rights to due process and a fair trial, without further consideration of Evidence Code section 352.2.

4. *Analysis: Application of Evidence Code section 352*

Again, defendant does not argue that the instant messages were inadmissible under Evidence Code section 352. His challenge to the admissibility of this evidence invokes only Evidence Code section 352.2, which as just discussed, does not apply here. The discussion below therefore addresses only the admissibility of the handwritten lyrics under Evidence Code section 352 and federal constitutional principles.

Statements by a defendant in the form of poetry or music lyrics are not " 'judged by a standard of prose oratory.' " (*In re*

*George T.* (2004) 33 Cal.4th 620, 636–637.) It is commonly understood that these creative compositions may involve figurative or nonliteral expressions, instead of factual descriptions of the speaker's intentions or acts. In some circumstances, however, poetry or lyrics, including rap lyrics, may constitute relevant and admissible evidence regarding matters including their author's motive and intent. (See *People v. Zepeda* (2008) 167 Cal.App.4th 25, 35 (*Zepeda*) [regarding the lyrics in two musical tracks credited to the defendant as "probative of [the] defendant's state of mind and criminal intent, as well as his membership in a criminal gang and his loyalty to it"]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373 (*Olguin*) [determining that lyrics authenticated as the defendant's work "demonstrated his membership in [a gang], his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing"].) An objection to lyrics as inadmissible under Evidence Code section 352 implicates a highly contextual analysis of their probative value as measured against the threat of undue prejudice that may be associated with their consideration by the trier of fact. In this respect, while " '[f]ew would argue . . . that Johnny Cash really "shot a man in Reno just to watch him die" ' " (*People v. Hin* (2025) 17 Cal.5th 401, 477 (*Hin*)), it has also been noted that "[i]f Johnny Cash had ever been charged with murdering a man in Reno, the prosecution would have likely been able to introduce Cash's lyrics as evidence that the murder was premeditated. On the other hand, if Cash was charged with accidentally stabbing a man in Las Vegas, the prejudicial impact of using Cash's discussion of an unrelated fictional crime in one of his songs would far exceed any potential probative value." (*United States v. Carpenter* (E.D.N.Y. 2019) 372 F.Supp.3d 74, 78–79.) Among

the factors that may be relevant to the analysis, "where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged crime, their probative value as a statement of fact is increased." (*Coneal, supra,* 41 Cal.App.5th at p. 969.) The probative value of lyrics may also be enhanced when their contents are corroborated by other evidence, although this corroborative evidence "may also render the lyrics cumulative." (*Ibid.*)

In arguing that the trial court abused its discretion, defendant asserts that the handwritten lyrics were cumulative of other evidence, of minimal probative value, and inflammatory. He contends that "[a] juror who viewed this evidence would be likely to forego a careful analysis of the evidence and instead vote to convict if only to take a proud and boastful gang member off the streets before he could carry out the violence he boasted of." The Attorney General, meanwhile, argues that the lyrics "provided evidence that [defendant] was associated with the Dragon Family Junior gang, that he was loyal to the gang, that he was familiar with the gang's culture of violence, and that he was willing to use firearms and violence to defend the gang's honor and territory." The Attorney General also regards the lyrics as probative "in that [defendant's] words linked him to the shooting" through its references to crimes committed with a .357 firearm and while wearing black clothing. Regarding undue prejudice, the Attorney General asserts that offensive and potentially offensive statements in the lyrics were, "[e]ssentially," "the same as any of [defendant's] other writings that had already been admitted," especially the instant messages associated with the user everybodykilla22.

We find no abuse of discretion in the admission of the handwritten lyrics. The lyrics were probative of several significant issues at trial, and their probative value was not substantially outweighed by countervailing considerations such as undue prejudice to defendant.

Regarding their probative value, some of the lyrics were relevant to establishing defendant's active participation in the Dragon Family/Dragon Family Junior gang at the time of the shooting. (See §§ 186.22, subd. (a), 190.2, subd. (a)(22); *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509.) These included the passages "black fitted Detroit tiger baseball cap but the D stands for Dragon," and "its dfj every day all day till the day i die." Lyrics referring to wearing a "black gangsta baseball cap," "bailin in all black," and a "black beannie disgize" also tied the author to the Dragon Family/Dragon Family Junior gang, albeit less directly, by referring to wearing the color of clothing associated with the gang. Also, the lyrics providing, "everyother muthafucka thinks im trippin tell a n***a Im to old to bang kickback and let them lil n****z do there thang I tell um fuck that shit bangin's the blood that's pumpin through my veins" helped explain why, despite defendant's age, he still associated with Dragon Family Junior members.[35]

---

[35] The lyrics were undated, but the jury reasonably could have concluded that they had been written by defendant relatively close in time to when the shootings occurred, and very possibly in Arizona while he knew he was, or might be, wanted for a prior homicide in Orange County. Among the circumstances conducive to such an inference, the lyrics were written on looseleaf paper found in an apartment that defendant had occupied for only a matter of months prior to his arrest, and

The lyrics were not merely cumulative of other evidence regarding defendant's active gang membership. The prosecution introduced other evidence at trial to establish that defendant was a longtime member of the Dragon Family/Dragon Family Junior gang. Yet much of this proof either came from cooperating witnesses whom the defense sought to portray as not credible, or, like evidence of defendant's gang tattoos, connected him to the Dragon Family/Dragon Family Junior gang but did not specifically establish defendant's active gang membership at the time of the shooting. Along with the instant messages secured from the computer in the Arizona apartment,[36] the lyrics were important in establishing that defendant was an active participant in the gang when the charged crimes occurred, and they were relied upon by the prosecution's gang expert for that purpose.

The lyrics were also probative of issues of motive and intent, including defendant's premeditation and deliberation. (See *Zepeda, supra,* 167 Cal.App.4th at p. 35; *Olguin, supra,*

---

the lyrics that are fairly read as describing a surprise attack committed while wearing a black disguise are essentially identical to a statement appearing in an instant message shown to have been written by everybodykilla22 in early 2004. These circumstances enhanced the evidentiary value of the lyrics, as compared to writings known to have significantly predated the commission of a charged offense.

[36] Regarding defendant's gang membership, one of the instant messages described by the prosecution's forensic computer examiner read, "Nope, but I will never say I stop bangin tho. I don't give a fuk where I go, Ima still be a DF n***a for lyfe. Haha. U know U represent that shit. Every one thinks Ima Jr anyway. I don't give a fuk all G to me. Fuk Yea." The trial court later redacted this message from the array of instant messages that was admitted as an exhibit.

31 Cal.App.4th at p. 1373.) Some of the lyrics, including lines providing that "OC is ours" and "catch an enime slipping you know ima empty that clip, cause wether im jackin or I bang you know it don't mean a thang, I do it for two reasons that's the hood and some change,"[37] suggest an intent to purge rival gangs from the territory claimed by the Dragon Family/Dragon Family Junior gang and, specifically, an intent to shoot any rivals caught in that territory. In this respect, the lyrics helped explain why defendant might have shot perceived rivals in this area even when the victims were not being violent or intimidating, and how the shooting was intended to further the criminal conduct or activities of the Dragon Family/Dragon Family Junior gang and its members. (See §§ 186.22, subd. (b)(1), 190.2, subd. (a)(22).) Also, at trial the defense sought to develop the argument that the shooter, whomever that may have been, was startled by something they saw in the black Acura (perhaps someone opening or trying to open a door) and impulsively fired several shots inside. Lyrics such as, "N****z cant see me for the fact that I stay with my black beannie disgize so don't be suprized wen the guys dressed in black are coming to take your life" countered this theory by suggesting that defendant had an intent to kill when he shot the victims.

Relatedly, some of the lyrics corresponded with circumstances of the fatal shooting, as testified to by other witnesses at trial. The line, "don't be suprized wen the guys dressed in black are coming to take your life" could reasonably be understood as describing a killing committed while wearing

---

[37] Detective Walker testified that "[t]o catch somebody slipping means just that, to catch them slipping, to surprise them."

black clothing. So read, these lyrics were consistent with evidence regarding the shooter that was presented at trial: Villegas and Do testified that defendant shot the victims while wearing black clothing, and Tran's brother and cousin also testified that the shooter was wearing black. The lyrics also contained lines describing possession of a .357 or .38 firearm, which could have been used to fire the bullets that killed Tran and injured his brother and cousin. The jury also could have assigned significance to the fact that lyrics found in Arizona referenced "the enime that we just murdered on these OC streets."[38]

There were, admittedly, some discrepancies and gaps between the lyrics and other evidence regarding the charged crimes. Among them, Do testified that defendant was wearing a baseball cap, not a beanie, when he shot the victims, the defense disputed that defendant drank a brand of alcoholic beverage described in the lyrics, and no evidence was introduced that defendant owned or rode in a Cadillac vehicle. The lyrics also overlapped to some extent with other evidence presented at trial, especially the instant messages. Yet the lyrics constituted probative evidence of defendant's guilt even accounting for these inconsistencies and overlaps, and for the somewhat generic similarities between the conduct described in the lyrics and the charged crimes.

---

[38] Although the trial court apparently did not regard the lyrics as particularly probative of defendant's identity as the shooter, we review the ruling, not the specific reasons that may have been given for it. (*Chism, supra,* 58 Cal.4th at p. 1295, fn. 12 [" 'we review the ruling, not the court's reasoning, and, if the ruling was correct on any ground, we affirm' "].)

Regarding the risk of undue prejudice, the lyrics included slurs and crude terms, as well as numerous graphic descriptions of violence and violent intent. The presence of offensive words in a challenged statement does not always require its exclusion under Evidence Code section 352, however. (See, e.g., *People v. Townsel* (2016) 63 Cal.4th 25, 66–67, *People v. Quartermain* (1997) 16 Cal.4th 600, 627–629.) The prosecutor on multiple occasions attempted to clarify that defendant used the recurring slur found in the lyrics and instant messages to refer to friends and enemies generally, not a particular racial group. (See *Townsel*, at p. 67 [noting that "the prosecutor, in his closing argument, made no effort to portray defendant as a racist"].) Also, there was evidence that defendant (under the username everybodykilla22) used similar language and had written about violent gang-related activity in the instant messages he sent. The presence of this other evidence in the record made it less likely that defendant would suffer undue prejudice from the lyrics' admission. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1073–1074 [finding evidence of a defendant's possession of firearms unrelated to the charged crimes not unduly prejudicial due to the presence of other evidence in the record linking defendant to firearms].) And while some of the violent acts described in the lyrics may have been more provocative than anything found within the instant messages, they are certainly no more disturbing than the facts of the murder and attempted murders charged in this case.

Defendant also argues that the lyrics amounted to improper propensity evidence because they portrayed him as having a violent character and invited the jury to convict him on that basis. Detective Walker's brief testimony that the lyrics described a gang "lifestyle" might have raised substantial issues

had it been further developed. (See *Hin, supra,* 17 Cal.5th at pp. 480–481; *Coneal, supra,* 41 Cal.App.5th at p. 971.) There may also be a thin line between propensity evidence and the use of lyrics to show a motive of "increas[ing] the crime rate" to secure respect for a gang, a theory urged by the prosecutor in invoking the lyrics during closing argument. We are nevertheless persuaded that in this case, the lyrics were not mere propensity evidence. The connections that have been described between the contents of the lyrics and the facts and issues in dispute in this case provided proper grounds for the lyrics' admission. And with Evidence Code section 352 providing for the exclusion of evidence only when its probative value is *substantially* outweighed by other considerations, we cannot say that the trial court abused its discretion in admitting the lyrics.

The facts here are materially different from other cases in which courts have determined that lyrics admitted into evidence should have been excluded under Evidence Code section 352. Basic distinctions exist between this case and *Hin, supra,* 17 Cal.5th 401, where we found error in the admission of violent rap lyrics found on a compact disc located in the defendant's bedroom. In *Hin,* "the prosecution did not argue or introduce any evidence to show that [the defendant] was involved in the creation or production of the song or that it described any of the charged crimes." (*Id.* at p. 479.) "Indeed," we observed, "there is no evidence that [the defendant] authored the song, wrote the lyrics, was involved in its production, *or even that he listened to it.*" (*Ibid.*, italics added.) The Attorney General conceded that the defendant's only connection to the song was " 'the fact that [he] possessed the CD.' " (*Ibid.*) In contrast, in this case a substantial foundation was laid that defendant authored the

lyrics, and sufficient connections could be drawn between the lyrics and the circumstances of the charged crimes.[39]

In *Coneal, supra,* 41 Cal.App.5th 951, the court found error in the admission at a murder trial of five rap videos, all of which had been posted online months before the fatal shooting. (*Id.* at pp. 954, 961–963.)  At least one of these videos did not feature the defendant at all.  (See *id.* at pp. 961–962.)  Lyrics within the videos, one of which involved the defendant reciting a series of felonies (*id.* at p. 962), "casually describe[d] graphic, widespread violence," including violent acts directed at rival gang members, and contained misogynistic verses (*id.* at p. 970).

---

[39]     Our decision in *Melendez, supra,* 2 Cal.5th 1 is distinguishable for similar reasons.  There, we found no abuse of discretion in the trial court's *exclusion* at a murder trial of lyrics found on a piece of paper obtained from the codefendant's jail cell that were offered to show he, and not the defendant, was the killer.  (*Id.* at pp. 21–24.)  We concluded in *Melendez* that "[t]he piece of paper lacked foundation in several respects" (*id.* at p. 23), noting that although the codefendant's initials appeared on the paper, no evidence, such as a handwriting comparison, had been offered to show that he had written them, or that a nickname appearing with the initials on the document referred to the codefendant (*id.* at pp. 23–24).  Concerning the specific lyrics written on the paper, which referenced killings committed for the " 'mob,' " we stated, "No reason appears to assume they relate actual events," there being no indication the crime at issue was gang-related.  (*Id.* at p. 24.)  We concluded our analysis of the issue by observing that we were to "assume the document had some marginal relevance, the court additionally acted within its discretion when it found that its prejudicial effect outweighed any probative value." (*Ibid.*)  This case involves the different question of whether the trial court abused its discretion by *admitting* lyrics in circumstances where a substantial foundation was laid that defendant authored them and the lyrics had more than merely marginal relevance.

In determining that the videos should have been excluded under Evidence Code section 352, the *Coneal* court regarded the videos as minimally probative, unduly prejudicial, and cumulative of other evidence introduced at trial, including screenshots from the videos that "completely or largely captured" the probative value of the videos. (*Coneal*, at p. 966; see also *id.* at p. 968.) The court explained that "[a]bsent some meaningful method to determine which lyrics represent real versus made up events, or some persuasive basis to construe specific lyrics literally, the probative value of lyrics as evidence of their literal truth is minimal." (*Id.* at p. 968.) It further determined that no factors to "increase the probative value of lyrics as statements of literal fact or intent" were present in the case before it to support the use "of the rap lyrics as evidence that the [defendant's gang's] primary activities were the list of felonies rapped by appellant; that appellant had or intended to kill rival gang members, catch victims by surprise, and engage in driveby shootings; or that the . . . rappers committed or intended to commit the various heinous crimes they rapped about." (*Id.* at pp. 969–970, fn. omitted.)

Again, the facts here are distinguishable. Whereas here the prosecution made a substantial showing that defendant wrote the lyrics, the lyrics that were introduced in *Coneal* involved several different performers. The lyrics here were, as discussed, probative of numerous contested issues and although there was some overlap between their contents and other evidence introduced at trial, they were not as cumulative as the lyrics involved in *Coneal* were perceived to be. Finally, there is

a "persuasive basis" (*Coneal*, *supra*, 41 Cal.App.5th at p. 968) in this case to interpret portions of the lyrics literally.[40]

To conclude, for the reasons stated above, we find no abuse of discretion in the trial court's denial of defendant's motion to exclude the lyrics under Evidence Code section 352. Considering the all-or-nothing choice the trial court was presented with both prior to trial and when the lyrics were ultimately admitted as an exhibit, we cannot say that " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice' " (*Pineda*, *supra*, 13 Cal.5th at p. 222) when it allowed the lyrics to be introduced as evidence and admitted as an exhibit. We likewise find no violation of defendant's rights to due process and a fair trial, the admission of the lyrics not having rendered defendant's trial fundamentally unfair. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 75.) In reaching this conclusion, we need not address whether, had the defense maintained an objection directed at specific lyrics, rather than asking the court to rule on the admissibility of the lyrics as a whole, the denial of a more narrowly targeted objection of that kind would have been an abuse of discretion.

---

[40] The defendant in *Coneal*, *supra*, 41 Cal.App.5th 951 did not challenge the admission at trial of two other rap songs that had been performed by the defendant *after* the fatal shooting and contained lyrics that might be understood as referencing the event. (*Id*. at pp. 957, 963.) The *Coneal* court expressed no views about the admissibility of those lyrics. (See *id*. at p. 969, fn. 17.)

### E. Exclusion of Witness from Courtroom

Defendant contends that the trial court committed prejudicial error when it refused to exclude a witness from the courtroom while another witness was testifying. We disagree.

1. *Facts*

The prosecution offered Minh Tran's brother as their first witness at trial. While he was testifying, defense counsel asked the prosecutor if Tran's cousin was in the courtroom. When the prosecutor replied that he was, defense counsel asked the court to exclude all other witnesses from the courtroom during the brother's testimony. At sidebar, the court asked for the prosecution's position. The prosecutor said that the brother and cousin were family members and that she wanted them both to be present in the courtroom. The court inquired whether the two had previously testified in the matter. The prosecutor replied that both had previously testified under oath before the grand jury and had been questioned about the shooting at that time. Upon receiving this information, the court ruled, "I think they're entitled to remain."

Later that day, after cross-examination of Tran's brother commenced and the court recessed for lunch, defense counsel advised the court that at the outset of the lunch break he saw a group that included the victims "huddle" in the back of the courtroom. Defense counsel said he believed that individuals within the group were discussing their testimony with one another, and he renewed the motion to exclude all but the testifying witness from the courtroom. The prosecutor replied that the people within the group were related. She said she had approached them during the lunch break and instructed them not to discuss their testimony, and they indicated they

understood. Defense counsel acknowledged he had not heard what the group was discussing. At defense counsel's request, the court ordered Tran's brother and his cousin not to discuss their testimony with each other while the trial was ongoing. The trial court then reiterated that it would not excuse either relative from the courtroom, citing *People v. Bradford* (1997) 15 Cal.4th 1229 (*Bradford*) and *People v. Griffin* (2004) 33 Cal.4th 536 (*Griffin*). The trial court explained that "mere speculation or feeling that their testimony could or would be influenced is insufficient. Since both of these witnesses have testified at the grand jury proceedings, that testimony has been memorialized by way of transcript, any discrepancies, I am sure, will be duly noted on cross-examination, and certainly any changes in that testimony based on alleged conversations can be explored by the defense." Cross-examination of Tran's brother then resumed.

### 2. *Analysis*

"The judge's power to control the progress and, within the limits of the adversary system, the shape of the trial includes broad power to sequester witnesses before, during, and after their testimony." (*Geders v. U.S.* (1976) 425 U.S. 80, 87 (*Geders*).) "The aim of imposing 'the rule on witnesses,' as the practice of sequestering witnesses is sometimes called, is twofold. It exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid." (*Ibid.*)

Codifying this authority, Evidence Code section 777, subdivision (a) provides that, in general, "the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of

other witnesses." The sequestration power recognized under Evidence Code section 777 does not extend to the parties to an action, or to a designated officer or employee of a party that is not a natural person. (Evid. Code, § 777, subds. (b), (c).) Furthermore, although the court may exclude a witness who is also a victim of a tried offense, such an order must "be consistent with" specified statutory objectives. (Pen. Code, § 1102.6, subd. (d).) One of these objectives provides that "[a] victim may be excluded from a criminal proceeding only if" (*id*., subd. (b)), among other requirements, the party seeking exclusion "demonstrates that there is a substantial probability that overriding interests will be prejudiced by the presence of the victim" (*id*., subd. (b)(1)), with a criminal defendant's right to a fair trial being identified as an overriding interest (*id*., subd. (b)(1)(A)). (See *People v. Dunn* (July 24, 2025, S184521) ___ Cal.5th __ [2025 Cal. LEXIS 4631 at pp. *65–*66] (*Dunn*); *People v. Winbush* (2017) 2 Cal.5th 402, 463 (*Winbush*).)

A ruling by the trial court denying a party's sequestration request is reviewed for an abuse of discretion. (*Griffin*, *supra*, 33 Cal.4th at p. 574; *People v. Lariscy* (1939) 14 Cal.2d 30, 32 (*Lariscy*).)

The decisions in *Bradford*, *supra*, 15 Cal.4th 1229 and *Griffin*, *supra*, 33 Cal.4th 536, which the trial court relied upon, are informative. In *Bradford*, we found no abuse of discretion when the trial court allowed three anticipated witnesses to be present in the courtroom during opening statements. (*Bradford*, at p. 1322.) We explained, "Defendant's mere assertion that the victims *could or would be* influenced by the opening statements was insufficient to establish that the victims' presence posed 'a substantial risk of influencing or affecting the content of any testimony.'" (*Ibid*.) In *Griffin*, the trial court ruled that the

94

victim's mother and sister, both of whom had already testified during the case in aggravation at the penalty phase of a capital trial, could remain in the courtroom for the remainder of that stage of the proceeding. (*Griffin*, at pp. 570–572.) The mother and sister were later recalled as rebuttal witnesses, at which time they provided additional testimony. (*Id.* at p. 573.) In rejecting the defendant's claim of error on appeal, we explained, "Nothing before the trial court at the time it made its ruling suggested that [the mother's or sister's] presence posed a substantial risk that either woman would craft or shape her own testimony, or cause any other witness to do so, as a result of her presence. In arguing against the motion on this point, defense counsel asserted only that such a risk existed, but an assertion of this sort is insufficient to support a claim that the trial court abused its discretion." (*Id.* at p. 574.)

Two of our other decisions — *People v. Wallace* (2008) 44 Cal.4th 1032 and *Lariscy*, *supra*, 14 Cal.2d 30 — are also on point. The defendant in *Wallace* challenged the trial court's ruling allowing a witness to be present at a murder trial. (*Wallace*, at p. 1053.) The defendant argued that the witness's "presence allowed him to hear the prosecutor's opening statement setting forth the prosecution's theory of the case and also exposed him to the testimony of other witnesses, enabling [the witness] to tailor his own testimony to that of those other witnesses." (*Ibid.*) Reviewing for an abuse of discretion, we found none, concluding that the record at the time of the ruling contained no evidence that the witness's presence posed "a substantial risk that he would tailor his testimony to that of other witnesses, or that he would cause other witnesses to tailor their testimony to his." (*Id.* at p. 1054.) We further explained that "later events at trial do not suggest that [the witness]

tailored his testimony to conform to what he had learned from being present at trial, but instead show that he simply testified to matters he was likely to know based on personal knowledge." (*Ibid*.)

Similarly, in *Lariscy*, we reviewed the trial court's denial of a defense motion to exclude witnesses during the testimony of other witnesses. In upholding the ruling, we explained, "No reason was offered for the motion save the suggestion that the evidence of one might influence the others. The court observed that they had testified in the preliminary examination; that their testimony had been transcribed; [and] that there was more likelihood of influence outside in the hall than in the courtroom." (*Lariscy*, *supra*, 14 Cal.2d at p. 32.) "The matter being one within the sound discretion of the court," we held, the denial of the motion "was not error." (*Ibid*.)

These decisions and other precedent (see *Dunn*, *supra*, ___ Cal.5th __ [2025 Cal. LEXIS 4631 at pp. *63–*67]) illustrate both the trial court's discretion in ruling on a sequestration request and our role in reviewing the reasonableness of a determination that allowing a witness to remain in the courtroom presented no substantial risk to a defendant's right to a fair trial. Guided by these principles, we conclude that the facts here, although somewhat different from those described in our precedents, do not demonstrate that the trial court's ruling was an abuse of discretion. Both Tran's brother and his cousin were "victims" within the meaning of the victim sequestration statute (see § 1102.6, subd. (c) [defining " 'victim' "]), and it was speculative that the cousin's sworn testimony at trial would be influenced through exposure to the brother's trial testimony, or that the brother's testimony would be affected by the cousin's presence. Both witnesses had previously testified before the

grand jury and had personal knowledge of the facts to which they testified. On cross-examination at trial, the defense could have highlighted any inconsistencies across their accounts of the shooting and probed what had induced these changes. Finally, the trial court instructed both witnesses not to discuss their testimony with one another. Taking all of this into account, the trial court did not abuse its discretion by denying the sequestration request.

In arguing that the failure to grant the defense's sequestration motion amounted to reversible error, defendant observes that Tran's brother and cousin each had already provided two different descriptions of the shooter, one in their initial statements to police and another in their respective grand jury testimony. According to defendant, "By allowing the second witness to be present for the testimony of the first, it allowed the second witness to have the courage to adopt the second story, that the shooter was tall and slim," in proceedings before a judge, jury, and the defendant. Defendant also notes defense counsel's report of seeing the two witnesses huddle with a group of people during the lunch recess, and his belief that they were discussing testimony.

The statutory scheme recognizes that exposing a witness to testimony of a prior witness may in certain circumstances pose a significant risk to a defendant's right to a fair trial. Trial courts must be attentive to such risks and exercise their discretion appropriately. (Accord, *Geders, supra,* 425 U.S. at p. 87.) In this case, however, defendant merely speculates about the effect that listening to Tran's brother's trial testimony would have on the testimony of Tran's cousin. The trial court was in a far better position than we are to assess whether any concerns regarding collusion or improper influence were sufficiently well

grounded as to justify sequestration. The court decided it was speculative that the witnesses' testimony would be influenced, whether in the manner described by defendant (which presumes a likelihood that, had Tran's cousin been excluded from the courtroom during the brother's testimony, the cousin would recant his sworn grand jury testimony regarding the shooter) or otherwise; and that the relevant circumstances, including the precaution of ordering the witnesses not to discuss their testimony with each other, sufficiently allayed any concerns in this respect. On this record, we cannot say this was an unreasonable determination, and we find no abuse of discretion and no violation of defendant's rights under state or federal law.

## F. Prosecutorial Misconduct at Closing Argument

Defendant argues that the prosecutor's closing statement at the guilt phase of trial misstated the law regarding premeditation and deliberation, and that she improperly exhorted the jury to convict defendant by urging them to "take your streets back."

Defendant did not object to these statements, and we conclude that the failure to object at trial forfeits any claim of prosecutorial misconduct on appeal. While defendant also argues that this failure to object amounted to ineffective assistance of counsel, we conclude that this claim fails because trial counsel reasonably could have decided not to object to the prosecutor's argument regarding premeditation and deliberation or to her "take your streets back" comment.

### 1. *Facts*

In her closing statement at the guilt phase of trial, the prosecutor discussed the instructions that had been provided to the jury describing the elements of murder and attempted

murder.  She said, "[W]hen we talk about first-degree murder and attempted murder — I'm going to discuss these together — I'm going to be talking about the concept in the law that we heard about, and we have probably heard about it on television as well, and that is premeditation and deliberation.  This can be found in jury instruction 521."  Soon thereafter, the prosecutor told the jury, "So, again, 521 as to the murder, [jury instruction] 600 as to the attempted murders is your law for murder in the first degree and attempted murder."  A picture of a yellow traffic light was displayed to the jury.  The prosecutor said, "Well, who hasn't seen that?  At least one of us maybe even today, running a little bit late to court, thought to themselves, 'Well, what do I do when I see that?'  [¶]  And you do several things.  We gauge our speed.  Can we make it?  We look at the car in front of us.  Are they going to stop?  We look at the car in back of us.  What are they going to do?  Are they going to slam on their brakes and hit me if I stop too fast?  How about looking out for cops?  Some of us may even gauge how many tickets we have and whether, if we get caught, we can afford traffic school.  This all happens in seconds.  [¶]  And, ladies and gentlemen, every time you've done that, you've shown premeditation and deliberation.  Every single time.  Sometimes you make a good decision about that, and sometimes you don't.  But the law says that if you consider these things in a matter of seconds, as long as you thought about: Do I stop?  Do I not stop?  What are the pros?  What are the cons?  Then you have formed the necessary mental state to prove premeditation and deliberation.  [¶] So again on 521 what we're looking at is whether a decision to kill was considered by the killer before the killing took place.  This is very important.  It does not mean the killer made a good decision.  You could be at that light and decide I'm gonna run it, and it's a bad decision,

and you get into a — into a car accident or maybe you almost miss somebody. Not a good decision, but you weighed the pros and cons and did it anyway. [¶] So we are not equating a good decision with careful consideration and premeditation and deliberation. All we're saying is that he considered it, because murder is never a good idea. [¶] And as you can tell, it can be made in seconds."

Later, in concluding her initial closing argument, the prosecutor referenced statements appearing in the instant messages and handwritten lyrics found in defendant's Arizona apartment, concluding with the "O.C. is ours" statement within the lyrics. The prosecutor told the jury, "With your verdict, ladies and gentlemen, take your streets back. Thank you."

### 2. *Analysis*

Defendant failed to object at trial to either challenged aspect of the prosecutor's closing argument. The " ' "general rule" ' " is that " ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 657.) "A defendant will be excused from the requirement of making a timely objection and/or a request for admonition if either would have been futile. [Citation.] In addition, the failure to request that the jury be admonished does not forfeit the issue for appeal if an admonition would not have cured the harm caused by the misconduct or the trial court immediately overrules an objection to alleged misconduct such that the defendant has no opportunity to make such a request." (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.)

Defendant argues that the failure to object should be excused because any objection would have been futile "under controlling authority" and no adequate curative admonition could have been given. Neither of these arguments is persuasive here. "A defendant claiming that one of these exceptions [to the contemporaneous objection rule] applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." (*People v. Panah* (2005) 35 Cal.4th 395, 462.) The record here does not indicate the trial court would not have given due consideration to an objection to either of the challenged lines of argument. Nor were the prosecutor's arguments "so extreme or pervasive" that a suitable curative admonition could not have been provided, assuming one was necessary. (*Centeno, supra*, 60 Cal.4th at p. 674.) We therefore do not regard this case as falling under an exception to the general rule requiring a contemporaneous objection, and we conclude that defendant has forfeited his claim of prosecutorial misconduct.[41]

---

[41] As discussed *post*, trial counsel may have declined to object to the traffic light analogy and the prosecutor's "take your streets back" comment for valid tactical reasons, which might have included a sense that an objection to the latter remark might have drawn more attention to it and potentially allowed for elaboration by the prosecutor. While we recognize that the requirement of a contemporaneous objection may demand on-the-spot assessments of risks and benefits by counsel in circumstances like these, such an objection remains necessary to afford the trial court an opportunity to consider and rule upon the claim of error, and possibly provide a curative admonition or instruction to the jury. " ' " 'The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to

Defendant also argues that counsel's failure to object to these portions of the prosecutor's argument constituted ineffective assistance of counsel. "A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) As we explained *ante* in addressing defendant's assertion that his trial counsel was ineffective for failing to request a jury instruction on third party liability, such a claim requires a showing of both deficient representation and resulting prejudice. (*Strickland*, *supra*, 466 U.S. at p. 687.) To establish prejudice, a defendant claiming ineffective assistance of counsel "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

Here, defendant claims that his trial counsel was ineffective for failing to object to improper closing argument by the prosecutor. We conclude that counsel did not provide deficient representation. Wrongful conduct by a prosecutor " 'violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.) Prosecutorial misbehavior that falls short of this threshold violates state law when " 'it involves " 'the use of deceptive or reprehensible

obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' " " (*People v. Saunders* (1993) 5 Cal.4th 580, 590; accord, *People v. Salazar* (2016) 63 Cal.4th 214, 240.)

methods to attempt to persuade either the court or the jury.' " ' " (*Id*. at p. 1215.) In addressing claims of misconduct involving statements made at closing argument, we have recognized that " 'it is improper for the prosecutor to misstate the law.' " (*Centeno, supra*, 60 Cal.4th at p. 666.) Otherwise, however, " ' "[a] prosecutor is given wide latitude during argument" ' " (*People v. Ward* (2005) 36 Cal.4th 186, 215), and " ' "during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature" ' " (*ibid*.; see also *People v. Loker* (2008) 44 Cal.4th 691, 742; but cf. *Centeno*, at p. 669 [finding misconduct by a prosecutor at closing argument due to mischaracterization of the standard of proof]).

" '[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one . . . .' [citation], and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence.' " (*Centeno, supra*, 60 Cal.4th at p. 675; see also *People v. Kelly* (1992) 1 Cal.4th 495, 540.) "Representation does not become deficient for failing to make meritless objections" (*People v. Ochoa* (1998) 19 Cal.4th 353, 463), and there may be valid reasons why counsel may choose not to make even a meritorious objection (see *People v. Huggins* (2006) 38 Cal.4th 175, 206 [noting that counsel may not want "to draw the jurors' attention to particular comments by the prosecutor by objecting to them"]; *People v. Welch* (1999) 20 Cal.4th 701, 764; *People v. Padilla* (1995) 11 Cal.4th 891, 947–948). As one court has explained, "From a strategic perspective, . . . many trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury

may construe their objections to be a sign of desperation or hyper-technicality." (*United States v. Molina* (9th Cir. 1991) 934 F.2d 1440, 1448.) Other tactical reasons to refrain from raising even valid claims of error in the presentation of argument can include the interest in not drawing additional attention to, or inviting elaboration on, comments made by opposing counsel; also, some objectionable statements by an opponent may tee up points that counsel would like to make in rebuttal better than an unobjectionable argument would. (See, e.g., *Welch*, at p. 764 [counsel's failure to object to the prosecutor's biblical references at closing argument may have been a reasonable tactical decision informed by an intent to respond to this argument in rebuttal].) This all said, error in the presentation of argument may be so apparent and impactful absent corrective measures as to render a failure to object ineffective assistance. (See *Centeno*, *supra*, 60 Cal.4th at p. 675.)

Addressing the prosecutor's traffic light analogy first, several courts have allowed prosecutors to use similar examples to illustrate premeditation and deliberation, though with close attention being paid to the specific phrasing used by counsel. (E.g., *People v. Azcona* (2020) 58 Cal.App.5th 504, 516–517 ["find[ing] no fault" with the analogy and noting that "the prosecutor's point" in using the traffic light example "was that the *time* required for premeditation is no greater than the time needed to make those other (far less consequential) decisions"]; *People v. Son* (2020) 56 Cal.App.5th 689, 699 ["see[ing] no error in the yellow light example" given by the prosecutor and explaining, "[a]t least in the way the prosecutor framed it, if someone were to go through the decisionmaking process the prosecutor described, the decision to proceed through the

intersection would be premeditated"]; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1085 [concluding that when "[v]iewed in the context of the prosecutor's whole argument, the yellow light analogy was not improper"; "[c]onsistent with the law, the prosecutor used the traffic light illustration to explain the concept of premeditation and deliberation as a weighing of options that can happen very quickly"]; see also *id.* at pp. 1084–1087.) We have implied that such an analogy may be appropriate. (*People v. Avila* (2009) 46 Cal.4th 680, 715 [observing that a prosecutor's discussion of approaching a traffic light served "as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated,'" and concluding that the prosecutor did not flatly equate such a decision with the decision to kill, as contended by the defendant].)

Defendant's trial counsel reasonably could have concluded that the traffic light example given by the prosecutor was similarly unobjectionable. The essence of this illustration was that although premeditation and deliberation require a decision made after a weighing of considerations, this process can occur quickly. As the prosecutor described, "[T]he law says that if you consider these things in a matter of seconds, as long as you thought about: Do I stop? Do I not stop? What are the pros? What are the cons? Then you have formed the necessary mental state to prove premeditation and deliberation." So explained, the traffic light example did not misstate the law regarding premeditation and deliberation, as communicated to the jury through the CALCRIM No. 521 instruction that the prosecutor

referenced.[42]  (See *People v. Potts* (2019) 6 Cal.5th 1012, 1027 [explaining the concepts of premeditation and deliberation].) Contrary to defendant's contentions, the prosecutor did not communicate to the jury that stopping or proceeding through a traffic light always involves premeditation and deliberation regardless of whether it involved a careful weighing of considerations, or that the decision whether to proceed through a yellow traffic light is of the same enormity as a decision whether to kill a person.  A juror would understand the prosecutor as arguing that *when* someone engaged in the thought process she described, they engaged in *a* process of premeditation and deliberation.  The prosecutor did not have to explicitly distinguish this process from the premeditation and deliberation involved with murder to make the rather obvious differences between the two even more clear.

Whether it was deficient representation to fail to object to the prosecutor's "take your streets back" comment presents a

---

[42]  Regarding the premeditation and deliberation required for first degree murder, the jury was instructed that "[t]he defendant acted deliberately if he carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill.  [¶]  The defendant acted with premeditation if he decided to kill before committing the act that caused death.  [¶]  The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated.  The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.  [¶]  A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated.  On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." A similar instruction was given regarding premeditation and deliberation in connection with the attempted murder charges.

closer question, but here again we find it was not. " ' " 'It is, of course, improper [for the prosecutor] to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 788–789.) Arguments by prosecutors that invite jurors to premise their verdicts on considerations beyond the evidence introduced at trial also raise concerns insofar as they encourage a conviction "for reasons wholly irrelevant to [the defendant's] own guilt or innocence." (*United States v. Monaghan* (D.C. Cir. 1984) 741 F.2d 1434, 1441.) We have repeatedly found no impropriety, however, when prosecutors have told jurors at the penalty phase that they function as " 'the conscience of the community' " (*People v. Gamache* (2010) 48 Cal.4th 347, 389; see *People v. Ledesma* (2006) 39 Cal.4th 641, 741; *People v. Lucero* (2000) 23 Cal.4th 692, 733–734), and we recently described "urg[ing] the jury to solve the social problems of gangs and violence by returning convictions" as "tantamount" to such a permissible argument (*Holmes, McClain and Newborn*, at p. 789).

We observe at the outset this case is dissimilar to *United States v. Williams* (9th Cir. 1993) 989 F.2d 1061, which defendant relies upon. The court in that case concluded that a prosecutor's actions in tossing keys at a defendant and stating that the jury should tell the defendant " 'to take his keys and send them back to Denver' " and " 'tell these defendants that we do not want crank in Montana' " were improper, albeit harmless, "because they were an attempt to capitalize on whatever parochial inclinations the jurors might have . . . with respect

to . . . an out-of-state defendant." (*Id.* at p. 1072.) By comparison, the "take your streets back" statement in this case, which drew from the "O.C. is ours" lyric that had been linked to defendant and the facts involved with the fatal shooting, was less obviously an inflammatory appeal to emotion over reason.

That said, we do not have to decide whether, had a timely objection been made to the prosecutor's remark, it should have been sustained. As we have explained, the question of whether trial counsel rendered ineffective assistance is decided along somewhat different lines, and counsel will not necessarily be found ineffective for failing to object to even improper arguments. We perceive reasonable tactical grounds for why defendant's trial counsel might have declined to object to this particular statement. Competent counsel could have been unsure whether an objection would have been sustained, and more certain that an unsuccessful objection would have brought undue attention to what was otherwise a brief remark. (See, e.g., *People v. Seumanu* (2015) 61 Cal.4th 1293, 1313 (*Seumanu*); *People v. Harris* (2008) 43 Cal.4th 1269, 1290.) Defense counsel may also have been concerned that any objection would provide the prosecutor with an opportunity to prolong her closing argument, which had otherwise concluded, and that given a reason to resume, the prosecutor could present an argument that was at least as compelling. Because these reasonable tactical choices could have informed counsel's failure to object, we find no ineffective assistance.

The presence of reasonable grounds for declining to object distinguish this case from *Centeno, supra,* 60 Cal.4th 659, in which we found ineffective assistance due to counsel's failure to object to a misleading hypothetical regarding the burden of proof. There, existing case law "provided firm grounds for an

objection at the time of [the] defendant's trial," the inaccuracy of the hypothetical was readily ascertainable, and the prosecutor's hypothetical, which conflated jurors' knowledge of this state's geographical outline with the beyond a reasonable doubt standard of proof, was "particularly misleading to the jury and [struck] at the most fundamental issue in a criminal case," making it "too powerful and pivotal to dismiss as irrelevant or trivial argument." (*Id*. at p. 675; see *id*. at p. 664 [describing the hypothetical used by the prosecutor].)

Were we to assume for sake of argument that the prosecutor's "take your streets back" comment was improper and assume further that counsel's failure to object to this statement amounted to deficient performance, we would find that this lapse did not prejudice defendant. Again, this was a brief remark by counsel. (See *Seumanu, supra,* 61 Cal.4th at p. 1344 ["we find the prosecutor's misconduct in making a few remarks in a much longer closing argument, and an even longer trial, could not have prejudiced defendant"]; *Young, supra,* 34 Cal.4th at p. 1190 [describing a prosecutor's misstatement at closing argument as "fleeting and therefore harmless"].) Whatever impact it may have had was limited by the trial court's instructions to the jury that it must render its verdict based on the evidence presented at trial, and that nothing the attorneys said was evidence. The court also instructed the jury that its decision should not be affected by bias, sympathy, prejudice, or public opinion. (See *Seumanu*, at p. 1345 [noting the tempering effect that jury instructions may have on improper prosecutorial rhetoric].) We perceive no reasonable probability that "the result of the proceeding would have been different" had counsel asserted a timely objection to this statement. (*Strickland, supra,* 466 U.S. at p. 694.)

For these reasons, we reject defendant's claims based on the prosecutor's statements at closing argument.

## G. Definition of Pattern of Criminal Gang Activity/ Assembly Bill 333

Defendant argues that his conviction for active participation in a street gang (§ 186.22, subd. (a)) and the true findings regarding the gang-murder special circumstance (§ 190.2, subd. (a)(22)) and the gang enhancements (§ 186.22, subd. (b)(1)) must all be reversed because the law applicable to these charges has changed since the time of his trial. We agree with defendant that this case was decided under legal principles that have been superseded by subsequent developments in the law that have retroactive effect, and that the resulting error was prejudicial.

### 1. *Facts*

At trial, most of the prosecution's evidence regarding predicate gang offenses, and the benefits a gang would derive from the commission of crimes, was introduced through its gang expert, Detective Walker. As described in the summary of trial proceedings provided at the outset of this opinion, Walker testified that a hypothetical modeled upon the facts of this case represented an "absolute textbook example of a gang hunting down a perceived enemy." He also testified that such a crime "enhances the individual, and the gang's reputation as a whole, which in turn will give them more power within the gang community." When asked by the prosecutor how an individual gang member earns respect, Walker testified, "You'll hear the gang members talking about putting in work, and 'putting in work' is just that. You're gaining respect. The more violent crime individual gang members commit, the more their

reputation is enhanced as an individual gang member and the gang as a whole. So that's one way to do it, put in work for the gang." Asked if gang members get more respect for committing more violent crimes, Walker replied, "Absolutely." He also testified that some of Dragon Family/Dragon Family Junior's primary activities were "assault with deadly weapons on rivals, as well as murder."

Regarding prior predicate offenses, the prosecution introduced certified records consisting, first, of plea forms, abstracts of judgment, and other documents relating to convictions incurred by Bryan Ha and Donny Nguyen. Ha pleaded guilty to assault with a deadly weapon (§ 245, subd. (a)(1)), assault with a firearm (§ 245, subd. (a)(2)), and active participation in a criminal street gang (§ 186.22, subd. (a)), with enhancements, with the factual basis for the plea being that "On or about June 7, 2003, I, BRYAN QUANG HA, in Orange County California, in the area of Alerto's Restaurant in the city of Westminster, did willfully, knowingly and unlawfully, and while acting in concert with Donny Long Nguyen, assault [victim L.N.] with a deadly weapon [Gun] and also assault [victim L.K.] with a deadly weapon [knife]." Ha further admitted "that on June 7, 2003, [he] actively participated in Dragon Family Junior 'DFJ,' a criminal street gang, with knowledge that members of the Dragon Family Junior 'DFJ' gang engage in and have previously engaged in a pattern of criminal gang activity" and that he "committed the above listed crimes for the benefit of, at the direction of and in association with Dragon Family Junior 'DFJ,' a criminal street gang, with the specific intent to promote, further and assist in the criminal conduct of the Dragon Family Junior 'DFJ' gang members." Donny Nguyen entered a guilty plea to the same

crimes Ha pleaded guilty to, also with enhancements, and submitted a similar factual basis for his plea, except that his statement referred to acting in concert with Ha.

As previously noted, in response to questioning at trial, Donny Nguyen admitted that his convictions derived from a "confrontation with rivals" at Alerto's. Detective Walker gave a similarly succinct description of the incident, testifying that he had reviewed documentation regarding the convictions and that they arose out of a fight at Alerto's "between Dragon Family and an affiliate of King Cobra Boys. A brother of King Cobra Boys."

The prosecution also offered evidence regarding offenses committed by Si Tien Nguyen in 2002. Certified records showed that Si Tien Nguyen had been found guilty by a jury in November 2004 of attempted murder (two counts) (§§ 664, 187, subd. (a)), conspiracy to commit assault (§§ 182, subd. (a)(1), 245, subd. (b)), assault with a semiautomatic firearm (two counts) (§ 245, subd. (b)), possession of a firearm (former § 12031, subd. (a)(2)(C)), and active participation in a criminal street gang (§ 186.22, subd. (a)), with various sentence enhancements also being found true. The information in that case alleged, as overt acts, that on August 23, 2002, Nguyen obtained a gun from Eric Pham, got into a car driven by Pham, and was taken to Mile Square Park in Orange County. There he walked toward a victim, said "DFJ," and fired his gun. After describing Si Tien Nguyen's convictions, Detective Walker expressed his opinion that Si Tien Nguyen was a member of Dragon Family Junior on August 23, 2002, when this incident

occurred. Detective Walker did not provide additional testimony regarding the incident.[43]

In its closing instructions to the jury, the trial court defined a "pattern of criminal gang activity," as subsumed within the definition of a "criminal street gang" and thereby integral to the active participation in a criminal street gang charge, the gang enhancements, and the gang-murder special-circumstance allegation. This definition required the People to prove beyond a reasonable doubt (1) "the commission of any combination of two or more of the following crimes: [¶] assault with a firearm, assault with a deadly weapon and attempted murder"; (2) "at least one of those crimes was committed after

---

[43] The certified records that were introduced at trial also described other crimes committed by Si Tien Nguyen in July 2002. Charges arising out of this incident were resolved through Si Tien Nguyen's entry of a guilty plea to charges of assault with a deadly weapon (§ 245, subd. (a)(1)) and active participation in a criminal street gang (§ 186.22, subd. (a)), with the admission of certain sentence enhancements. The statement of basis for the guilty plea was that "on 7-21-02, in O.C., CA, I willfully & unlawfully committed an assault with a deadly weapon (METAL TOOL) on the person of [victim K.N.] and caused great bodily injury and that on that day I was an active participant in DFJ, a criminal street gang, knowing that DFJ's members engage in [a] pattern of criminal gang activity. I also admit that I committed the above crime for the benefit of, at the direction of and in association with DFJ, with the specific intent to further, promote & assist the criminal conduct of DFJ & its members." The records did not otherwise describe the factual circumstances associated with this incident, and no other evidence was introduced at defendant's trial regarding it. The prosecution did not rely on this assault as a predicate offense, and, given the dearth of evidence that was introduced regarding the incident, accounting for it in our analysis would not alter the outcome in this case.

September 26, 1988"; (3) "the most recent crime occurred within three years of one of the earlier crimes"; and (4) "the crimes were committed on separate occasions or were personally committed by two or more persons." The court also instructed the jury that "[t]he crimes, if any, that establish a pattern of criminal gang activity need not be gang-related" and if it found "defendant guilty of a crime in this case, [it] may consider that crime in deciding . . . whether a pattern of criminal gang activity has been proved." In her closing argument, the prosecutor invoked Si Tien Nguyen's convictions for assault with a semiautomatic firearm and Donny Nguyen's convictions for assault with a firearm and assault with a deadly weapon in arguing that the prosecution had proved a pattern of criminal gang activity.

### 2. *Analysis*

The crime of active participation in a criminal street gang and the gang enhancements and gang-murder special circumstance involved in this case all require the existence of a "criminal street gang." (§§ 186.22, subds. (a), (b)(1), (f); 190.2, subd. (a)(22).) The definition of a "criminal street gang" requires that gang members have engaged in "a pattern of criminal gang activity" (§ 186.22, subd. (f)), with this pattern involving the commission of what are commonly known as predicate criminal offenses.

Assembly Bill 333 altered existing law regarding gang crimes and enhancements in various ways. (See *People v. Clark* (2024) 15 Cal.5th 743, 752–753.) Most relevant here, it "narrowed the definition of a 'pattern of criminal [gang] activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been

committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) . . . Assembly Bill 333 [also] narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)

Reflecting these changes, section 186.22, subdivision (e)(1) now provides, "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational." The qualifying offenses referenced in this provision are set out at section 186.22, subdivision (e)(1)(A)–(Z). Section 186.22, subdivision (e)(2) now specifies that "[t]he currently charged offense shall not be used to establish the pattern of criminal gang activity."

The parties agree that the *Estrada* inference of retroactivity applies to the enhanced showing required to

establish a pattern of criminal gang activity. (See *Tran, supra,* 13 Cal.5th at pp. 1206–1207.)[44]

Understandably, given when the trial below took place, defendant's jury was not given instructions that track the revised language of section 186.22, subdivision (e)(1) and (2). Among other things, it was not instructed that the predicate offenses had to confer a common benefit that was "more than reputational." With the relevant aspects of Assembly Bill 333 applying retroactively, this disconnect with the law as it has since been amended constitutes error affecting defendant's conviction for active participation in a criminal street gang and the true findings as to the gang enhancements and the gang-murder special-circumstance allegation.[45]

---

[44]    Assembly Bill 333 also added language to section 186.22 providing, "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g), as amended by Stats. 2021, ch. 699, § 4.)

[45]    The Attorney General argued in his briefing that it would be improper to regard Assembly Bill 333 as having amended the gang-murder special circumstance because this special circumstance was adopted through an initiative measure (the Gang Violence and Juvenile Crime Prevention Act of 1998 (Proposition 21)) that provided for amendment only by another statute adopted by the voters or by statute passed by a two-thirds majority of each house of the Legislature. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, §§ 11, 39, pp. 121, 131.) We subsequently rejected this argument in *People v. Rojas* (2023) 15 Cal.5th 561, in which we held "that the application of Assembly Bill 333 to the gang-murder special circumstance does not violate the limitation on

This error is susceptible to being found harmless if the absence of prejudice is shown beyond a reasonable doubt. (*People v. Lamb* (2024) 16 Cal.5th 400, 449 (*Lamb*).) In conducting this form of harmlessness review, " 'the question is not whether there is evidence in the record that would support a . . . finding of the missing element. Instead, we ask whether we can conclude beyond a reasonable doubt that "the . . . verdict would have been the same" had the [finder of fact] been instructed on the missing element.' " (*Ibid.*)

Regarding prejudice, the Attorney General concedes that the lack of findings made under appropriate instructions regarding a common benefit to the gang that is more than reputational requires reversal of defendant's conviction for active participation in a criminal street gang and the true findings on the gang enhancements as well as the gang-murder special circumstance. We conclude that this concession is well taken.

To determine whether the error was harmless, we return to the evidence regarding predicate offenses that was presented at defendant's trial. In reviewing this evidence, we do not consider case-specific hearsay testified to by Detective Walker, which is now inadmissible (see *Lamb*, *supra*, 16 Cal.5th at p. 445; *People v. Valencia* (2021) 11 Cal.5th 818, 839 ["facts concerning particular events and participants alleged to have been involved in predicate offenses . . . constitute case-specific

___

legislative amendment in Proposition 21." (*Id.* at p. 566.) Consistent with *Rojas*, at oral argument the Attorney General conceded that the instructional error involved here extended to the gang-murder special circumstance, and that the finding on this allegation must also be reversed.

facts that must be proved by independently admissible evidence"]; *People v. Sanchez* (2016) 63 Cal.4th 665, 686 ["When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay"]), although this testimony, even if accounted for, would not alter the outcome. This review assumes the admissibility of the contents of the certified records of conviction that were introduced as exhibits. (See *Lamb*, at p. 445.)

The charged crimes in this case are no longer capable of being considered as predicate offenses. (See § 186.22, subd. (e)(2).) The other offenses presented as predicate offenses were, again, crimes involving assault with a firearm and assault with a deadly weapon committed in 2003 by Donny Nguyen, in connection with what he acknowledged was a confrontation with rivals; and crimes committed by Si Tien Nguyen in August 2002. We cannot conclude from the evidence that was presented regarding these offenses that any rational fact finder, properly instructed, would have found beyond a reasonable doubt two predicate offenses committed on separate occasions by gang members that commonly benefitted Dragon Family/Dragon Family Junior in a manner that was more than reputational.

Focusing on the August 2002 crimes committed by Si Tien Nguyen, a rational fact finder could have concluded that insufficient direct or circumstantial evidence had been presented to prove that kind of common benefit beyond a reasonable doubt. The statement of overt acts that appeared within the certified records describing this incident provided a skeletal recitation of the sequence of events leading up to the shooting. But the records did not rule out reasonable doubt that the crimes provided a common benefit to Dragon Family/Dragon

Family Junior that was more than merely reputational. (See *Lamb*, *supra*, 16 Cal.5th at p. 454.) Without opining on what kind of showing might have sufficed in this regard, we observe that the records did not identify the victims as gang members, and although Si Tien Nguyen said "DFJ" before shooting, the context for the shooting was otherwise unknown. Detective Walker's testimony, meanwhile, focused on the *reputational* benefits that committing crimes, and especially violent crimes, might provide to a gang member and their gang. His testimony did not attach any nonreputational benefit to Si Tien Nguyen's offenses.

Because the prosecution bore the burden of proving at least two predicate offenses committed on separate occasions, the lack of evidence establishing that Si Tien Nguyen's August 2002 offenses provided a common benefit to the gang that was more than reputational establishes, on its own, that the instructional error here was not harmless. The high standard for demonstrating the harmlessness of the instructional error involved here has not been satisfied. (See *id.* at pp. 445–446, 453–454; *People v. Cooper* (2023) 14 Cal.5th 735, 742–746 [finding similar instructional error prejudicial].) We need not go further and consider the June 2003 incident involving Bryan Ha and Donny Nguyen.

To summarize, a rational fact finder could have found, on this record, that the prosecution had not proved beyond a reasonable doubt two predicate offenses involving a common benefit to the Dragon Family/Dragon Family gang that was more than reputational. Because the absence of findings made under the revised standard for proving a pattern of criminal gang activity was not harmless, we reverse defendant's conviction of active participation in a criminal street gang (count

4) and the true findings on the gang enhancements and the gang-murder special-circumstance allegation.[46] Because the gang-murder special circumstance was the only special circumstance allegation in this case, the judgment of death must also be reversed.[47]

## H. Cumulative Error

Defendant argues that he was prejudiced by the cumulative effect of errors at the guilt phase of his trial. Because there were no errors apart from the instructional error associated with Assembly Bill 333, which we have just addressed, this argument necessarily fails.

---

[46] In raising the Assembly Bill 333 instructional issue in his opening supplemental brief, defendant argued that the changes made to the definition of a pattern of criminal gang activity dictate the reversal of his conviction for active participation in a criminal street gang and the true findings on the gang enhancements and gang-murder special circumstance. In his supplemental reply brief, defendant stated that his conviction for being a felon in possession of a firearm (count 5) also must be reversed because it "required the prosecutor to prove that the offense[] [was] committed for the benefit of a street gang ([§] 186.22[,] subd. (b)(1))." Defendant did not further develop this argument. We conclude that any challenge to count 5 under Assembly Bill 333 has been forfeited as inadequately developed and raised too late. (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 830, fn. 6; *Rangel, supra,* 62 Cal.4th at pp. 1218–1219.)

[47] " 'Because we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial.' " (*People v. Sek* (2022) 74 Cal.App.5th 657, 669.) Whether such a retrial will occur and how it shall proceed are matters to be determined following remand.

### I.  Other Claims

Defendant also raises several claims of error associated with the penalty phase of his trial, including various challenges to the death penalty statute and its application.  Because we conclude that the judgment of death must be reversed, we need not address any of these arguments.

### III.   DISPOSITION

We reverse the conviction for active participation in a criminal street gang, the true findings on the gang enhancements and the gang-murder special-circumstance allegation, and the judgment of death.  We otherwise affirm the judgment.  The matter is remanded to the trial court for further proceedings consistent with our decision.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

PEOPLE v. AGUIRRE

S175660

Dissenting Opinion by Justice Liu

At the third stage of a *Batson*/*Wheeler* inquiry, after a prosecutor states nondiscriminatory reasons for striking a prospective juror, the trial court must make a " 'sincere and reasoned effort' " to evaluate the genuineness of the prosecutor's stated reasons. (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1159 (*Gutierrez*); see *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).) In so doing, "the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." (*People v. Fuentes* (1991) 54 Cal.3d 707, 720 (*Fuentes*).)

Here the trial court determined only that race-neutral reasons existed and did not "carefully evaluate the prosecutor's explanations" for challenging the prosecutive juror. (*Fuentes*, *supra*, 54 Cal.3d at p. 711.) Because the trial court applied the wrong legal standard and did not meaningfully evaluate whether the prosecutor's stated reasons actually prompted her to challenge the prospective juror, deference to the trial court's ruling is inappropriate. Applying independent review and conducting the requisite evaluation, I would hold that a *Batson*/*Wheeler* violation occurred here.

In addition, I would hold that Evidence Code section 352.2 applies retroactively under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) and its progeny. Today's contrary holding elevates

form over substance and ignores clear legislative intent in determining whether a law is ameliorative under *Estrada*, adding further incoherence to our case law on retroactivity.

As to these two issues, I respectfully dissent.

## I.

In analyzing a third-stage *Batson*/*Wheeler* claim, "[a] trial court's conclusions are entitled to deference only when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' " (*Gutierrez*, *supra*, 2 Cal.5th at p. 1159; accord, *People v. Lenix* (2008) 44 Cal.4th 602, 614 [" 'So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' "].) "A '*reasoned*' effort involves, at a minimum, evaluating whether a proffered justification is supported by the record and, where a proffered reason is 'not borne out by the record,' either 'reject[ing] [the] reason or ask[ing] the prosecutor to explain further.' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 802, quoting *Gutierrez*, at p. 1172.)

Prospective Juror No. 179 (Juror 179) was 45 years of age, married, and a father to three sons. He was a college graduate, worked as an engineer, and enjoyed camping, sports, and coaching. His cousin and stepbrother had been incarcerated. He knew a judge and was friends with two law enforcement officers: one was a "fraternity brother," and they coached football together; the other was his neighbor. Regarding his views on the criminal justice system and the death penalty, Juror 179 said he viewed our criminal justice system as "[a]bout right," believed "the death penalty should be imposed if the crime(s) dictate/fit the actions," and answered "no" to whether

he believed the death penalty should be abolished.  As to his feelings about the imposition of the death penalty, he circled that it was imposed "[t]oo racially disproportionately" and circled "yes" in response to whether he would be able to vote for the death penalty if he found it appropriate after consideration of relevant factors.

After voir dire, the prosecutor exercised a peremptory strike against Juror 179.  The full colloquy regarding the *Batson*/*Wheeler* objection and the trial court's ruling was as follows:

> [Counsel for Aguirre]:  The record should reflect Juror Number 179 is an African-American, the only African-American in the box.  I listened very carefully to his answers, all very neutral, not favoring one side or the other.  So I can't think of a reason why counsel would have excused him for anything he said, neither extremely for the death penalty or extremely against it.  So therefore we are going to make a Wheeler/Witherspoon/Witt objection, ask that he is a protected class, and ask the prosecutor to justify the challenge.
>
> The Court:  [Prosecutor]?
>
> [The Prosecutor]:  Thank you, your Honor.  [¶] Juror 179 is an engineer, very precise type area of work.  He is friends with gang members, has been friends with gang members in the past, had heard of [Dragon Family Junior], but didn't know if it was in connection to any crime.  Although he answers certain questions okay, he had some level of

hesitation in giving the answer.  So that's my reason for excusing him.

The Court:  They appear to be race neutral.

[Counsel for Aguirre]:  I disagree he gave any hesitation, he answered the questions very forthrightly.

The Court:  Well, he had heard of Dragon Family, he had —

[Counsel for Aguirre]:  In an old conversation without any details, that he couldn't really remember.

The Court:  Well —

[The Prosecutor]:  That's my point.

[Counsel for Aguirre]:  I have made the objection.

The Court:  The question is whether or not there are any race neutral grounds, and there appear to be race neutral grounds, so I will deny it.

The colloquy provides no indication that the trial court evaluated whether the prosecutor's stated justifications were genuine.  The court responded to the prosecutor's proffered reasons by saying, "They appear to be race neutral."  When defense counsel repudiated the prosecutor's "hesitation" rationale, the court shifted focus by saying, "Well, he had heard of Dragon Family."  There is no indication the trial court evaluated or credited the prosecutor's "hesitation" description.  After defense counsel challenged the significance of the juror's awareness of the Dragon Family gang, the court framed the dispositive question as "whether or not there are any race

neutral grounds" and reiterated its initial assessment that "there appear to be race neutral grounds" — with nothing more.

Whether there "appear" to be "any" race-neutral grounds is not the proper inquiry at the third step of *Batson*. It is true that at the second step of *Batson*, the question is whether the prosecutor has stated a race-neutral reason for the strike: "[T]he second stage of the *Batson/Wheeler* framework 'does not demand an explanation that is persuasive, or even plausible. " . . . [T]he issue is the facial validity of the prosecutor's explanation." ' " (*Gutierrez*, *supra*, 2 Cal.5th at p. 1168; see *Purkett v. Elem* (1995) 514 U.S. 765, 768.) But at the third step, the issue is " ' "the subjective genuineness of the race-neutral reasons given for the peremptory challenge." ' " (Maj. opn., *ante*, at p. 28.) In other words, the court must inquire whether the prosecutor's stated reasons are sincere and not pretextual. Because there is no indication that the court did so, deference to its ruling is inappropriate.

Today's opinion says we " ' "assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear on their credibility." ' " (Maj. opn., *ante*, at pp. 32–33, quoting *People v. Baker* (2021) 10 Cal.5th 1044, 1077–1078.) But "[t]hat assumption can be overcome." (*Baker*, at p. 1078.) Here the record provides no indication that the court conducted this analysis and in fact suggests the court engaged in the wrong inquiry. Moreover, "when it is not self-evident why an advocate would harbor a concern, the question of whether a neutral explanation is genuine and made in good faith becomes more pressing." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1171; see *ibid.* [comparing facially neutral reasons that are "not self-evident" to those that "are sufficiently self-evident, if honestly held, such

that they require little additional explication"].) Today's opinion points to nothing in the colloquy showing that "the [trial] court made a *reasoned* attempt to determine whether the justification was a credible one." (*Gutierrez*, at p. 1172.) Our precedent squarely holds that deference is not warranted in this situation, where "the prosecutor's reason for this strike was not self-evident and the record is void of any explication from the court." (*Ibid.*)

As noted, the prosecutor stated her reasons for the strike as follows: "[1] Juror 179 is an engineer, very precise type area of work. [2] He is friends with gang members, has been friends with gang members in the past, [3] had heard of D.F.J., but didn't know if it was in connection to any crime. [4] Although he answers certain questions okay, he had some level of hesitation in giving the answer." A careful, independent examination of these reasons reveals cause for suspicion.

(1) Juror 179 was a process engineer for Boeing. During voir dire, defense counsel asked Juror 179 what would make him a good juror, specifying "[f]or instance, do you have good attention to detail." Juror 179 said, "Well, yeah, I do have attention to detail, I mean engineering, that's part of what I do." Later, the prosecutor opened her questioning by asking the juror if he was an engineer, to which he replied, "Yes, I am." The prosecutor said: "And your work is very precise." Juror 179 responded, "Yes, it is."

Today's opinion says the prosecutor's stated reason may have " 'stemmed from a concern about the general attitudes and philosophies persons in that profession might harbor.' " (Maj. opn., *ante*, at p. 36.) But it is hardly obvious why being an engineer, having good attention to detail, or doing work that is

very precise would pose a "concern" for the prosecutor. What "general attitudes and philosophies" does the court think the prosecutor had in mind? And does the court think the prosecutor had reason to prefer jurors who *lack* attention to detail?

It seems unlikely that the prosecutor was genuinely concerned about the mere fact of Juror 179 being an engineer, especially since she did not strike two non-Black engineers (one was a computer engineer, the other did not specify what type) and a non-Black mechanical engineering student. And as to having good attention to detail or doing very precise work, in all likelihood any of the non-Black engineers would have responded similarly — does the court think some engineers would say they are *not* attentive to detail or do *not* do very precise work? — if the prosecutor had bothered to ask. But the prosecutor did not ask the non-Black engineers or engineering student any of these questions or probe their mindset about their profession.

Today's opinion notes that the prosecutor "stress[ed]" to one of the three jurors with an engineering background "that there was no 'math formula' to the penalty calculation" (maj. opn., *ante*, at p. 49), and she asked another prospective juror with scientific training if "he understood that the role of the juror was 'a little bit different than exact sciences' " (*ibid.*) and later struck him. But these aspects of the record do little to demonstrate the prosecutor's strike of Juror No. 179 actually " 'stemmed from a concern about the general attitudes and philosophies persons in that profession might harbor.' " (*Id.* at p. 36.) The fact is that the prosecutor did not ask the non-Black engineers about this supposed concern, and "the failure to ask undermines the persuasiveness of the claimed concern." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 250, fn. 8 (*Miller-El*); see *id.* at

p. 249 [inferring racial discrimination from the prosecutor's failure to question a similar non-Black juror about the concern that the prosecutor gave for striking a Black juror].)

(2) Now consider the prosecutor's assertion that Juror 179 "is friends with gang members, has been friends with gang members in the past." Regardless of how the court spins it (maj. opn., *ante*, at p. 39, fn. 20), the prosecutor's statement that Juror 179 "is friends" with gang members mischaracterized what the juror said. The record establishes only that Juror 179 had childhood friends who were involved in gangs. Further, his questionnaire and voir dire responses indicate he had beliefs about gangs that were favorable to the prosecution. In response to whether he felt it should be a crime to be a member of a gang, Juror 179 wrote he "[w]ould have to agree. I've always been told not to join gangs. I grew up seeing my friends and family hurt by gang activity." In response to whether he or his close friends or relatives ever associated with gangs, Juror 179 answered "yes" and explained: "I grew up in Harbor City California. Gangs were an everyday visual. Mexican/Blacks (Bloods/Crips)/Whites. Drug activity and shootings occured [*sic*] all the time. Alot [*sic*] of my friends were in the gang." He indicated that he, a close friend, or a relative had been a victim of a crime of violence, explaining "Gang shooting." When asked during voir dire about the circumstances of the gang shooting, he said: "Well, there were several. Just growing up, several, I mean my best friend actually was shot by a drive-by." He replied "absolutely" when the court confirmed his statement that he "grew up with some friends who were in gangs." The prosecutor later asked, "You said in your life experience you have known people who are gang members?" Juror 179 said, "Absolutely." She asked, "Friends with some of them?" He responded,

8

"Absolutely." She then asked, "Also seen gang violence?" He again responded, "Absolutely." She stated, "And that's part of who you are, right?" Juror 179 said, "Absolutely."

As a whole, these responses make clear that Juror 179 had nothing positive to say about gangs; his view of gangs was negative because he, his friends, and his family had been victimized by gangs. Indeed, he believed being a member of a gang should be a crime. Although Juror 179 had childhood friends who were gang members, I do not see how this was a plausible concern for the prosecutor in light of his clearly negative view of gangs.

In his questionnaire, Juror 179 also wrote the following as to his feelings about a defendant who is a member of a gang: "I feel sorry for the defendant. He probably has had a rough life and was look[ing] to the gang to provide the support in his life." He indicated that as a juror he could set those feelings aside. Although sympathy for a defendant based on his gang affiliation is a valid basis for excusal (*People v. Williams* (1997) 16 Cal.4th 153, 191), the prosecutor did not state this as a reason for striking Juror 179. (See *Miller-El*, *supra*, 545 U.S. at p. 252 [a prosecutor must "state his reasons as best he can and stand or fall on the plausibility of the reasons he gives"].)

Today's opinion acknowledges that the prosecutor's failure to state this reason "means it cannot be relied upon as an independent ground for the peremptory challenge." (Maj. opn., *ante*, at p. 38, fn. 19.) Yet the majority insists that "the trial court could have considered this response . . . when evaluating the sincerity of the reasons the prosecutor did provide — including the prospective juror's friendships with gang members." (*Ibid.*) But "[i]f this had been the case, such

reasoning should have been articulated by the prosecutor." (*Gutierrez, supra,* 2 Cal.5th at p. 1169.) Neither the trial court nor this court can substitute its own reasons for those stated by the prosecutor. Our opinion in *Gutierrez,* which addressed an analogous circumstance, makes clear that had the trial court thought the prosecutor's concern may have been motivated by Juror 179's capacity for empathy toward gang members, it was required to ask the prosecutor for such clarification rather than substitute its views for what the prosecutor said. (*Ibid.*)

(3) As to the prosecutor's statement that Juror 179 "had heard of D.F.J. but didn't know if it was in connection to any crime," it is unclear why this would be a reason for striking the juror. When asked on the questionnaire whether he had heard of Dragon Family/Dragon Family Junior or Young Locs gang, Juror 179 responded affirmatively and wrote, "I heard it is an Asian gang and I heard it from my friends in Garden Groove [*sic*]." When the court asked about his knowledge of the Dragon Family, Dragon Family Junior, or Young Locs, he confirmed he had "[j]ust heard the name." The prosecutor later asked, "You said you heard of this particular gang before?" Juror 179 said, "Yes." The prosecutor asked, "In what context did that come up, sir?" Juror 179 responded, "Just with talk with people at work." The prosecutor continued, "Okay. Was it in conjunction to any particular crime, or just in general?" He replied, "I can't recall the conversation, but V.F.N." The prosecutor continued: "But as you sit here today, is it fair to say that you remember just the name of the gang, and it is a gang?" Juror 179 answered in the affirmative. The prosecutor asked: "And no other specifics?" He replied, "Correct." The prosecutor then ended questioning, stating: "All right, fair enough, thank you very much, sir."

I do not see why these answers would present a concern for the prosecutor. (Cf. *Gutierrez, supra,* 2 Cal.5th at p. 1171 ["it is difficult to lend credence to the prosecutor's concern about 'how [a prospective juror] would respond when she hears that [a witness was] from a criminal street gang' when" the prosecutor's questioning "failed to shed light on the nature of his apprehension or otherwise indicate his interest in meaningfully examining the topic, and the matter was far from self-evident"].) Moreover, there is no apparent reason why the prosecutor struck Juror 179 while agreeing to seat a non-Black juror with similar knowledge.

(4) Finally, the prosecutor said Juror 179 "had some level of hesitation in giving the answer," which I assume to mean the answer regarding whether he had heard of D.F.J. in relation to a specific crime. Defense counsel responded, "I disagree he gave any hesitation, he answered the questions very forthrightly," and the trial court gave no indication that it credited this reason. Under *Snyder v. Louisiana* (2008) 552 U.S. 472 (*Snyder*), this demeanor-based reason cannot be the basis for upholding the strike.

In *Snyder*, defense counsel "disputed" the prosecutor's demeanor-based reason for striking a Black prospective juror, Mr. Brooks. (*Snyder, supra,* 552 U.S. at p. 479.) The trial court simply said, " 'I'm going [to] allow the challenge.' " (*Ibid.*) Observing that "the record does not show that the trial judge actually made a determination concerning Mr. Brooks' demeanor," the high court refused to give deference to the trial court's ruling and rejected it. (*Ibid.*) "Rather than making a specific finding on the record concerning Mr. Brooks' demeanor, the trial judge simply allowed the challenge without explanation. . . . [W]e cannot presume that the trial judge

credited the prosecutor's assertion that Mr. Brooks was nervous." (*Ibid.*) So too here: we cannot presume that the trial court credited the prosecutor's assertion that Juror 179 showed "some level of hesitation" in answering questions.

In sum, all the prosecutor's stated reasons for striking Juror 179 appear suspect, and I believe "it was more likely than not that the challenge was improperly motivated." (*Johnson v. California* (2005) 545 U.S. 162, 170.) Because this constitutional violation "undermine[s] public confidence in the fairness of our system of justice" (*Batson, supra,* 476 U.S. at p. 87), the judgment in its entirety must be reversed.

## II.

For reasons similar to those stated in Justice Evans's dissenting opinion in *People v. Burgos* (2024) 16 Cal.5th 1, 33 (*Burgos*), I would conclude that Evidence Code section 352.2 applies retroactively under the principle of *Estrada, supra,* 63 Cal.2d 740.

Evidence Code section 352.2 establishes a presumption that evidence involving creative expression, including a defendant's creation of rap lyrics, will be excluded. The Legislature enacted this statute because rap lyrics "evoke a unique prejudice when introduced as evidence." (Assem. Com. on Public Safety, Assem. Bill No. 2799 (2021–2022 Reg. Sess.) as amended Mar. 10, 2022, p. 3.) " 'One would not presume that Bob Marley, who wrote the well-known song "I Shot the Sheriff," actually shot a sheriff, or that Edgar Allan Poe buried a man beneath his floorboards, as depicted in his short story "The Tell-Tale Heart," simply because of their respective artistic endeavors on those subjects.' " (*Ibid.*) Yet, particularly in the context of "gangster rap lyrics," people are more likely to believe

they are true to life. (*Ibid.*) The Legislature sought to prevent the use of creative expression as " ' "racialized character evidence: details or personal traits prosecutors use in insidious ways playing up racial stereotypes to imply guilt." ' " (*Ibid.*) Before the enactment of this law, "[p]rosecutors frequently use[d] gangster rap lyrics against defendants." (*Ibid.*)

Today's opinion holds that Evidence Code section 352.2 does not apply retroactively, analogizing it to Penal Code section 1109, the statute at issue in *Burgos*, which concerns bifurcation of gang evidence. (Maj. opn., *ante*, at pp. 72–76.) But *Burgos* observed that the legislative findings "reflect[ing] significant concerns about gang enhancements in general" applied "most directly" to provisions other than section 1109, while "describ[ing] the function of section 1109 in more equivocal terms." (*Burgos*, *supra*, 16 Cal.5th at pp. 19, 20.) According to the court, "the measured nature of change" in section 1109 is reflected in the fact that it allows defendants to elect bifurcation, a change in the "sequence of trial proceedings," rather than making it mandatory. (*Burgos*, at pp. 20, 21.) By contrast, the Legislature's statements about the purpose of Evidence Code section 352.2 cannot be dismissed as applying to other provisions, and Evidence Code section 352.2 mandates that judges exclude creative expression evidence except in narrow circumstances.

Unlike elective bifurcation, Evidence Code section 352.2 does not change the "sequence" of a proceeding. It gives courts clear instructions about evidence that must be excluded because the risk that juries will rely on it improperly is too high. Evidence Code section 352.2 is ameliorative in nature and not " ' "purely procedural" ' " (*Burgos*, *supra*, 16 Cal.5th at p. 28)

because it has the intent and effect of decriminalizing creative expression.

Today's opinion says Evidence Code section 352.2 "does not decriminalize anything" (maj. opn., *ante*, at p. 78) and "implements an essentially 'neutral' rule of evidence" (*id.* at p. 77). The court describes Evidence Code section 352.2 as "provid[ing] additional direction for evaluating the admissibility of creative expressions" by requiring courts to "consider several factors that they *already* might have folded into an evaluation of whether this type of material was admissible." (Maj. opn., *ante*, at pp. 78–79.)

But the touchstone of our retroactivity inquiry is legislative intent (*Estrada, supra,* 63 Cal.2d at pp. 744–745), and Evidence Code section 352.2's text and findings could not be more clear that the statute's purpose is not "neutral" in the manner today's opinion suggests. The Legislature said, in its own words, that it enacted the statute because prior evidentiary rules had been allowing "the use of an accused person's creative expression . . . to introduce stereotypes or activate bias *against the defendant*, []or as character or propensity evidence." (Stats. 2022, ch. 973, § 1, subd. (b), italics added; see *ibid.* ["It is the intent of this Legislature to provide a framework by which courts can ensure that the use of an *accused person's* creative expression will not be used to introduce stereotypes or activate bias *against the defendant*, nor as character or propensity evidence."], italics added; Evid. Code, § 352.2, subd. (a) ["the court . . . shall consider [that] . . . undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of *the defendant's* propensity for violence or general criminal disposition as well as the possibility that the evidence will

explicitly or implicitly inject racial bias into the proceedings"], italics added.)

By restricting the introduction of evidence that "create[s] a substantial risk of unfair prejudice" against defendants (Stats. 2022, ch. 973, § 1, subd. (b)), the Legislature sought to ensure that defendants are no longer convicted of crimes — i.e., criminalized — based on their creative expression. The author of Assembly Bill 2799, which added section 352.2 to the Evidence Code, initially labeled the bill in his legislative package as "AB 2799 – Decriminalizing Creative Expression" (Assemblymember Jones-Sawyer, 2021–2022 Legislative Package (Aug. 25, 2022) <https://web.archive.org/web/20220825221755/https:/a59.asmdc.org/2021-22-legislative-package> [as of Aug. 28, 2025]; all Internet citations in this opinion are archived by year, docket number, and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>]), and the public learned of Assembly Bill 2799 as the "Decriminalizing Artistic Expression Act" (see Brown, *Gov. Newsom Signs Bill Restricting Use of Rap Lyrics in Criminal Trials*, L.A. Times (Sept. 30, 2022) <https://www.latimes.com/entertainment-arts/music/story/2022-09-30/rap-lyrics-bill-governor-newsom-decriminalizing-artistic-expression-act> [as of Aug. 28, 2025]). It is difficult to fathom why this statute — plainly intended to prevent defendants from being punished based on their creative expression when they would otherwise suffer such prejudice — does not bear "a close enough relationship . . . [to] the reduction of punishment." (Maj. opn., *ante*, at p. 80.)

This court's continued focus on whether a law is a "prophylactic rule[] of criminal procedure" (*Burgos*, *supra*, 16 Cal.5th at p. 8) — even where the law undoubtedly benefits

a class of defendants — elevates form over function and ignores clear indications of legislative intent. Many laws we have previously deemed ameliorative were far from guarantees of lesser punishment. As we said in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, we have found retroactivity where "*Estrada* [was] not directly on point." (*Id.* at p. 303; see *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*).) As the court in *People v. Venable* (2023) 88 Cal.App.5th 445 explained, "Evidence Code section 352.2 provides defendants of color charged with gang-related crimes an ameliorative benefit, specifically, a trial conducted without evidence that introduces bias and prejudice into the proceedings, limitations designed to increase the likelihood of acquittals and reduce punishment for an identified class of persons." (*Venable*, at p. 456.) That is the unmistakable purpose of the law.

It is true that *Burgos* spoke of ameliorative statutes as ones that (1) " 'directly or potentially reduce the punishment for an offense,' " (2) " 'change the elements of a substantive offense, defense, or penalty enhancement,' " or (3) " 'create an alternative avenue for certain individuals to receive lesser or no punishment.' " (Maj. opn., *ante*, at p. 75.) But these are simply descriptions of our prior cases finding statutes retroactive; today's opinion provides no persuasive rationale for boxing ourselves into this framework. There is nothing magical about the form an ameliorative law takes: a change in how a trial is conducted may greatly benefit defendants, particularly where the Legislature has said the goal is to protect them from prejudice and bias. The evident purpose of a law like Evidence Code section 352.2 is to prevent what the Legislature regards as wrongful convictions.

Suppose the Legislature passed a law limiting the use of confessions in criminal trials with a stated purpose of preventing wrongful convictions and with findings that explain why, in the Legislature's judgment, confessions are often unreliable. Would we say this is merely a prophylactic rule of criminal procedure and on that basis conclude it is not ameliorative within the meaning of *Estrada*? It seems to me that the Legislature's interest in avoiding wrongful convictions with such a law is at least as great as its interest in avoiding unjust punishment through the availability of pretrial diversion (*Frahs*, *supra*, 9 Cal.5th 618), limitations on transfer of juveniles to criminal court (*Lara*, *supra*, 4 Cal.5th 299), or modification of the elements of gang offenses and enhancements (*People v. Tran* (2022) 13 Cal.5th 1169, 1206–1207).

Neither *Burgos* nor today's opinion adequately explains why the form of amelioration should be the touchstone of our analysis or why the particular forms identified in *Burgos* should be exclusive. If such form-based line-drawing were justified, we could have reasoned in *Frahs* or *Lara* that ameliorative statutes are limited to those (1) that directly or potentially reduce punishment for an offense or (2) that change the elements of an offense, defense, or enhancement. But we didn't; we looked to the ameliorative function of the statutes in *Frahs* and *Lara*, and we should do the same here. Today's holding, like *Burgos*, lacks a coherent principle and will further "sow confusion in the law." (*Burgos*, *supra*, 16 Cal.5th at p. 37 (dis. opn. of Evans, J.).)

For the reasons above, I would reverse the judgment and permit the prosecution to seek retrial based on admissible evidence before a lawfully selected jury.

**LIU, J.**

**I Concur:**
**EVANS, J.**

PEOPLE v. AGUIRRE

S175660


Dissenting Opinion by Justice Evans


Like Justice Liu, I would reverse the judgment in its entirety on the ground the trial court erred in sustaining the prosecutor's peremptory challenge of a Black prospective juror. (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).) As Justice Liu points out, the trial court did not make a " 'sincere and reasoned effort' " to evaluate the genuineness of the reasons offered by the prosecutor. (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1159.) The court instead improperly narrowed its inquiry to "[t]he question . . . whether or not there are any race neutral grounds" and found "there appear to be race neutral grounds." It makes little sense to defer, as the majority opinion does (see maj. opn., *ante*, at p. 35), to an evaluation the trial court itself never made.

The standard of review matters here. Indeed, even the majority opinion recognizes the tenuousness of its conclusion. (See maj. opn., *ante*, at p. 44 ["one or two of the prosecutor's reasons for a strike might raise concerns if viewed in isolation"].) In reviewing some of the prosecutor's reasons, the majority can say only that one was not "*so* improbable as to suggest that race played a part in the prosecutor's decision." (*Id.* at p. 42, italics added.) The majority concedes that another reason is " 'not explicitly confirmed by the record' " while finding solace in the fact that the proffered reason passes an extremely low bar: "we 'cannot say the record contradicts' it[.]" (*Id.* at p. 43.) And the majority brushes off comments favorable to the prosecution from

1

the prospective juror as "not *inherently* inconsistent with, and would not *obviously* overcome" the prosecutor's concern about the juror's views on gangs. (*Id.* at p. 38, italics added.) I therefore agree with Justice Liu that if we were to review the record independently, we would find a *Batson/Wheeler* violation occurred here.

I write separately to highlight additional reasons why deference to the trial court is unwarranted in cases such as this. As discussed below, a variety of training materials used by prosecutors over the past two decades appear to compromise the efficacy of *Batson/Wheeler* protections. These training materials, which have not been cited by either party, are nonetheless in the public domain. They expose the risks of deferring to trial court decisions that do not probe beyond superficially nondiscriminatory justifications for striking potential jurors and, in my view, should inform whether and when it is appropriate to afford deference to purportedly race-neutral justifications.

*****

In 2020, having found the *Batson/Wheeler* procedure ineffective in eliminating the discriminatory exclusion of potential jurors, the Legislature passed Assembly Bill No. 3070 (2019–2020 Reg. Sess.). (Stats. 2020, ch. 318, § 1, subd. (b) ["The Legislature . . . finds that the existing procedure for determining whether a peremptory challenge was exercised on the basis of a legally impermissible reason has failed to eliminate . . .

discrimination"].)[1]  A report submitted in support of Assembly Bill No. 3070 reviewed an extensive collection of prosecutorial training materials that had been obtained from California district attorneys' offices.  (See Semel et al., Whitewashing the Jury Box:  How California Perpetuates the Discriminatory Exclusion of Black and Latinx Jurors (2020) p. 44, fn. 493.)[2] These materials suggest that prosecutors were trained not to

---

[1]    Assembly Bill No. 3070 postdates both this trial and the prosecutorial trainings discussed herein and therefore is not directly applicable to this case.  However, the Legislature's recognition of the deficiency of the *Batson / Wheeler* framework is not irrelevant to our own constitutional duty to prevent racial discrimination in jury selection.  (See, e.g., *State v. Jefferson* (2018) 192 Wn.2d 225, 249 [modifying its constitutional *Batson* framework in light of the deficiencies recognized by Washington General Rule 37].)

[2]    In 2019, in response to California Public Record Act requests by the American Civil Liberties Union of Northern California, 16 California county district attorney offices produced training materials relevant to *Batson / Wheeler* and jury selection.  These materials were subsequently published online. (See American Civil Liberties Union of Northern Cal., CPRAs re:  DA Compliance with *Batson* & *Wheeler* Mandates (July 24, 2020) <https://www.aclunc.org/article/cpras-re-da-compliance-batson-wheeler-mandates> [as of Aug. 28, 2025]; Berkeley Death Penalty Clinic, California District Attorney Jury Selection Training Materials (2020) <https://www.law.berkeley.edu/experiential/clinics/death-penalty-clinic/projects-and-cases/whitewashing-the-jury-box-how-california-perpetuates-the-discriminatory-exclusion-of-black-and-latinx-jurors/california-district-attorney-training-materials/> [as of Aug. 28, 2025] (California District Attorney Jury Selection Training Materials).)  All Internet citations in this opinion are archived by year, docket number, and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>.

state race-neutral reasons that they actually have for striking minority jurors, but rather to *contrive* race-neutral reasons that will survive a *Batson/Wheeler* challenge.

    1. *Relying upon instinct and working backward to develop a record to justify peremptory strikes*

The training materials from multiple counties — including Orange County, where defendant's trial occurred[3] — instructed prosecutors to rely upon their instincts when deciding which jurors to challenge.  The Orange County training materials invited prosecutors to "[a]lways go with your initial gut feeling" towards a juror.  (Orange County District Attorney, Voir Dire Pt. I (Sept. 2014) p. 3.)[4]  Prosecutors in the office were told very plainly to "ALWAYS, ALWAYS — TRUST YOUR INSTINCTS."  (Orange County District Attorney, Practical Application Techniques for Voir Dire (June 2011) p. 1.)  "Don't ignore your personal reaction to a prospective juror.  If you have a vague feeling that there is something wrong about a prospective juror, don't gamble."  (Orange County District

---

[3]    As this case arises from Orange County, I focus in particular on the materials disclosed by the Orange County District Attorney.  But the cited materials are merely exemplars of the training content disclosed by over a dozen counties.

[4]    The title of the training materials provided in this opinion derive either from the document title of the PDF file as listed in the California District Attorney Jury Selection Training Materials collection, *supra*, or from the title included within the training materials themselves.  If no individual author is listed within the materials themselves, the institutional author, the relevant county's district attorney, is listed.  Some trainings contain no date within the materials themselves, but the PDF is dated.

Attorney, Pages from Felony Panel — Training (Mar. 2011) p. 6.)

At first glance, advising prosecutors to rely on instinct in the exercise of peremptory challenges may seem unremarkable. From our earliest cases, this court has condoned the time-honored tradition of relying on inchoate hunches as the basis for a peremptory challenge. (See *Wheeler*, *supra*, 22 Cal.3d at p. 275 [citing 4 Blackstone, Commentaries 353 for the proposition that peremptory challenges may be based upon " 'sudden impressions and unaccountable prejudices' "]; *People v. Hall* (1983) 35 Cal.3d 161, 170 [underscoring that a prosecutor "may act freely on the basis of 'hunches,' unless and until these acts create a prima facie case of group bias, and even then he may rebut the inference"].)

A moment's reflection, however, exposes the risks of training prosecutors to rely so heavily on "hunches," "vague feeling," and intuition. "The problem is that on-the-fly decisions based on an instinct or hunch are susceptible to unconscious bias and racial stereotypes." (*People v. Johnson* (Colo. 2024) 549 P.3d 985, 1000 (conc. opn. of Márquez, J.); accord, *Batson*, *supra*, 476 U.S. at p. 106 (conc. opn. of Marshall, J.) ["A prosecutor's own conscious or unconscious racism" may "easily" lead to a "characterization" about "a prospective black juror . . . that would not have come to his mind if a white juror had acted identically"]; see Page, *Batson's Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge* (2005) 85 B.U. L.Rev. 155, 160 ["[R]ace-and gender-based stereotypes almost inevitably affect people's judgment and decision-making, even if people do not consciously allow these stereotypes to affect their

judgment. This includes attorneys making peremptory challenges"].)

The danger is particularly acute when unaccompanied by any warning concerning the perils of doing so. (See Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions* (2010) 4 Harv. L. & Policy Rev. 149, 168 [discussing the problem of implicit bias in the exercise of peremptory challenges, and the need for appropriate "training of lawyers to avoid implicit biases"].) Yet none of the training materials discussed or even mentioned this possibility. The absence of training on the long-recognized risks of latent bias may have heightened the risks of discriminatory conduct.

What's more, despite being instructed to rely on gut instinct, prosecutors were *not* trained to forthrightly acknowledge the role intuition played in their decisions. Instead, the training materials regularly instructed prosecutors to work backward from their gut feeling of dislike of particular jurors to construct a more concrete record.

An Alameda County District Attorney training, for example, advised that a "good juror" is one who is "[r]elatable to prosecutor" and that identifying them is "[n]ot [an] exact science — trust [your] instinct." (Alameda County District Attorney, Jury Selection: Why It Can Be the Most Important and Difficult Part of the Trial (Jan. 1, 2017) p. 18.) It then cautioned that because of *Batson/Wheeler*, "[g]ut instinct may not be sufficient [¶] . . . [¶] [t]he more concrete the explanation, the better the record." (*Id.* at p. 17.)

One slide, which appeared in various training materials in Orange County from 2011 to 2018, directed prosecutors to

6

"question jurors fully and carefully so as to elicit race-neutral justifications" and to "[d]evelop dissimilarities" (presumably between White jurors that prosecutors found acceptable and the jurors of color prosecutors planned to strike). (Mestman, Orange County District Attorney, Jury Voir Dire & *Wheeler/Batson* (Sept. 23, 2011) p. 13; see also Mestman, Ethical Jury Selection (Aug. 20, 2018) p. 13.) Another set of training materials from 2016 and 2017 directed prosecutors to "[a]sk many questions *to find* [a] race neutral justification." (Orange County District Attorney, "Objection, *Wheeler/Batson"* (Aug. 2016) p. 9, italics added; see also Orange County District Attorney, "Objection, *Wheeler/Batson"* (Sept. 2017) p. 7.)

Such advice may naturally have been understood to mean prosecutors should decide which jurors to strike based on "instinct," and then use voir dire questions to discover post hoc "race-neutral" justifications in order to develop a "more concrete" record that would withstand scrutiny more effectively than simply relying on a "hunch" or "vague feeling."

Prosecutors across California also were encouraged to supply "multiple reasons" for the challenged peremptory. (See, e.g., Frawley, Ventura County District Attorney, Voir Dire (2018) p. 11 [advising not to assume "one justification will suffice" and underscoring there is "strength in quantity" even if a justification "seems trivial"].) Training materials in Orange County reiterated this instruction, advising prosecutors to "[g]ive multiple reasons for each challenge" and to "develop dissimilarities" between jurors. (E.g., Mestman, Orange County

District Attorney, *Wheeler/Batson* Ethical Jury Selection (Aug. 17, 2015) pp. 5, 10.)

It is possible this advice may have encouraged prosecutors to articulate makeweight justifications and other evidence to obfuscate discrimination. Indeed, that appears to have occurred here.

The first reason offered by the prosecutor for striking Prospective Juror No. 179 was that he "is an engineer, very precise type area of work." The manufactured character of this purported justification can be gleaned from the fact that two seated jurors were *also* engineers, and a third was an engineering student. I can think of no nondiscriminatory reason — and the majority opinion offers none — why of the four prospective jurors who were in the engineering field, only the Black engineer was deemed by the prosecutor to be in a "very precise type area of work." Nor can I — or the majority — come up with a nondiscriminatory reason why the prosecutor asked only the Black engineer whether his "work is very precise." If we allow for the possibility that the prosecutor was asking questions in an attempt to *find* a race-neutral justification (as the training materials instructed), in order to have a more concrete explanation than their gut instinct (as training materials also instructed), then we can see what may have really been going on. Unfortunately, the trial court made no sincere and reasoned effort to find out. And the majority, by deferring nonetheless to the trial court's ruling, effectively holds that reviewing courts also should not look too closely into the

reasons proffered by the prosecutor even when such reasons appear suspect.

The majority opinion acknowledges that some of the proffered justifications may have been concerning if not so suspect as to themselves expose a discriminatory motive. (See maj. opn., *ante*, at p. 45, fn. 23 ["the reasons given by the prosecutor vary to some extent in their obviousness and the extent to which they find support in the record"]; *id.* at p. 44 [assuming "one or two of the prosecutor's reasons for a strike might raise concerns if viewed in isolation"].) The majority opinion does not, however, explicitly answer the question of whether any justifications that were "less obvious" and "less supported by the record" would hold up on their own. As the high court has explained, "[t]he prosecution's proffer of [a] pretextual explanation naturally gives rise to an inference of discriminatory intent." (*Snyder v. Louisiana* (2008) 552 U.S. 472, 485; *Ali v. Hickman* (9th Cir. 2009) 584 F.3d 1174, 1192 [a single pretextual justification may betray discriminatory motive "even where other, potentially valid explanations are offered"].) As we have cautioned, a prosecutor's "positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility." (*People v. Smith* (2018) 4 Cal.5th 1134, 1158.) The majority's analysis, however, suggests the opposite. Flaws in individual justifications will be overlooked where multiple justifications "viewed as a whole . . . provide adequate grounds for upholding the trial court's ruling." (Maj. opn., *ante*, at p. 45, fn. 23.) This technique of appellate review tracks prosecutorial training not to "base any challenge . . . on a single reason, especially if that reason is weakened when subjected to comparative analysis . . . [i]f you develop

multiple reasons, any one reason susceptible to comparative analysis will not be found wanting on pretextual grounds in light of the other reasons." (Coleman, Mr. *Wheeler* Goes to Washington: The Full Federalization of Jury Challenge Practice in California (2006) Cal. Dist. Attorneys Assn. Prosecutor's Notebook, vol. XXXIII, 23 (Mr. *Wheeler* Goes to Washington).)

2. *Prepackaged Lists of Race-Neutral Justifications*

Another common feature among the prosecution training materials was their inclusion of lists of race-neutral justifications that could be used in response to *Batson/Wheeler* motions.

For example, the training manual Mr. *Wheeler* Goes to Washington, in a section entitled "*Wheeler* words that work," provided 16 different race-neutral justifications as well as 18 demeanor-based reasons. (Coleman, Mr. *Wheeler* Goes to Washington, *supra*, at pp. 35–47.) The manual's "[f]inal trial tactics" section advised prosecutors to "[r]ecall the list of acceptable attributes for demeanor challenges" in order to "give detailed verbal expression to such subjective instincts when a prima facie case is found." (*Id.* at pp. 46–47.) The Inquisitive Prosecutor's Guide *Batson/Wheeler* training, a publication from the Santa Clara County District Attorney, similarly included a list of dozens of race-neutral reasons to be used in challenging prospective jurors. (Santa Clara County District Attorney, The Inquisitive Prosecutor's Guide: *Batson-Wheeler* Outline (June 10, 2016) p. 17 (Inquisitive Prosecutor's Guide).) And many of the Orange County training materials from 2012 to 2018 included a "Cheat Sheet" with a list of race-neutral justifications designed for easy reference at trial. (Mestman, *Wheeler/Batson*

10

Ethical Jury Selection, *supra*, at p. 11; see also Mestman, Ethical Jury Selection, *supra*, at p. 14.)

Although perhaps not expressly intended, the implicit suggestion of these materials was that prosecutors should rely upon the prepackaged justifications rather than state their actual reasons for striking prospective jurors. A strategy of relying on stock justifications undermines the constitutional safeguards of *Batson/Wheeler*. The *Batson* framework, after all, is intended to "produce actual answers" to claims of juror discrimination by eliciting a prosecutor's " 'real reason' " for striking a juror. (*Johnson v. California* (2005) 545 U.S. 162, 172.) A trial court attentive to that obligation would have (and should have) discharged its duty to uncover the prosecutor's real reason for the strike and not have been content to accept a reason on which the prosecutor *could have* relied.

In Orange County, prosecution training materials characterized engineers — an occupation described as purportedly anti-prosecution in defendant's case (see maj. opn., *ante,* at pp. 26, 35) — as "good" jurors, while other materials from the county included the occupation as a potential race-neutral justification for exclusion. (Compare Voir Dire*, supra,* at p. 3; with Jury Voir Dire & *Wheeler/Batson*, *supra*, at p. 8 and Brown, Orange County District Attorney, Voir Dire (Apr. 2012) p. 31.) One possible implication of these contradictory messages is that prosecutors may have felt free to use any occupation as either a favorable or unfavorable characteristic, depending on their trial strategy and whether they needed a purported race-neutral rationale.

The Orange County "Cheat Sheet" included in trainings between 2012 and 2018 listed "engineer" as one example in its

11

prepared list of "Race-Neutral Justifications." (E.g., Brown, Voir Dire, *supra*, at p. 31.) Because the 2009 jury selection in this case preceded the earliest dated *Batson/Wheeler* training material from Orange County, and the date of origin for the "Cheat Sheet" is unknown, one may not be able to conclude that the prosecutor in this case relied upon stock justifications created by other prosecutors. But greater care is warranted than the majority exercises here in accepting justifications appearing on this list — particularly where the prosecutor separately seated multiple jurors trained in engineering. (See dis. opn. of Liu, J., *ante*, at pp. 6–8.)

*****

A central feature of our *Batson/Wheeler* jurisprudence is deference to trial courts. Ostensibly, and uncontroversially, this deference is afforded because a trial court is making a credibility determination. Trial courts are better positioned than reviewing courts reading a cold appellate record to distinguish between a genuine justification and mere pretext. As we have repeatedly held, "[w]e presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.)

That we ordinarily defer to trial courts, however, does not end the inquiry or dictate the outcome in every instance. (*People v. Baker* (2021) 10 Cal.5th 1044, 1078 [deference may be "inappropriate when the court evinces a misunderstanding of

the legal inquiry"].) When criminal defendants object to the discriminatory exclusion of jurors, fulfilling the promise of *Batson* and *Wheeler* is directly proportional to how carefully the trial court, and in turn appellate courts, evaluate the proffered justifications. As the state's highest court, and the final arbiter of our state's prohibition of discrimination in the exercise of peremptory challenges, our primary function in interpreting *Batson/Wheeler* is not to revisit the day-to-day credibility determinations made by trial courts, but to define the degree of care and attention trial courts, and subsequent reviewing courts, must exercise to fulfill the guarantees we first articulated in *Wheeler*.

Unfortunately, this court has repeatedly deferred to trial court rulings, even in the face of significant evidence that deference was not justified under the facts of the case. (See, e.g., *People v. Williams* (2013) 56 Cal.4th 630, 652 [applying " 'great deference' " despite trial court's statements openly espousing discriminatory stereotypes of Black women as anti-prosecution in death penalty cases]; cf. *id.* at pp. 699–728 (dis. opn. of Liu, J.); *People v. Miles* (2020) 9 Cal.5th 513, 547–552 [applying deferential review where prosecutor repeatedly relied on the allegedly race neutral justification of Black jurors' views of the O.J. Simpson verdict, despite seating, and not questioning, other White jurors who held similar views]; cf. *Miles*, at pp. 606–617 (dis. opn. of Liu, J.); *People v. Hardy* (2018) 5 Cal.5th 56, 83 [applying deference despite acknowledging multiple reasons as "weak," explaining that though "some of the reasons, in isolation, might not be very convincing, as a whole they support

13

the trial court's ruling"]; cf. *Hardy*, at pp. 107–125 (dis. opn. of Liu, J.).)

Here, too, as recounted by my dissenting colleague, there are several circumstances which demonstrate that deference to the trial court is unjustified. The trial court articulated the incorrect legal standard for *Batson/Wheeler*'s third stage, stating that the "question is whether or not there are any race neutral grounds, and there appear to be race neutral grounds, so I will deny [the motion]." This language cannot be squared with the correct legal standard, and the majority's attempts to do so are unpersuasive. (Dis. opn. of Liu, J., *ante,* at pp. 4–6.) The majority's deferential analysis is also out of step with numerous decisions, both state[5] and federal[6] which have

---

[5] See, e.g., *People v. Tennille* (2016) 315 Mich.App. 51, 67, 68 ("the trial court is tasked with engaging in a more penetrating analysis" and "may not simply 'accept' a prosecutor's race-neutral explanation and terminate the inquiry there"); *Cook v. State*, (Fla.Dist.Ct.App. 2012) 104 So. 3d 1187, 1190 (trial court's statement " 'I think it's race-neutral' " did not "perform[] a genuineness analysis pursuant to step three"); *Williams v. State* (2018) 134 Nev. 687, 693 (trial court's statement " 'I don't find the State based it on race' " did not qualify as "the sensitive inquiry required by step three" and did not "allow meaningful, much less deferential review").

[6] See, e.g., *U.S. v. Rutledge* (7th Cir. 2011) 648 F.3d 555, 558, 561 (trial court's statement that "[t]hose are both nonracial-related reasons" was insufficient; trial court statement indicated only that "it understood that the prosecutor's purported reason for striking [the juror] was race-neutral. Once again, step three requires more"); *Dolphy v. Mantello* (2d Cir. 2009) 552 F.3d 237, 239 (trial court's statement "I'm satisfied that is a race neutral explanation, so the strike stands" was "such a conclusory statement [that it] does not necessarily

declined to defer to trial courts that have similarly articulated a deficient legal standard at *Batson*'s third step.

The record below suggests that the reasons actually offered by the prosecutor mischaracterized the record, made little sense, and applied equally to non-Black jurors accepted by the prosecutor — the very hallmarks of pretextual discrimination that *Batson* and *Wheeler* were meant to prohibit. (Dis. opn. of Liu, J., *ante*, at pp. 6–10.) That an appellate court would choose to defer in such a scenario is, in part, why the Legislature acted to augment the *Batson/Wheeler* framework. (See Assem. Com. on Judiciary, Analysis of Assem. Bill No. 3070 (2019–2020 Reg. Sess.) as amended May 4, 2020, pp. 8, 9 [explaining why the *Batson/Wheeler* process "does not adequately prevent discrimination in jury selection" and citing Justice Liu's remarks questioning "whether we have maintained the proper level of vigilance" in enforcing the existing prohibition of discrimination in the use of peremptory challenges].)

In performing their obligations under *Batson/Wheeler*, courts should be aware that study after study reflects that

---

indicate — even by inference — that the trial court credited the prosecution's explanation"); *Jordan v. Lefevre* (2d Cir. 2000) 206 F.3d 196, 200 ("the district court's conclusory statement that the prosecutor's explanations were race neutral did not satisfy *Batson*'s third step"); *Carter v. City of Wauwatosa* (7th Cir. 2024) 114 F.4th 866, 877 (trial court's statement that the defense "provided a race-neutral reason for having exercised their peremptory strike" was insufficient because it does "not indicate whether [the district judge] believed the defense [or] whether he found them credible . . . [D]etermining whether the defense provided a race-neutral reason is not the point of step three of the *Batson* analysis. Rather, it is the point of step two").

certain groups have been disproportionately targeted for exclusion by prosecutors. (See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 840 (dis. opn. of Liu, J.) [collecting studies]; *People v. Harris* (2013) 57 Cal.4th 804, 887–889 (conc. opn. of Liu, J.) [discussing additional studies and experimental research on the disparate strikes of Black jurors].) The Legislature has forthrightly recognized this fact. (Assem. Bill No. 3070 (2019–2020 Reg. Sess.) § 1, subd. (b) ["The Legislature finds that peremptory challenges are frequently used in criminal cases to exclude potential jurors from serving based on their race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, and that exclusion from jury service has disproportionately harmed African Americans, Latinos, and other people of color" ].) The time is long past for courts to recognize the same harm.

Against this backdrop, where the prosecutor's reasons for a strike were not self-evident and the record is void of any explication from the court, we should not defer. Instead, we should vigorously enforce every defendant's right to a jury nondiscriminatorily drawn from a representative cross-section of the community. In the meantime, even apart from the training materials discussed above, there exists sufficient evidence of discrimination here to warrant reversal of the judgment in its entirety.

                                                                        **EVANS, J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Aguirre

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S175660
**Date Filed:** August 28, 2025

_____

**Court:**  Superior
**County:**  Orange
**Judge:**  William R. Froeberg

_____

**Counsel:**

Carla J. Johnson, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland and James William Bilderback II, Assistant Attorneys General, Holly D. Wilkens, Michael T. Murphy, Kristine A. Gutierrez, Warren J. Williams and Christopher Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Carla J. Johnson
Attorney at Law
5318 East Second Street, #346
Long Beach, CA 90803
(562) 433-7777

Christopher Beesley
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9161